THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| GROEB FARMS, INC. | Case No. 13-58200 |
| Debtor. | Honorable Walter Shapero |

**DEBTOR'S FIRST DAY MOTION FOR ORDER PURSUANT TO SECTIONS 105 AND 366 OF THE BANKRUPTCY CODE (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE TO THE DEBTOR AND (II) ESTABLISHING CERTAIN PROCEDURES TO DETERMINE REQUESTS FOR ADEQUATE ASSURANCE OF PAYMENT**

The Debtor, by and through its proposed counsel, Foley & Lardner LLP, hereby submits this motion (the "Utilities Motion") for entry of an order, pursuant to sections 105 and 366 of title 11 of the United States Code (the "Bankruptcy Code") (i) prohibiting utility providers from altering, refusing, or discontinuing utility service to the Debtor and (ii) establishing certain procedures to determine requests for adequate assurance of payment by the Debtor's utility providers. In support of this Utilities Motion, the Debtor relies on the Declaration of Jack Irvin, Jr. the Chief Financial Officer of the Debtor in Support of Chapter 11 Petitions and First Day Orders sworn to on October 1, 2013 (the "Irvin Declaration")[1]. In further support of this Utilities Motion, the Debtor respectfully represents as follows:

**Jurisdiction**

1. This Court has jurisdiction to hear the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § l57(b). Venue is proper in this Court pursuant

---
[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Irvin Declaration.

to 28 U.S.C. §§ 1408 and 1409. Sections 105(a), and 366 of the United States Code (the "Bankruptcy Code") authorize the relief requested in this Motion.

**Background**

2. On the date hereof (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan. The Debtor intends to continue in possession of its property and to manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed and no committees have been appointed or designated in the Debtor's chapter 11 case.

3. The Debtor was formed in 1981 and is the country's leading processor and packager of honey for food manufacturers, food service companies and retail customers.

4. The Debtor is headquartered in Onsted, Michigan. The Debtor also operates a honey processing facility in San Bernardino, California, and maintains a testing lab in Belleview, Florida.

5. The Debtor has approximately 76 full time employees, 8 contractors hired through staffing services, and 4 part time employees. Approximately 47 of the employees are in Michigan, 25 are in California, 2 are in Georgia, and 2 are in Florida. For the fiscal year ended December 31, 2012 the Debtor had net sales from continuing operations of approximately $137.8 million.

6. In 2001, the Government imposed anti-dumping duties on honey imported from China. After the institution of these duties, the honey industry increasingly imported honey whose country of origin was identified to the buyers as Asian nations such as Vietnam, Malaysia,

and Indonesia. When imports identified with a Chinese country of origin fell, the Government began to investigate the honey industry and the possibility that honey was being transshipped (i.e. shipped through a second country to conceal its origins) and/or mislabeled to avoid the anti-dumping duties. Beginning in 2007, the U.S. Department of Justice ("DOJ") brought the first of several cases in different districts alleging that U.S. honey packers had imported transshipped honey. In 2008, the Debtor received a grand jury subpoena seeking information relating to the investigation of its industry.

7. Following an extensive DOJ investigation, in February 2013, the Debtor entered into a deferred prosecution agreement (the "DPA") with the DOJ as a global resolution for the Debtor. The agreement required the Debtor to: (1) accept and acknowledge responsibility for historical purchases of transshipped honey; (2) continue cooperating with the government's ongoing investigation for two years; (3) pay a $2 million fine; (4) dispose of any and all Chinese-origin honey in its possession which entered the country in contradiction to the duty requirements and (5) cease selling any of its finished goods containing such Chinese honey. The agreement further required the Debtor to continue ongoing compliance programs and remediation measures. The DPA acknowledged that two former, unnamed executives had misled the Debtor's board, the Debtor's customers and the public.

8. Both before and after execution of the DPA, the Debtor took a number of steps to remediate issues regarding potentially transshipped honey. In January 2012, the Debtor retained Foley & Lardner LLP to conduct an internal investigation. In January 2012, the Debtor also began revising its policies and procedures relating to the procurement of honey overseas. In February 2012, the Debtor named a new interim president and relieved its then-current CEO from his operating responsibilities. In June 2012, the Debtor agreed to a separation agreement

with such CEO and stripped the then-current vice president of operations of all purchasing responsibility and subsequently terminated him. The Debtor hired a new full time president and CEO, Rolf Richter, effective June 27, 2012. The Debtor also licensed software to facilitate verification of container numbers and countries of origin for the honey that the Debtor purchases. The Debtor continues to carry BRC certification at each of its plants, which is a globally recognized food safety, quality and audit program subject to stringent audit testing by third parties. The Debtor also has strengthened its supplier audit program and reinvigorated lab testing procedures at its state-of the-art lab testing facility in Florida. In October 2012, the Debtor hired John Wolf as its Vice President of Supply Chain and Management, to further enhance supply management and compliance. Mr. Wolf has a long history of experience in the food industry, including 24 years with Kellogg's.

