THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GROEB FARMS, INC. | ) | Case No. 13-58200 |
|  | ) |  |
| Debtor. | ) | Honorable Walter Shapero |
|  | ) |  |

**DEBTOR'S FIRST DAY MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 364(b) OF THE BANKRUPTCY CODE, FOR AN ORDER AUTHORIZING IT TO PAY THE PREPETITION CLAIMS OF CERTAIN POTENTIAL LIENHOLDERS**

The Debtor, by and through its proposed counsel, Foley & Lardner LLP, hereby submits this motion (the "Motion") for entry of an order pursuant to sections 105(a), 363(b), and 364(b) of title 11 of the United States Code (the "Bankruptcy Code") authorizing it to pay the pre-petition claims of certain potential lienholders. In support of this Motion, the Debtor relies on the Declaration of Jack Irvin, Jr., the Chief Financial Officer of the Debtor, in Support of Chapter 11 Petitions and First Day Orders sworn to on October 1, 2013 (the "Irvin Declaration")[1]. In further support of this Motion, the Debtor respectfully represents as follows:

**Jurisdiction**

1. This Court has jurisdiction to hear the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Sections 105(a), 363(b) and 364(b) of the Bankruptcy Code authorize the relief requested in this Motion.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Irvin Declaration.

4824-5985-6406.1

## Background

2.      On the date hereof (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan. The Debtor intends to continue in possession of its property and to manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed and no committees have been appointed or designated in the Debtor's chapter 11 case.

3.      The Debtor was formed in 1981 and is the country's leading processor and packager of honey for food manufacturers, food service companies and retail customers.

4.      The Debtor is headquartered in Onsted, Michigan. The Debtor also operates a honey processing facility in San Bernardino, California, and maintains a testing lab in Belleview, Florida.

5.      The Debtor has approximately 76 full time employees, 8 contractors hired through staffing services, and 4 part time employees. Approximately 47 of the employees are in Michigan, 25 are in California, 2 are in Georgia, and 2 are in Florida. For the fiscal year ended December 31, 2012 the Debtor had net sales from continuing operations of approximately $137.8 million.

6.      In 2001, the Government imposed anti-dumping duties on honey imported from China. After the institution of these duties, the honey industry increasingly imported honey whose country of origin was identified to the buyers as Asian nations such as Vietnam, Malaysia, and Indonesia. When imports identified with a Chinese country of origin fell, the Government began to investigate the honey industry and the possibility that honey was being transshipped

(i.e. shipped through a second country to conceal its origins) and/or mislabeled to avoid the anti-dumping duties. Beginning in 2007, the U.S. Department of Justice ("DOJ") brought the first of several cases in different districts alleging that U.S. honey packers had imported transshipped honey. In 2008, the Debtor received a grand jury subpoena seeking information relating to the investigation of its industry.

7. Following an extensive DOJ investigation, in February 2013, the Debtor entered into a deferred prosecution agreement (the "DPA") with the DOJ as a global resolution for the Debtor. The agreement required the Debtor to: (1) accept and acknowledge responsibility for historical purchases of transshipped honey; (2) continue cooperating with the government's ongoing investigation for two years; (3) pay a $2 million fine; (4) dispose of any and all Chinese-origin honey in its possession which entered the country in contradiction to the duty requirements and (5) cease selling any of its finished goods containing such Chinese honey. The agreement further required the Debtor to continue ongoing compliance programs and remediation measures. The DPA acknowledged that two former, unnamed executives had misled the Debtor's board, the Debtor's customers and the public.

8. Both before and after execution of the DPA, the Debtor took a number of steps to remediate issues regarding potentially transshipped honey. In January 2012, the Debtor retained Foley & Lardner LLP to conduct an internal investigation. In January 2012, the Debtor also began revising its policies and procedures relating to the procurement of honey overseas. In February 2012, the Debtor named a new interim president and relieved its then-current CEO from his operating responsibilities. In June 2012, the Debtor agreed to a separation agreement with such CEO and stripped the then-current vice president of operations of all purchasing responsibility and subsequently terminated him. The Debtor hired a new full time president and

3

4824-5985-6406.1

13-58200-wsd    Doc 10    Filed 10/01/13    Entered 10/01/13 16:25:46    Page 3 of 15

CEO, Rolf Richter, effective June 27, 2012. The Debtor also licensed software to facilitate verification of container numbers and countries of origin for the honey that the Debtor purchases. The Debtor continues to carry BRC certification at each of its plants, which is a globally recognized food safety, quality and audit program subject to stringent audit testing by third parties. The Debtor also has strengthened its supplier audit program and reinvigorated lab testing procedures at its state-of the-art lab testing facility in Florida. In October 2012, the Debtor hired John Wolf as its Vice President of Supply Chain and Management, to further enhance supply management and compliance. Mr. Wolf has a long history of experience in the food industry, including 24 years with Kellogg's.

