# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GROEB FARMS, INC. | ) | Case No. 13-58200 |
| | ) | |
| Debtor. | ) | Honorable Walter Shapero |
| | ) | |

**DEBTOR'S FIRST DAY MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363, 364 AND 503(b)(1) AUTHORIZING (I) CONTINUED MAINTENANCE OF EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM; AND (IV) WAIVER OF CERTAIN OPERATING GUIDELINES RELATING TO BANK ACCOUNTS**

The Debtor and debtor-in-possession in the above-captioned case (collectively, the "Debtor"), by and through its proposed counsel Foley & Lardner LLP, file this motion (the "Motion") for entry of an order pursuant to sections 105(a), 363, 364 and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") authorizing, but not directing (i) continued maintenance of existing bank accounts, (ii) continued use of existing business forms, (iii) continued use of existing cash management system as modified herein and (iv) a waiver of certain operating guidelines relating to bank accounts. The facts and circumstances supporting this Motion are set forth below and attested to by the Declaration of Jack Irvin, Jr., Chief Financial Officer of Groeb Farms, Inc., in Support of Chapter 11 Petitions and First Day Motions filed contemporaneously herewith (the "Irvin Declaration")[1]. In further support of this Motion, the Debtor respectfully represents as follows:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Irvin Declaration.

## Jurisdiction

1. This Court has jurisdiction to hear the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § l57(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Sections 105(a), 363, 364 and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") authorize the relief requested in this Motion.

## Background

2. On the date hereof (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan. The Debtor intends to continue in possession of its property and to manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed and no committees have been appointed or designated in the Debtor's chapter 11 case.

3. The Debtor was formed in 1981 and is the country's leading processor and packager of honey for food manufacturers, food service companies and retail customers.

4. The Debtor is headquartered in Onsted, Michigan. The Debtor also operates a honey processing facility in San Bernardino, California, and maintains a testing lab in Belleview, Florida.

5. The Debtor has approximately 76 full time employees, 8 contractors hired through staffing services, and 4 part time employees. Approximately 47 of the employees are in Michigan, 25 are in California, 2 are in Georgia, and 2 are in Florida. For the fiscal year ended December 31, 2012 the Debtor had net sales from continuing operations of approximately $137.8 million.

6. In 2001, the Government imposed anti-dumping duties on honey imported from China. After the institution of these duties, the honey industry increasingly imported honey whose country of origin was identified to the buyers as Asian nations such as Vietnam, Malaysia, and Indonesia. When imports identified with a Chinese country of origin fell, the Government began to investigate the honey industry and the possibility that honey was being transshipped (i.e. shipped through a second country to conceal its origins) and/or mislabeled to avoid the anti-dumping duties. Beginning in 2007, the U.S. Department of Justice ("DOJ") brought the first of several cases in different districts alleging that U.S. honey packers had imported transshipped honey. In 2008, the Debtor received a grand jury subpoena seeking information relating to the investigation of its industry.

7. Following an extensive DOJ investigation, in February 2013, the Debtor entered into a deferred prosecution agreement (the "DPA") with the DOJ as a global resolution for the Debtor. The agreement required the Debtor to: (1) accept and acknowledge responsibility for historical purchases of transshipped honey; (2) continue cooperating with the government's ongoing investigation for two years; (3) pay a $2 million fine; (4) dispose of any and all Chinese-origin honey in its possession which entered the country in contradiction to the duty requirements and (5) cease selling any of its finished goods containing such Chinese honey. The agreement further required the Debtor to continue ongoing compliance programs and remediation measures. The DPA acknowledged that two former, unnamed executives had misled the Debtor's board, the Debtor's customers and the public.

8. Both before and after execution of the DPA, the Debtor took a number of steps to remediate issues regarding potentially transshipped honey. In January 2012, the Debtor retained Foley & Lardner LLP to conduct an internal investigation. In January 2012, the Debtor also

4825-2762-0630.1
3
13-58200-wsd    Doc 11    Filed 10/01/13    Entered 10/01/13 16:37:21    Page 3 of 16

began revising its policies and procedures relating to the procurement of honey overseas. In February 2012, the Debtor named a new interim president and relieved its then-current CEO from his operating responsibilities. In June 2012, the Debtor agreed to a separation agreement with such CEO and stripped the then-current vice president of operations of all purchasing responsibility and subsequently terminated him. The Debtor hired a new full time president and CEO, Rolf Richter, effective June 27, 2012. The Debtor also licensed software to facilitate verification of container numbers and countries of origin for the honey that the Debtor purchases. The Debtor continues to carry BRC certification at each of its plants, which is a globally recognized food safety, quality and audit program subject to stringent audit testing by third parties. The Debtor also has strengthened its supplier audit program and reinvigorated lab testing procedures at its state-of the-art lab testing facility in Florida. In October 2012, the Debtor hired John Wolf as its Vice President of Supply Chain and Management, to further enhance supply management and compliance. Mr. Wolf has a long history of experience in the food industry, including 24 years with Kellogg's.