9. As a result of the foregoing measures, the Debtor has robust policies and procedures in place relating to the purchase of honey to avoid international duty issues in the future. The Debtor also provides compliance training to all of its employees.

10. The Debtor had hoped that the DPA would enable the Debtor to have a fresh start with new executives and a new compliance program. However, in April 2013, just two months after the DPA was finalized, two civil putative class action lawsuits were filed against the Debtor in the United States District Court for the Northern District of Illinois by producers, packers and/or distributors of honey. In *Adee Honey Farms, et al v. Groeb Farms, et al.*, Case No. 1:13-cv-02922 (the "Adee Lawsuit"), the putative class alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Lanham Act. In *Moore's Honey Farm, et al. v. Groeb Farms, Inc., et al.*, Case No. 1:13-cv-02905 (the "Moore Lawsuit", and collectively with the Adee Lawsuit, the "Putative Class Actions"), the putative class alleges violations of RICO

and common law fraud, negligent misrepresentations, conspiracy, and clandestine wrongful importation without paying the anti-dumping duties. On June 24, 2013, the Putative Class Actions were consolidated (hereinafter, the "<u>Putative Class Action</u>") by Order of the Court handling the Moore Lawsuit (the "<u>Consolidation Order</u>"). An Amended Complaint must be filed pursuant to the Consolidation Order on or before October 21, 2013. The Putative Class Action is based on the factual statements contained in the DPA and claims the class members were harmed by the Debtor and other defendants' purchases of transshipped honey. While none of the claims make a specific demand, RICO and Lanham Act cases carry a potential for treble damages and attorneys' fees.

11. As a result of the DPA, and the costs associated with it, including: (1) the $2,000,000 fine; (2) the legal fees; (3) the costs of the compliance programs; and (4) the costs incurred in recruiting and hiring new, experienced executives, the Debtor has incurred significant unanticipated expenses.

12. Although the Debtor has significant defenses to the allegations in the Putative Class Action, the fine, the attorneys' fees and litigation and other expenses have severely strained, and would continue to severely strain, the Debtor's liquidity. In addition, despite the fact that the putative classes have not been certified, the mere existence of these lawsuits negatively affects the value of the Debtor outside of a bankruptcy proceeding and impedes potential buyers from purchasing the company at a maximized value to resolve the Debtor's financial issues.

13. In addition, increased prices in the honey market and supply shortages have had a negative impact on the Debtor. In late 2010, the Debtor had contracts with certain suppliers to purchase substantial amounts of honey at agreed-upon prices, while the honey market was

experiencing significant price increases. However, these suppliers failed to deliver the product to the Debtor. As a result, the Debtor was forced to re-enter the honey market to buy replacement product at a time when, on a global basis, prices were increasing and the supply of honey was decreasing. The Debtor has initiated legal action against certain suppliers in order to receive the contracted honey. These issues have put further pressure on the Debtor's financial condition.

14. As a result of the foregoing and various other factors, the Debtor defaulted under its Credit Agreement with Wells Fargo Bank, N.A. ("Wells"). As a result, Wells began to exercise its rights and remedies, including without limitation: (a) imposing a $750,000 reserve in borrowing on July 23, 2013; and (b) reducing or limiting the Debtor's available credit. These actions significantly reduced the Debtor's available cash, rendering it unable to buy necessary raw honey needed in the operation of its business.

15. On or about July 24, 2013, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan") to assist with the assessment and implementation of strategic alternatives. Thereafter, Houlihan undertook an extensive marketing effort, including reaching out to 165 potentially interested parties, including strategic and financial buyers and capital providers. Houlihan secured Confidentiality Agreements from 75 parties and submitted a Confidential Information Memorandum to those parties. As part of the marketing process, Houlihan requested the submission of Indications of Interest ("IOIs") on or before September 18, 2013.