9. As a result of the foregoing measures, the Debtor has robust policies and procedures in place relating to the purchase of honey to avoid international duty issues in the future. The Debtor also provides compliance training to all of its employees.

10. The Debtor had hoped that the DPA would enable the Debtor to have a fresh start with new executives and a new compliance program. However, in April 2013, just two months after the DPA was finalized, two civil putative class action lawsuits were filed against the Debtor in the United States District Court for the Northern District of Illinois by producers, packers and/or distributors of honey. In *Adee Honey Farms, et al v. Groeb Farms, et al.*, Case No. 1:13-cv-02922 (the "Adee Lawsuit"), the putative class alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Lanham Act. In *Moore's Honey Farm, et al. v. Groeb Farms, Inc., et al.*, Case No. 1:13-cv-02905 (the "Moore Lawsuit", and collectively with the Adee Lawsuit, the "Putative Class Actions"), the putative class alleges violations of RICO and common law fraud, negligent misrepresentations, conspiracy, and clandestine wrongful importation without paying the anti-dumping duties. On June 24, 2013, the Putative Class

4

Actions were consolidated (hereinafter, the "Putative Class Action") by Order of the Court handling the Moore Lawsuit (the "Consolidation Order"). An Amended Complaint must be filed pursuant to the Consolidation Order on or before October 21, 2013. The Putative Class Action is based on the factual statements contained in the DPA and claims the class members were harmed by the Debtor and other defendants' purchases of transshipped honey. While none of the claims make a specific demand, RICO and Lanham Act cases carry a potential for treble damages and attorneys' fees.

11. As a result of the DPA, and the costs associated with it, including: (1) the $2,000,000 fine; (2) the legal fees; (3) the costs of the compliance programs; and (4) the costs incurred in recruiting and hiring new, experienced executives, the Debtor has incurred significant unanticipated expenses.

12. Although the Debtor has significant defenses to the allegations in the Putative Class Action, the fine, the attorneys' fees and litigation and other expenses have severely strained, and would continue to severely strain, the Debtor's liquidity. In addition, despite the fact that the putative classes have not been certified, the mere existence of these lawsuits negatively affects the value of the Debtor outside of a bankruptcy proceeding and impedes potential buyers from purchasing the company at a maximized value to resolve the Debtor's financial issues.

13. In addition, increased prices in the honey market and supply shortages have had a negative impact on the Debtor. In late 2010, the Debtor had contracts with certain suppliers to purchase substantial amounts of honey at agreed-upon prices, while the honey market was experiencing significant price increases. However, these suppliers failed to deliver the product to the Debtor. As a result, the Debtor was forced to re-enter the honey market to buy

5

4824-5985-6406.1

13-58200-wsd    Doc 10    Filed 10/01/13    Entered 10/01/13 16:25:46    Page 5 of 15

replacement product at a time when, on a global basis, prices were increasing and the supply of honey was decreasing. The Debtor has initiated legal action against certain suppliers in order to receive the contracted honey. These issues have put further pressure on the Debtor's financial condition.

14. As a result of the foregoing and various other factors, the Debtor defaulted under its Credit Agreement with Wells Fargo Bank, N.A. ("Wells"). As a result, Wells began to exercise its rights and remedies, including without limitation: (a) imposing a $750,000 reserve in borrowing on July 23, 2013; and (b) reducing or limiting the Debtor's available credit. These actions significantly reduced the Debtor's available cash, rendering it unable to buy necessary raw honey needed in the operation of its business.

15. On or about July 24, 2013, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan") to assist with the assessment and implementation of strategic alternatives. Thereafter, Houlihan undertook an extensive marketing effort, including reaching out to 165 potentially interested parties, including strategic and financial buyers and capital providers. Houlihan secured Confidentiality Agreements from 75 parties and submitted a Confidential Information Memorandum to those parties. As part of the marketing process, Houlihan requested the submission of Indications of Interest ("IOIs") on or before September 18, 2013.