9. As a result of the foregoing measures, the Debtor has robust policies and procedures in place relating to the purchase of honey to avoid international duty issues in the future. The Debtor also provides compliance training to all of its employees.

10. The Debtor had hoped that the DPA would enable the Debtor to have a fresh start with new executives and a new compliance program. However, in April 2013, just two months after the DPA was finalized, two civil putative class action lawsuits were filed against the Debtor in the United States District Court for the Northern District of Illinois by producers, packers and/or distributors of honey. In *Adee Honey Farms, et al v. Groeb Farms, et al.*, Case No. 1:13-cv-02922 (the "Adee Lawsuit"), the putative class alleges violations of the Racketeer Influenced

and Corrupt Organizations Act ("RICO") and Lanham Act. In *Moore's Honey Farm, et al. v. Groeb Farms, Inc., et al.*, Case No. 1:13-cv-02905 (the "Moore Lawsuit", and collectively with the Adee Lawsuit, the "Putative Class Actions"), the putative class alleges violations of RICO and common law fraud, negligent misrepresentations, conspiracy, and clandestine wrongful importation without paying the anti-dumping duties. On June 24, 2013, the Putative Class Actions were consolidated (hereinafter, the "Putative Class Action") by Order of the Court handling the Moore Lawsuit (the "Consolidation Order"). An Amended Complaint must be filed pursuant to the Consolidation Order on or before October 21, 2013. The Putative Class Action is based on the factual statements contained in the DPA and claims the class members were harmed by the Debtor and other defendants' purchases of transshipped honey. While none of the claims make a specific demand, RICO and Lanham Act cases carry a potential for treble damages and attorneys' fees.

11. As a result of the DPA, and the costs associated with it, including: (1) the $2,000,000 fine; (2) the legal fees; (3) the costs of the compliance programs; and (4) the costs incurred in recruiting and hiring new, experienced executives, the Debtor has incurred significant unanticipated expenses.

12. Although the Debtor has significant defenses to the allegations in the Putative Class Action, the fine, the attorneys' fees and litigation and other expenses have severely strained, and would continue to severely strain, the Debtor's liquidity. In addition, despite the fact that the putative classes have not been certified, the mere existence of these lawsuits negatively affects the value of the Debtor outside of a bankruptcy proceeding and impedes potential buyers from purchasing the company at a maximized value to resolve the Debtor's financial issues.

13. In addition, increased prices in the honey market and supply shortages have had a negative impact on the Debtor. In late 2010, the Debtor had contracts with certain suppliers to purchase substantial amounts of honey at agreed-upon prices, while the honey market was experiencing significant price increases. However, these suppliers failed to deliver the product to the Debtor. As a result, the Debtor was forced to re-enter the honey market to buy replacement product at a time when, on a global basis, prices were increasing and the supply of honey was decreasing. The Debtor has initiated legal action against certain suppliers in order to receive the contracted honey. These issues have put further pressure on the Debtor's financial condition.

14. As a result of the foregoing and various other factors, the Debtor defaulted under its Credit Agreement with Wells Fargo Bank, N.A. ("Wells"). As a result, Wells began to exercise its rights and remedies, including without limitation: (a) imposing a $750,000 reserve in borrowing on July 23, 2013; and (b) reducing or limiting the Debtor's available credit. These actions significantly reduced the Debtor's available cash, rendering it unable to buy necessary raw honey needed in the operation of its business.

15. On or about July 24, 2013, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan") to assist with the assessment and implementation of strategic alternatives. Thereafter, Houlihan undertook an extensive marketing effort, including reaching out to 165 potentially interested parties, including strategic and financial buyers and capital providers. Houlihan secured Confidentiality Agreements from 75 parties and submitted a Confidential Information Memorandum to those parties. As part of the marketing process, Houlihan requested the submission of Indications of Interest ("IOIs") on or before September 18, 2013.