16. The Debtor received eight written IOIs, including a proposal from Honey Financing Company, LLC ("Honey Financing"), an affiliate of Peak Rock Capital, to restructure the obligations of the Debtor and acquire the equity of the reorganized Debtor pursuant to the chapter 11 Plan of Reorganization (the "Plan") filed contemporaneously herewith. After reviewing the IOIs, the Debtor determined that the proposal from Honey Financing was the best

overall offer based on the following factors, among others: (1) the Debtor's financing needs and lending arrangements; (2) the speed and certainty of closing the transaction; and (3) the total overall value to be provided to all stakeholders as a result of the transaction. Therefore, the Debtor elected to pursue the transaction with Honey Financing. The Debtor entered into the Restructuring Support Agreement in connection with the offer (the "Honey Financing RSA").

17. Also on September 18, 2013, HC Capital Holdings 0909A ("HC"), an affiliate of Honey Financing, purchased the Wells debt, and became the Debtor's senior secured lender.

18. In order to further bolster its restructuring efforts, the Debtor executed a Restructuring Support Agreement with its senior subordinated debt holders, Argosy Investment Partners II, L.P, and Marquette Capital Fund I, LP (the "Senior Subordinated Debt RSA").

19. The Debtor has also entered into a Restructuring Support Agreement with the interim class action co-lead counsel in the Putative Class Action (the "Putative Class Action RSA" and collectively with the Honey Financing RSA and the Senior Subordinated Debt RSA, the "RSAs").

20. The Debtor filed this chapter 11 case in order to affect the restructuring transaction as defined in the RSAs.

21. Additional factual background relating to the Debtor, including its corporate structure, business operations, the circumstances leading to the filing of the chapter 11 case, the Restructuring Agreement and the Debtor's existing indebtedness, is set forth in detail in the Irvin Declaration*, filed concurrently herewith and fully incorporated herein by reference.

**Relief Requested**

22. Pursuant to sections 105(a) and 366 of the Bankruptcy Code, the Debtor seeks entry of an order (i) determining that the Debtor has provided each of its utility providers (each

singularly, a "Utility," and, collectively, the "Utilities")[2] with "adequate assurance of payment" in compliance with section 366 of the Bankruptcy Code ("Adequate Assurance"); (ii) approving certain procedures (the "Assurance Procedures"), described below, that provide for an initial offer of Adequate Assurance to the Utilities and a procedure for the Utilities to request additional or different Adequate Assurance; and (iii) prohibiting the Utilities from altering, refusing, or discontinuing utility services to the Debtor.

23. Section 366 of the Bankruptcy Code prevents the Utilities from altering, refusing, or discontinuing utility service to the Debtor during the first thirty (30) days of the Debtor's chapter 11 cases. *See* 11 U.S.C. § 366(a), (c)(2). If the Debtor does not provide each Utility with "adequate assurance of payment" by the end of such 30-day period, however, the Utility may then alter, refuse, or discontinue service. *See* 11 U.S.C. § 366(c)(2).

24. The utility services provided by the Utilities to the Debtor include, but are not necessarily limited to, electrical power, natural gas, water, telephone and data services, including cellular phone service, rubbish removal and recycling, alarm services, parking lot maintenance and similar utility products and services (the "Utility Services"). The Debtor cannot operate without the Utility Services provided by the Utilities, and any disruption could cause significant damage to the Debtor's ongoing business operations and estate. For these reasons, the Debtor must ensure the continued provision of Utility Services.

   **A.     Adequate Assurance**

25. The Debtor intends to pay when due all undisputed postpetition charges for Utility Services. As indicated by the budget attached to the Debtor's Motion for Order Approving

---

[2] A list of substantially all of the Debtor's Utilities is attached as Exhibit 6 to the Utilities Motion (the "Utilities List"). The inclusion of any entity on, or the exclusion of any entity from, Exhibit 6 is not an admission by the Debtor that such entity is, or is not, a "utility" for purposes of section 366. The Debtor reserves the right to contest an entity's status as a "utility" at a later date.

Interim and Final use of Cash Collateral, the Debtor expects that its available cash will be more than sufficient to pay for the Debtor's postpetition Utility Services.

26. Nevertheless, in accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtor proposes to, as necessary in accordance with the procedures detailed herein, deposit, for the benefit of the Utilities, a sum equal to approximately 50% of the Debtor's estimated cost of monthly utility consumption calculated as a historical average over the past twelve months – $16,536.50 – into a newly-created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within 30 days after the Petition Date. The Adequate Assurance Deposit Account will be increased in the event that there are any Added Utilities (as defined below), in an amount equal to the value of two weeks of services utilized by the Debtor (based on a historical average over the past twelve months) from such Added Utilities.

27. The Debtor proposes that the Court deem each Utility to have received sufficient Adequate Assurance pursuant to the Adequate Assurance Procedures described herein and Section 366(c)(3)(A) of the Bankruptcy Code.