16. The Debtor received eight written IOIs, including a proposal from Honey Financing Company, LLC ("Honey Financing"), an affiliate of Peak Rock Capital, to restructure the obligations of the Debtor and acquire the equity of the reorganized Debtor pursuant to the chapter 11 Plan of Reorganization (the "Plan") filed contemporaneously herewith. After reviewing the IOIs, the Debtor determined that the proposal from Honey Financing was the best overall offer based on the following factors, among others: (1) the Debtor's financing needs and

6

4824-5985-6406.1

13-58200-wsd    Doc 10    Filed 10/01/13    Entered 10/01/13 16:25:46    Page 6 of 15

lending arrangements; (2) the speed and certainty of closing the transaction; and (3) the total overall value to be provided to all stakeholders as a result of the transaction. Therefore, the Debtor elected to pursue the transaction with Honey Financing. The Debtor entered into the Restructuring Support Agreement in connection with the offer (the "Honey Financing RSA").

17. Also on September 18, 2013, HC Capital Holdings 0909A ("HC"), an affiliate of Honey Financing, purchased the Wells debt, and became the Debtor's senior secured lender.

18. In order to further bolster its restructuring efforts, the Debtor executed a Restructuring Support Agreement with its senior subordinated debt holders, Argosy Investment Partners II, L.P., and Marquette Capital Fund I, LP (the "Senior Subordinated Debt RSA").

19. The Debtor has also entered into a Restructuring Support Agreement with the interim class action co-lead counsel in the Putative Class Action (the "Putative Class Action RSA" and collectively with the Honey Financing RSA and the Senior Subordinated Debt RSA, the "RSAs").

20. The Debtor filed this chapter 11 case in order to affect the restructuring transaction as defined in the RSAs.

21. Additional factual background relating to the Debtor, including its corporate structure, business operations, the circumstances leading to the filing of the chapter 11 case, the Restructuring Agreement and the Debtor's existing indebtedness, is set forth in detail in the Irvin Declaration, filed concurrently herewith and fully incorporated herein by reference.

**Relief Requested**

22. Pursuant to sections 105(a), 363(b) and 364(b) of the Bankruptcy Code, the Debtor hereby seeks the entry of an order: (a) authorizing it, in its sole discretion and subject to the terms and conditions set forth herein, to pay, in the ordinary course of the Debtor's business,

the prepetition secured claims (collectively, the "Lienholder Claims") of certain parties holding a potential lien on, security interest in or other possessory rights to property of the Debtor's estate as described below (collectively, the "Lienholders"); and (b) granting related relief.

**Basis for Relief**

23. In the operation of its business, certain parties with commercial relationships with the Debtor have the ability to and do obtain liens on and interests in property owned by the Debtor, including in some cases a right to possession of the Debtor's property. The Debtor believes that the failure to pay the claims of these parties could have a significant adverse impact on its business operations and reorganization efforts.

24. The preservation and maximization of the going concern value of the Debtor's business, including the preservation of key business relationships, are among management's primary goals as the Debtor transitions into chapter 11. Providing seamless service to customers is key to meeting those goals. For these reasons, the Debtor seek to minimize the adverse business effects - as well as the cash flow impact - of its chapter 11 filing to the fullest extent possible by obtaining authority to pay those parties in a position to disrupt the Debtor's business operations.

25. The Debtor has two domestic processing facilities, one in California and one in Michigan, that process and produce honey, food ingredients, industrial sweeteners and food service products. Debtor also maintains a testing lab in Belleview, Florida.

26. Many of the Debtor's customers are food processors and manufacturers who use the Debtor's honey and other products in the production of their own goods. Other customers are retailers for whom the Debtor provides private label products. All of these customers require

8

4824-5985-6406.1

deliveries of the Debtor's honey and other products in a timely manner. Even a small delay in delivery may render the customers unable to fulfill their own manufacturing and/or sales needs.

27. As such, the Debtor must be able to rely on the Lienholders to timely ship and handle its honey and other raw materials. Under many state laws, these Lienholders may be able to assert a lien with respect to these goods, including in some cases, possessory liens. If any of the Lienholders asserted these rights and failed to ship or handle the Debtor's honey and other raw materials, the Debtor's ability to fulfill its customer obligations would be severely impaired, negatively affecting its reorganization prospects.