16.     The Debtor received eight written IOIs, including a proposal from Honey Financing Company, LLC ("Honey Financing"), an affiliate of Peak Rock Capital, to restructure the obligations of the Debtor and acquire the equity of the reorganized Debtor pursuant to the chapter 11 Plan of Reorganization (the "Plan") filed contemporaneously herewith. After reviewing the IOIs, the Debtor determined that the proposal from Honey Financing was the best overall offer based on the following factors, among others: (1) the Debtor's financing needs and lending arrangements; (2) the speed and certainty of closing the transaction; and (3) the total overall value to be provided to all stakeholders as a result of the transaction. Therefore, the Debtor elected to pursue the transaction with Honey Financing. The Debtor entered into the Restructuring Support Agreement in connection with the offer (the "Honey Financing RSA").

17.     Also on September 18, 2013, HC Capital Holdings 0909A ("HC"), an affiliate of Honey Financing, purchased the Wells debt, and became the Debtor's senior secured lender.

18.     In order to further expedite its restructuring efforts, the Debtor executed a Restructuring Support Agreement with its senior subordinated debt holders, Argosy Investment Partners II, L.P., and Marquette Capital Fund I, LP (the "Senior Subordinated Debt RSA").

19.     The Debtor has also entered into a Restructuring Support Agreement with the interim class action co-lead counsel in the Putative Class Action (the "Putative Class Action RSA" and collectively with the Honey Financing RSA and the Senior Subordinated Debt RSA, the "RSAs").

20.     The Debtor filed this chapter 11 case in order to affect the restructuring transaction as defined in the RSAs.

21.     Additional factual background relating to the Debtor, including its corporate structure, business operations, the circumstances leading to the filing of the chapter 11 case, the

4825-2762-0630.1
7
13-58200-wsd    Doc 11    Filed 10/01/13    Entered 10/01/13 16:37:21    Page 7 of 16

Restructuring Agreement and the Debtor's existing indebtedness, is set forth in detail in the Irvin Declaration, filed concurrently herewith and fully incorporated herein by reference.

**Relief Requested**

22. By this Motion, the Debtor seeks entry of an order, under sections 105(a), 363, 364 and 503(b)(1) of the Bankruptcy Code, authorizing (a) maintenance of existing bank accounts, (b) continued use of existing business forms, (c) continued use of existing cash management system as modified herein and (d) waiving certain operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the United States Trustee: Operating Instructions and Reporting Requirements for Chapter 11 Cases (the "U.S. Trustee Guidelines"), adopted by the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee").

**Basis For Relief**

**A. The Debtor Should Be Granted Authority to Maintain Their Existing Bank Accounts**

23. The Office of the U.S. Trustee has established the U.S. Trustee Guidelines for Debtor in possession in order to supervise the administration of chapter 11 cases. These U.S. Trustee Guidelines require chapter 11 Debtors to, among other obligations, (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for the payment of taxes including payroll taxes; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks for all debtor in possession accounts which bear the designation "Debtor In Possession." The last requirement is designed to draw a clear line of demarcation between prepetition and postpetition transactions and operations and prevent the inadvertent postpetition payment of

prepetition claims. Pursuant to Bankruptcy Code sections 105(a) and 363, the Debtor seeks a waiver of these requirements and authorization to continue using their existing bank accounts.

24. Prior to the commencement of this chapter 11 case, in the ordinary course of its business, the Debtor maintained with Wells approximately three bank accounts out of which it manages cash receipts and disbursements (the "Bank Accounts").

25. At Wells, the Debtor maintains a Collection Account (as defined in the Credit Agreement) including a lockbox (the "Lockbox"). The Debtor's cash receipts flow to the Lockbox and then are swept by Wells into the Collection Account.

26. The Debtor also maintains a Designated Account (as defined in the Credit Agreement) with Wells. The proceeds of the Debtor's revolving line of credit are deposited into the Designated Account and the Debtor's expenses are paid from that account.

**27.** Debtor also maintains a small petty cash account at Old National Bank in Evansville, Indiana (the "Petty Cash Account") for the payment of small expenses. The balance of the Petty Cash Account does not exceed $3,500.00. As of the Petition Date, the balance in the Petty Cash Account is $2,545.45. A list of all of the Bank Accounts is annexed as **Exhibit 6.**

28. The Debtor seeks a waiver of the U.S. Trustee's requirement that its Bank Accounts be closed and that new postpetition bank accounts be opened. If enforced in this case, such requirements would cause enormous disruption to the Debtor's business and would impair the Debtor's chapter 11 efforts. As described in detail below, the Debtor's Bank Accounts comprise the established Cash Management System (defined below) that the Debtor needs to maintain, as modified herein, in order to ensure smooth collections and disbursements in the ordinary course of its business. Therefore, to avoid delays in paying debts incurred post-petition, and to ensure as smooth a transition into chapter 11 as possible, the Debtor should be permitted

to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the ordinary course of business operations.[2] Otherwise, transferring the Bank Accounts will be disruptive, time consuming and expensive.