### B. Assurance Procedures

28. The Assurance Procedures will permit each Utility to seek additional or different Adequate Assurance beyond the Adequate Assurance Deposit Account, and will provide the Utilities with the protections afforded to them under the Bankruptcy Code, while protecting the Debtor from any interruption in Utility Services:

> A. Absent any further order of this Court and except as otherwise provided herein, the Utilities would not be able to alter, refuse or discontinue service to, or discriminate against, the Debtor on account of the commencement of this chapter 11 case or any unpaid prepetition charges, and also would not be permitted to request payment of a deposit or receipt of other security in connection with any unpaid prepetition charges;

B. The Debtor will serve this Utilities Motion and the order thereon (the "Utility Order"), if granted by this Court, via first-class mail, within five business days after the date that the Utility Order is entered by this Court, on each of the Utilities identified on the list attached hereto as **Exhibit 6**. In the event that any Utility inadvertently has been omitted from Exhibit 6, the Debtor, upon discovery of such omission, will file with this Court an amended Exhibit 6 (the "Amended Exhibit") adding the name of each inadvertently omitted (and subsequently discovered) Utility (the "Added Utilities"), and promptly will serve on each Added Utility this Utilities Motion, the Amended Exhibit and the Utility Order (each such service, a "Supplemental Service");

C. Any Utility would be able to submit a request for a modification of the amount of the adequate assurance of payment (an "Adequate Assurance Modification Request"), so as to be received within 30 days after the Petition Date or, in the case of an Added Utility, so as to be received within 30 days of such company's Supplemental Service (together with the Initial Additional Payment Request Deadline, (as applicable, the "Adequate Assurance Modification Request Deadline") by submitting such request to (i) Foley & Lardner LLP, attn: Judy A. O'Neill, John A. Simon and Tamar N. Dolcourt, One Detroit Center, 500 Woodward Ave., Ste. 2700, Detroit, Michigan 48226;

D. Any Adequate Assurance Modification Request must be in writing and: (i) set forth the location for which utility services are provided; (ii) include a summary of the Debtor's payment history relevant to the affected account(s), including any security deposits or other prepayments or assurances previously provided by the Debtor; (iii) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not constitute satisfactory adequate assurance of payment; and (iv) include a proposal for what would constitute adequate assurance of payment from the Debtor, along with an explanation of why such proposal is reasonable;

E. Upon the Debtor's receipt of an Adequate Assurance Modification Request at the address listed in paragraph (c) above, the Debtor will attempt to reach a consensual agreement with the Utility regarding the Utility's request for additional or different Adequate Assurance;

F. The Debtor may, in its discretion, consensually resolve any Adequate Assurance Modification Request with the requesting Utility without further order of the Court, and may, in connection with any such resolution and in its discretion, provide the Utility with additional Adequate Assurance, including a cash deposit, prepayments, and/or other forms of security, without further order of the Court, if the Debtor determines in its business judgment that the additional Adequate Assurance is reasonable;

G. If the Debtor determines that the Adequate Assurance Modification Request by the Utility is not reasonable and cannot reach a consensual resolution of the same within a reasonable period of time, the Debtor will promptly request a hearing before the Court to determine the adequacy of that Utility's Adequate Assurance (an "Assurance Hearing"), as provided in section 366(c)(3) of the Bankruptcy Code;

H. Pending resolution of a Utility's Adequate Assurance Modification Request at an Assurance Hearing, such Utility will be prohibited from altering, refusing or discontinuing service to the Debtor or discriminating against the Debtor on account of the commencement of these chapter 11 cases or any unpaid prepetition charges;

I. If a Utility fails to submit an Adequate Assurance Modification Request by its Adequate Assurance Modification Request Deadline, meeting the requirements set forth above, such Utility will have waived its right to make an Adequate Assurance Modification Request, and will be deemed to have received, by virtue of the Adequate Assurance Deposit Account, adequate assurance of payment in accordance with section 366(c)(1)(A)(vi) of the Bankruptcy Code;

J. Based on the establishment of the Adequate Assurance Deposit Account, a Utility will be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further assurance of payment.

4822-3854-1334.1

13-58200-wsd    Doc 9    Filed 10/01/13    Entered 10/01/13 15:45:19    Page 11 of 14

29. The Debtor requests that the Court prohibit the Utilities from altering, refusing, or discontinuing Utility Services to the Debtor absent a failure to comply with the Assurance Procedures.

**Basis For Relief Requested**

30. The Debtor needs the relief requested in this Utilities Motion to ensure that the Utilities will provide the Debtor with post-petition Utility Services without interruption. The Debtor's operations depend upon water, gas, electricity, telephone and data services, and various other utility services, so even a short-term interruption in Utility Services could cause significant damage to the its business operations.