28. Many, if not all, of the Lienholders that the Debtor seeks authority to pay provide critical goods or services to the operation of the Debtor's supply chain. As such, the Debtor has determined, in the exercise of its business judgment, that payment of the Lienholders is important to avoid costly disruptions to the Debtor's operations and preserve its ability to timely and adequately fill customer orders.

29. Moreover, because the amount of most of the Lienholder Claims are for less than the value of any property securing those claims, it appears that most of the Lienholders are (or will allege that they are) fully secured creditors. In general, pursuant to section 506 of the Bankruptcy Code, fully secured creditors are entitled to receive (a) payment in full of their prepetition claims, and (b) the postpetition interest accruing on such claims up to the value of the collateral. Consequently, payment of the Lienholder Claims now will: (a) in most cases give the Lienholders no more than they otherwise would be entitled to receive on account of their claims in the chapter 11 process; and (b) save the Debtor the cost of interest that otherwise may accrue on the Lienholder Claims.

30. The categories of Lienholder Claims that the Debtor seeks authority to pay by this Motion and additional justification for such payments to each category are as set forth below.

**Shipper and Warehouse Claims**

31. In connection with the day-to-day operation of its business, the Debtor: (a) relies on numerous foreign and domestic commercial common carriers, shippers, freight forwarders, distributors and other third-party service providers (collectively, the "Shippers") to transport goods before, during and after the manufacturing process; and (b) supplements its own on-site storage facilities by storing finished products or raw materials and supplies used in the Debtor's manufacturing operations at a variety of third-party warehouse facilities (collectively, the "Warehouses"). As a result, the Shippers and the owners of the Warehouses (collectively, the "Warehousemen") maintain possession of certain of the Debtor's materials or products in the ordinary course of its business. As of the Petition Date, many of the Shippers and Warehousemen had claims for storage, transportation and related services previously provided to the Debtor (collectively, the "Shipper and Warehouse Claims").

32. If the Debtor fails to pay the Shipper and Warehouse Claims, the Debtor believes that many of the Shippers and Warehousemen may stop providing their essential services to the Debtor. The Debtor believes that any such interruption in obtaining the services and cooperation of the Shippers and Warehousemen would: (a) delay shipment of raw materials to the Debtor; (b) delay shipments to customers, which could disable or disrupt its operation; (c) damage the Debtor's business reputation; (d) undermine the Debtor's ability to generate ongoing operating revenue; and (e) adversely, and perhaps irreparably, compromise the Debtor's restructuring efforts.

33. Under state law, Shippers and Warehousemen typically are entitled to possessory or similar liens for the transport or storage of the goods in their possession as of the Petition Date. Because the perfection and maintenance of the liens held by Shippers and Warehousemen in most cases is dependent upon possession, it is anticipated that Shippers and Warehousemen will refuse to deliver or release such goods before their claims have been satisfied and their liens extinguished. If Debtor is unable to satisfy the Shippers and Warehousemen, it would need to identify replacement services to the extent possible. Even if suitable alternative freight carriers or warehouse facilities are available, the time necessary to identify these replacement providers and integrate those into the Debtor's operations likely would cause a significant disruption to the Debtor's manufacturing and distribution system. During this transition period, the Debtor would lose access to valuable goods held by the Shippers and Warehousemen.

34. The Debtor estimates that, as of the Petition Date, the aggregate amount of Shipper and Warehouse Claims was approximately $225,236.62.

### Conditions on Payment of Lienholder Claims

35. In an effort to ensure that the prompt payment of the Lienholder Claims provides the Debtor with the maximum benefit to its estate, the Debtor proposes that each recipient of a payment of a Lienholder Claim (a "Lienholder Payment") be required to: (a) continue to extend normalized trade credit and provide other business terms on a post-petition basis (consistent with past practices), including with respect to any applicable credit limits, the pricing of goods and services and the provision of equivalent levels of service, on terms at least as favorable as those extended prepetition or on such other terms that are acceptable to the Debtor in its business judgment, until the Debtor emerges from chapter 11; (b) not file of record in any jurisdiction (whether federal, state or in any subdivision of a state), or otherwise assert against the Debtor, its

chapter 11 estate or against any of its property, a lien (whether statutory or otherwise) or security interest relating in any manner to the Lienholder Claims satisfied through the Lienholder Payment; (c) release any and all liens on property in which the Debtor has an interest which is in the Lienholder's possession or control; and (d) release to the Debtor as requested goods or other assets of the Debtor in the Lienholder's possession (collectively, the "Trade Terms").