29. Accordingly, the Debtor requests that this Court waive the strict enforcement of the requirement that the Debtor open new bank accounts. The Debtor further requests that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtor be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

30. In other cases of this size and nature, it has been recognized that the strict enforcement of bank account closing requirements does not serve the rehabilitative purposes of chapter 11. Accordingly, courts in this and other jurisdictions have waived such requirements and replaced them with alternative procedures that provide the same protections. See e.g., *In re Energy Conversion Devices, et. al;* Case No. 12-43166 (TJT) (Bankr. E.D. Mich. Mar. 30, 2012); *In re ASC, Inc.*, Case No. 07-48680 (TJT) (Bankr. E.D. Mich. May 9, 2007); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2005); *In re Collins & Aikman Corp.*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich. May 17, 2005).

31. The Debtor also seeks a waiver of the requirement to establish specific bank accounts for tax payments. The Debtor believes that it can pay its tax obligations most efficiently out of its existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of such accounts, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

---

[2] If the Debtor opens any new bank accounts or closes any existing Bank Accounts, it will notify the Office of the United States Trustee of such account activity.

32. The Debtor represents that if the relief requested herein is granted, it will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by it before the Petition Date, other than those authorized by this Court. The Debtor will work closely with Wells and Old National Bank to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

### B. The Debtor Should Be Granted Authority To Continue To Use Existing Business Forms And Checks

33. The Debtor requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices), and checks, existing immediately before the Petition Date, without reference to the Debtor's status as Debtor-in-Possession. Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as Debtor-in-Possession because Debtor's industry is small and its bankruptcy is likely to receive widespread publicity within the industry. Moreover, the Debtor's vendors will receive direct notice of the commencement of this case.

34. If the Debtor were required to change its correspondence and business forms, it would be forced to choose standard forms rather than the current forms with which those that do business with the Debtor are familiar. Such a change in operations would create a sense of disruption and potential confusion within and without the Debtor's organization. The Debtor believes that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery and business forms. The Debtor respectfully submits that doing so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

35. This and other courts have routinely granted the same or similar relief to chapter 11 Debtor. See e.g., *In re Energy Conversion Devices, et. al;* Case No. 12-43166 (TJT) (Bankr.

E.D. Mich. Mar. 30, 2012); *In re ASC, Inc.,* Case No. 07-48680 (TJT) (Bankr. E.D. Mich. May 9, 2007); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2005); *In re Collins & Aikman Corp.*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich. May 17, 2005). This Court should do the same.

   **C. The Debtor Should Be Authorized To Continue To Use The Existing Cash Management System As Modified Herein**

   36. The Debtor maintains a cash management and disbursement system in the ordinary course of its operations (as described below, the "Cash Management System"). In order to lessen the disruption caused by the bankruptcy filings and maximize the value of the Debtor's estate in this chapter 11 proceeding, it is vital to the Debtor that it maintains its Cash Management System, with the limited exception noted herein.

   37. The Cash Management System is funded primarily by receipts from the sale of honey and other products produced by the Debtor, as well as daily advancement of funds from the Debtor's prepetition revolving credit facility with HC. Funds required for payment of the Debtor's obligations are transferred from the Collection Account to the Designated Account.

   38. The majority of Debtor's incoming cash receipts are directed to the Lockbox controlled by Wells. A small amount of the funds are sent directly to the Debtor's Michigan operation to release material for production. These remaining funds are sent to the Collection Account. Wells then holds the funds for one day in the Collection Account to ensure they clear. Once the funds clear, then they are applied to reduce the Debtor's line of credit revolver balance.

   39. Each day, the Debtor submits a Daily Cash Report ("DCR") to its lender, HC. The DCR reflects all cash received by the Debtor as well as all newly generated receivables for the prior day. 85% of the eligible receivable amount is added to the Debtor's availability under its revolving line of credit. When cash is received, the receivable is liquidated, and the Debtor

4825-2762-0630.1

receives an additional 15% increase in its available credit after the payment is applied to the Debtor's line of credit revolver balance.

40. Once a week the Debtor submits an updated inventory report to HC. The Debtor is permitted to borrow against 39% of its eligible raw honey inventory and 59% of its eligible finished goods inventory. Those amounts also increase Debtor's available credit under the line of credit revolver.