31. Under section 366 of the Bankruptcy Code, a utility company may not, during the first thirty (30) days of a chapter 11 case, alter, refuse, or discontinue services to a debtor solely because of unpaid prepetition amounts.

32. In 2005, Congress added subsection (c) to section 366 of the Bankruptcy Code. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 108-9, § 417, 119 Stat. 23, 108 (2005) ("BAPCPA").

33. As a result of such amendments, under section 366(c) of the Bankruptcy Code, a utility company may alter, refuse, or discontinue service at the expiration of the thirty-day period following the Petition Date if during such thirty-day period the debtor does not provide "adequate *assurance*" of payment for postpetition services in a form "satisfactory" to the utility provider. *See* 11 U.S.C. § 366(c)(2). In addition, under section 366(3)(a), a party-in-interest may request a modification in the adequate assurance payment amount.

34. The proposed Assurance Procedures are designed to ensure that the Utilities receive the "adequate assurance" contemplated by section 366(c) of the Bankruptcy Code by

providing for a fair and orderly method for processing requests by the Utilities for additional or different Adequate Assurance or for the Utilities to object to the procedures themselves. Without the Assurance Procedures, the Utilities could force the Debtor to address numerous and disorganized requests for Adequate Assurance at a time when the Debtor needs to focus significant resources on managing its business operations during the Debtor's transition into chapter 11.

35. Absent the relief requested in this Utilities Motion, the Utilities could wait until the twenty-ninth (29th) day after the Petition Date and then threaten to discontinue utility service because the Adequate Assurance provided by the Debtor was not, in the Utility's opinion, "satisfactory."

36. Similar relief to the relief requested herein has been granted by this and other courts subsequent to the 2005 amendments. *See, e.g.*, *In re Energy Conversion Devices, et. al.,* Case No. 12-43166 (TJT) (Bankr. E.D. Mich. March 14, 2012); *In re ASC, Inc.,* Case No. 07-48680 (TJT) (Bankr. E.D. Mich. May 7, 2007); *In re The Holliston Mills, Inc.,* Case No. 07-10687 (Bankr. D. Del. June 20, 2007) (MFW); *In re Medifacts Int'l, Inc.*, Case No. 07-10110 (Bankr. D. Del. Feb. 20, 2007) (PJW); *In re Dura Auto. Sys., Inc.,* Case No. 06-11202 (Bankr. D. Del. Nov. 21, 2006) (KJC); *In re Premium Papers Holdco, LLC,* Case No. 06-10269 (Bankr. D. Del. April 10, 2006) (CSS); and *In re Nellson Nutraceutical, Inc.,* Case No. 06-10072 (Bankr. D. Del. Feb. 23, 2006) (PJW).

37. Further, under section 105(a) of the Bankruptcy Code, the Court possesses the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this Title." 11 U.S.C. § 105(a).

38. As the proposed Assurance Procedures will ensure that the Debtor continues to receive Utility Services without prejudice to the Utilities, the Debtor submits that the relief requested in this Utilities Motion is necessary, appropriate, and in the best interests of the Debtor and its estate and creditors.

## Notice

39. Notice of this Utilities Motion has been provided to: (a) the Office of the United States Trustee for the Eastern District of Michigan; (b) the secured creditors of the Debtor and their counsel; (c) the twenty (20) largest unsecured creditors of the Debtor; and (d) each Utility designated on **Exhibit 6** of this Utilities Motion. The Debtor submits that in light of the nature of the relief requested, no further notice is required. This Utilities Motion has been submitted on an expedited basis because of the numerous matters to be considered by the Court during the initial period of these cases regarding the administration and the post-petition operations of the Debtor.

WHEREFORE, the Debtor respectfully requests entry of an order, the form of which is attached to this Utilities Motion as **Exhibit 1**, granting the relief requested herein and granting the Debtor such other and further relief as may be just and appropriate under the circumstances.

| | |
|---|---|
| Dated: October 1, 2013<br>Detroit, Michigan | FOLEY & LARDNER LLP<br><br>/s/ Judy A. O'Neill_____<br>Judy A. O'Neill (P32142)<br>John A. Simon (P61866)<br>Tamar N. Dolcourt (P73425)<br>One Detroit Center<br>500 Woodward Ave., Suite 2700<br>Detroit, MI 48226-3489<br>(313) 234-7100 (Telephone)<br>(313) 234-2800 (Facsimile)<br>*Proposed Counsel for the Debtor and Debtor in Possession* |