36. If a Lienholder accepts a Lienholder Payment and fails to provide the Debtor with the requisite Trade Terms, then (a) any Lienholder Payment received by the Lienholder may at the Debtor's discretion be deemed an unauthorized post-petition transfer under section 549 of the Bankruptcy Code that the Debtor may either (i) recover from the Lienholder in cash or goods or (ii) at the Debtor's option, apply against any outstanding administrative claim held by such Lienholder; (b) upon recovery of any Lienholder Payment, the corresponding prepetition claim of the Lienholder will be reinstated in the amount recovered by the Debtor, less the Debtor's reasonable costs to recover such amounts; (c) the Debtor shall have all rights to challenge the validity, priority or extent of the Lienholders' lien or interest and the validity and amount of the related claim; and (d) the Debtor shall have all rights to seek to avoid as fraudulent or preferential or otherwise any lien or interest held by the Lienholder. The Debtor requests that it may enter into agreements or make notations upon its checks or in wire transfer remittance documentation noting the application of the Trade Terms. However, the Debtor requests that the proposed order approve the applicability of the conditions in paragraph 35 and this paragraph 36 without the need for any such formal documentation.

### Request for Authority for Banks to Honor and Pay Checks and Fund Transfers Related to the Lienholder Claims

37. In addition, by this Motion, the Debtor requests that all Banks be authorized and directed, when requested by the Debtor in the Debtor's sole discretion, to receive, process, honor

12

4824-5985-6406.1

13-58200-wsd    Doc 10    Filed 10/01/13    Entered 10/01/13 16:25:46    Page 12 of 15

and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtor related to, Lienholder Claims, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

38. The Debtor represents that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of Lienholder Claims. Accordingly, the Debtor believes that checks other than those relating to authorized payments will not be honored inadvertently.

39. The Debtor further represents that they have anticipated access to sufficient debtor in possession financing to pay all Lienholder Claims, to the extent described herein, as such amounts become due in the ordinary course of its business.

40. Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date. As described herein, the Debtor's inability to pay Lienholder Claims would risk the disruption of the Debtor's supply chain and immediate loss of customers and severely impair the Debtor's ability to reorganize. Therefore, the relief requested herein is necessary to avoid immediate and irreparable harm and the requirements of Bankruptcy Rule 6003 for expedited relief are satisfied.

41. Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's right to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim constitutes a Lienholder Claim or is supported by a valid lien or security

13

4824-5985-6406.1

13-58200-wsd    Doc 10    Filed 10/01/13    Entered 10/01/13 16:25:46    Page 13 of 15

interest; or (e) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

### Request for Waiver of Stay

42. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate payment of the Lienholder Claims is essential to prevent potentially irreparable damage to the Debtor's operations, value and ability to reorganize. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

43. No trustee or examiner has been appointed in this chapter 11 case. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Eastern District of Michigan; (b) the Debtor's secured creditors and their counsel; (c) the twenty (20) largest creditors of the Debtor; and (d) all of the Lienholder parties identified on **Exhibit 6** of the Motion. In light of the circumstances of this Motion, the Debtor submits that no other or further notice need be provided.

### No Prior Request

44. No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests entry of an order, the form of which is attached to this Motion as **Exhibit 1**, granting the relief requested herein and granting the Debtor such other and further relief as may be just and appropriate under the circumstances.

| | |
|---|---|
| Dated: October 1, 2013<br>Detroit, Michigan | FOLEY & LARDNER LLP<br><br>/s/ John A. Simon<br>Judy A. O'Neill (P32142)<br>John A. Simon (P61866)<br>Tamar N. Dolcourt (P73425)<br>One Detroit Center<br>500 Woodward Ave., Suite 2700<br>Detroit, MI 48226-3489<br>(313) 234-7100 (Telephone)<br>(313) 234-2800 (Facsimile)<br><br>*Proposed Counsel for the Debtor and Debtor in Possession* |