41. Under the current Cash Management System, funds from the Lockbox are "swept" daily directly to the prepetition credit facility to pay down the line of credit revolver. In light of its bankruptcy filings, the Debtor does not request authority to continue this practice, but instead requests the authority to retain all funds in the Lockbox that would otherwise be swept directly to pay the prepetition credit facility, subject to the Court's determination of the Debtor's pending motion to use cash collateral and approve its request for debtor-in-possession financing, filed contemporaneously herewith.

42. On a daily basis, funds from the line of credit revolver are advanced to the Debtor and deposited directly into the Designated Account. The Debtor uses these funds to pay its operating expenses.

43. The Debtor maintains current and accurate accounting records of daily cash transactions, and submits that maintenance of this Cash Management System, as modified herein, will prevent undue disruption to the Debtor's business operations while protecting the Debtor's cash for the benefit of the estate.

44. The Debtor seeks authority to continue utilizing its current Cash Management System, as modified herein and described above. It is critical that the Debtor be able to consolidate management of cash and centrally coordinate transfers of funds. A substantial

disruption in the Debtor's cash management procedures would impair the Debtor's ability to successfully prosecute this chapter 11 case and maximize the value of the estate.

45. The Cash Management System utilizes the Bank Accounts to effectively and efficiently collect, transfer, and disburse funds as needed. The Cash Management System provides significant benefits to the Debtor, including the ability to: (a) closely track, and thus control, all corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Indeed, a disruption in the Cash Management System could cause delays in the collection and disbursement of funds, thus impeding the Debtor's ability to carry out its intended strategies in this chapter 11 case. The Debtor will continue to maintain detailed records reflecting all transfers of funds.

46. Therefore, it is both essential and in the best interest of the Debtor's estate and creditors that the Cash Management System be maintained and modified as described herein. Furthermore, the Debtor's chapter 11 case will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System. Accordingly, the Debtor respectfully requests that the Court authorize the continued use of the Cash Management System as modified herein.

47. This Court has the authority to grant the requested relief pursuant to its equitable powers under section 105(a) of the Bankruptcy Code. Section 105(a) provides, in relevant part, that the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The relief requested herein is

both necessary and appropriate to allow the Debtor to successfully prosecute these chapter 11 cases and to maximize the value of the Debtor's estate.

48. Bankruptcy courts routinely grant chapter 11 Debtor authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, the chapter 11 cases involve affiliated Debtor with complex financial affairs. See, e.g., *In re The Charter Co.,* 778 F.2d 617 (11th Cir. 1985). In large chapter 11 cases such as these, this Court has granted substantially similar relief. See e.g., *In re ASC, Inc.*, Case No. 07-48680 (TJT) (Bankr. E.D. Mich. May 9, 2007); *In re Collins & Aikman Corp.*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich. May 17, 2005). The Debtor respectfully submits that such relief should be granted here.

49. Moreover, allowing the Debtor to utilize its prepetition cash management system is entirely consistent with applicable provisions of the Bankruptcy Code. Bankruptcy courts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.,* 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d. Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 510 U.S. 1110 (1994). Courts have also emphasized the "huge administrative burden" and economic inefficiency of requiring the Debtor to maintain all accounts separately. *Columbia Gas*, 997 F.2d at 1061. See also *In re Southmark Corp.,* 49 F.3d 1111, 1114 (5th Cir. 1995) (maintaining existing cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

4825-2762-0630.1
15
13-58200-wsd    Doc 11    Filed 10/01/13    Entered 10/01/13 16:37:21    Page 15 of 16

## NOTICE

50. No trustee, examiner, or statutory committee has been appointed in this chapter 11 case. Notice of this Motion will be served upon (a) the Office of the United States Trustee for the Eastern District of Michigan, (b) the secured creditors of the Debtor and their counsel; and (c) twenty (20) largest unsecured creditors of the Debtor. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests entry of an order, the form of which is attached to this Motion as **Exhibit 1**, granting the relief requested herein and granting the Debtor such other and further relief as may be just and proper.

Dated: Detroit, Michigan
October 1, 2013

FOLEY & LARDNER, LLP

By: /s/ Judy A. O'Neill
Judy A. O'Neill (P32142)
John A. Simon (P61866)
Tamar N. Dolcourt (P73425)
One Detroit Center
500 Woodward Ave., Suite 2700
Detroit, MI 48226-3489
(313) 234-7100 (Telephone)
(313) 234-2800 (Facsimile)

*Proposed Counsel for the Debtor and Debtor in Possession*