**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GROEB FARMS, INC. | ) | Case No. 13-58200 |
| | ) | |
| Debtor. | ) | Honorable Walter Shapero |

## DECLARATION OF JACK IRVIN, JR. IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Jack Irvin, Jr. hereby declares (the "Declaration"), pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Financial Officer ("CFO") of Groeb Farms, Inc. (the "Debtor"), a privately-held corporation organized under the laws of the State of Michigan. The Debtor is the debtor-in-possession in the above-captioned chapter 11 case. I am authorized to submit this Declaration on behalf of the Debtor. As a result of my tenure with the Debtor, my review of public and non-public documents, and my discussions with other members of the Debtor's management team, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could testify competently to such matters.

2. I have been the Debtor's CFO since January of 2008. Prior to that, I was the President of Baltimore Spice, Inc.

3. On the date hereof (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of

Michigan. The Debtor intends to continue in possession of its property and to manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. Further, to enable it to minimize the adverse effects of the chapter 11 filing on the business, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Motions").

4. I am advised by counsel that this Court has jurisdiction over this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1408 and 1409.

5. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

6. I submit this Declaration in support of the Debtor's chapter 11 petition and the First Day Motions. Part I of this Declaration describes the Debtor's business and the circumstances surrounding the commencement of its chapter 11 case. Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## PART I. BACKGROUND

### Current Business Operations Of The Debtor

7. The Debtor was formed in 1981 and is the country's leading processor and packager of honey for food manufacturers, food service companies, and retail customers.

8. The Debtor is headquartered in Onsted, Michigan. The Debtor also operates a honey processing facility in San Bernardino, California, and maintains a testing lab in Belleview, Florida.

9. The Debtor has approximately 76 full time employees, 8 contractors hired through staffing services, and 4 part time employees. Approximately 47 of the employees are

in Michigan, 25 are in California, 2 are in Georgia, and 2 are in Florida. For the fiscal year ended December 31, 2012 the Debtor had net sales from continuing operations of approximately $137.8 million.

### The Debtor' Financing Arrangements

*Debt Financing*

10.     The Debtor is a party to that certain Credit and Security Agreement dated as of January 30, 2012 (as amended from time to time, the "Credit Agreement"), by and between the Debtor as Borrower, and Wells Fargo Bank, National Association, as the lender ("Wells"). The Credit Agreement sets forth the terms and obligations regarding an aggregate revolving commitment of a maximum of $25,000,000.00 and a five-year term loan of $1,120,000.00 (collectively the "Loans").

11.     On September 18, 2013, HC Capital Holdings 0909A ("HC") purchased Wells' position in the Loans and became the senior secured lender with respect to the Loans (the "Lender").

12.     As security for the indebtedness under the Loans, and pursuant to Section 3.1 of the Credit Agreement, the Debtor granted to Lender a security interest in various assets, including without limitation, all accounts, books, chattel paper, deposit accounts, goods, including Equipment and Fixtures, general intangibles, inventory, investment related property, negotiable collateral, supporting obligations, commercial tort claims, money, cash equivalents, any other assets which come into the Lender's possession, and all proceeds relating to or arising from them (all categories of collateral described herein and in Schedule 1.1 of the Security Agreement collectively referred to as the "Collateral").

13.     On June 18, 2013, Wells issued a Notice of Default because the Debtor fell below the Average Excess Availability amount required by the Creditor Agreement as a result

of a settlement payment (the "Excess Availability Default"). As a result of the Excess Availability Default, Wells assessed default interest on the Loan at a rate of 3.0% per annum above the rate in the Credit Agreement.

14. On June 26, 2013, Wells issued a Notice of Default because the Debtor failed to maintain the Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") required by the Credit Agreement (the "EBITDA Default"). As a result of the EBITDA Default, Wells restated that the Loan would accrue interest at a rate of 3.0% per annum above the rate in the Credit Agreement.

15. On July 23, 2013 without notice, Wells unilaterally implemented a $750,000.00 reserve against the Debtor's available funds under the Loans (the "Reserve"). The Reserve severely impacted the Debtor's ability to make payments to vendors, and fund its operations.

16. As a result of the Excess Availability Default and the EBITDA Default, Lender and the Debtor began to negotiate a Forbearance Agreement and Fourth Amendment to the Credit Agreement. Wells provided a draft of the Forbearance Agreement to the Debtor on July 31, 2013 (the "Draft Forbearance Agreement").

17. On August 8, 2013, Wells rescinded the Draft Forbearance Agreement. Discussions regarding a new Forbearance Agreement continued and the parties entered into a revised Forbearance Agreement and Fourth Amendment to the Credit Agreement on August 15, 2013 (the "Forbearance Agreement").

18. Pursuant to the Forbearance Agreement, among other things,: (1) (a) Wells agreed to consider making discretionary advances during the period of August 15, 2013 through September 6, 2013 (the "Forbearance Period"); (b) reduced the maximum revolver amount to $17,250,000.00 as of September 6, 2013, and reduced the inventory sublimit from

$15,000,000.00 to $12,500,000.00; and (c) required the Debtor to release Wells from any claims against it. The Debtor also hired Conway Mackenzie to provide Wells various reports a Chapter 11 budget and a Chapter 11 restructuring strategy.

19.    In addition to the Loans now owned by HC, the Debtor also has subordinated debt obligations.  Three private equity funds, Argosy Investment Partners III, L.P., Horizon Capital Partners III, L.P., and Marquette Capital Fund I, LP, hold $7,000,000.00 of senior subordinated secured debt.  Ernest Groeb, a former officer of the Debtor, is the shareholder representative with respect to $1,500,000.00 of junior subordinated unsecured debt.  There is also an unsecured debt obligation of approximately $423,762.00 to the Olesanik Family Living Trust, and unsecured trade debt of approximately $15,036,775.

*The Debtor's Equity Structure*

20.    The Debtor also has authorized and in some cases, issued common stock, preferred stock, and warrants, as follows:

Common Stock:

- Series A Common Stock: 69,110 shares authorized but unissued

- Series B Common Stock: 9,390 shares authorized but unissued

- Series C Common Stock: 10,507 shares authorized but unissued (subject to unexercised warrants)

- Series D Common Stock: 10,864 shares authorized and issued

- Series E Common Stock: 13,134 shares authorized and issued

- Series F Common Stock: 24,201 shares authorized; 12,701 shares issued

- Series G Common Stock: 35,947 shares authorized but unissued (subject to unexercised warrants)

Preferred Stock:

- Series A 6% Convertible: 69,110 shares authorized and issued

- Series B Convertible: 9,390 shares authorized and issued

- Series C 6% Convertible: 27,271 shares authorized and issued

Warrants:

- Common Stock C Warrants: 10,507 warrants authorized, but unexercised

- Common Stock G Warrants: 9,024 warrants authorized, but unexercised

21.     Outside investors hold approximately 79% of the Debtor's equity through a mix of the common and preferred stock. Some of this percentage includes amounts held by the senior subordinated debt holders through stock and warrants. The Debtor's management and former management holds approximately 15% of the Debtor's equity through a mix of the common and preferred stock. The Debtor's former directors hold the remaining approximately 6% through a mix of the common and preferred stock.

## Events Leading To Chapter 11 Filing

22.     In 2001, the Government imposed anti-dumping duties on honey imported from China. After the institution of these duties, the amount of Chinese imports fell, as the amount of honey exports rose from Vietnam, Malaysia, Indonesia, and other Asian countries that had not historically exported significant amounts of honey. As a result, the Government began to investigate the honey industry and the possibility that honey was being transshipped (*i.e.* shipped through a second country to conceal its origins) and/or mislabeled to avoid the anti-dumping duties. Beginning in 2007, the U.S. Department of Justice ("DOJ") brought the first of several cases in different districts alleging that U.S. honey packers had imported transshipped honey. In 2008, the Debtor received a grand jury subpoena seeking information relating to the investigation of its industry.

23.     Following an extensive DOJ investigation, in February 2013, the Debtor entered into a deferred prosecution agreement (the "DPA") with the DOJ as a global resolution of the

Debtor. The agreement required the Debtor to: (1) accept and acknowledge responsibility for historical purchases of transshipped honey; (2) continue cooperating with the government's ongoing investigation for two years; (3) pay a $2 million fine; (4) dispose of any and all Chinese-origin honey in its possession, which entered the country in contradiction to the duty requirements; and (5) cease selling any of its finished goods containing such Chinese honey. The agreement further required the Debtor to put in place a number of compliance and remediation measures. The DPA acknowledged that two former, unnamed executives had misled the Debtor's board, the Debtor's customers, and the public.

24. Both before and after execution of the DPA, the Debtor took a number of steps to remediate issues regarding potentially transshipped honey. In January 2012, the Debtor retained Foley & Lardner LLP to conduct an internal investigation. In January 2012, the Debtor also began revising its policies and procedures relating to the procurement of honey overseas. In February 2012, the Debtor named a new interim president and relieved its then-current CEO from his operating responsibilities. In June 2012, the Debtor agreed to a separation agreement with such CEO and stripped the then-current vice president of operations of all purchasing responsibility and subsequently terminated him. The Debtor hired a new full time president and CEO, Rolf Richter, effective June 27, 2012. The Debtor also licensed software to facilitate verification of container numbers and countries of origin for the honey that the Debtor purchases. The Debtor continues to carry BRC certification at all plants, which is a globally recognized food safety, quality and audit program subject to stringent audit testing by third parties. The Debtor also strengthened its supplier audit program and reinvigorated lab testing procedures at its state-of the-art lab testing facility in Florida. In October 2012, the Debtor hired John Wolf as its Vice President of Supply Chain and Management, to further

enhance supply management and compliance. Mr. Wolf has a long history of experience in the food industry, including 24 years with Kellogg's.

25. As a result of the foregoing measures, the Debtor has robust policies and procedures in place relating to the purchase of honey to avoid international duty issues in the future. The Debtor also provides compliance training to all of its employees.

26. The Debtor had hoped that the DPA would enable the Debtor to have a fresh start with new executives and a new compliance program. However, in April 2013, just two months after the DPA was finalized, two civil putative class action lawsuits were filed against the Debtor in the United States District Court for the Northern District of Illinois by producers, packers and/or distributors of honey. In *Adee Honey Farms, et al v. Groeb Farms, et al.,* Case No. 1:13-cv-02922 (the "Adee Lawsuit"), the putative class alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Lanham Act. In *Moore's Honey Farm, et al. v. Groeb Farms, Inc., et al.,* Case No. 1:13-cv-02905 (the "Moore Lawsuit" and collectively with the Adee Lawsuit the "Putative Class Actions"), the putative class alleges violations of RICO and common law fraud, negligent misrepresentations, conspiracy, and clandestine wrongful importation without paying the anti-dumping duties. On June 24, 2013, the Putative Class Actions were consolidated (hereinafter, the "Putative Class Action") by Order of the Court handling the Moore Lawsuit (the "Consolidation Order"). An Amended Complaint must be filed pursuant to the Consolidation Order on or before October 21, 2013. The Putative Class Action is based on the factual statements contained in the DPA and claims the class members were harmed by the Debtor and other defendants' purchases of transshipped honey. While none of the claims make a specific demand, RICO and Lanham Act cases carry a potential for treble damages and attorneys' fees.

27. As a result of the DPA, and the costs associated with it, including: (1) the $2,000,000 fine; (2) the legal fees; (3) the costs of the compliance programs; and (4) the costs incurred in recruiting and hiring new, experienced executives, the Debtor has incurred significant unanticipated expenses.

28. Although the Debtor has significant defenses to the allegations in the Putative Class Action, the fine, the attorneys' fees and litigation and other expenses have severely strained, and would continue to severely strain, the Debtor's liquidity. In addition, despite the fact that the putative classes have not been certified, the mere existence of these lawsuits negatively affects the value of the Debtor outside of a bankruptcy proceeding and impedes potential buyers from purchasing the company at a maximized value to resolve the Debtor's financial issues.

29. In addition, increased prices in the honey market and supply shortages have had a negative impact on the Debtor. In late 2010, the Debtor had contracts with certain suppliers to purchase substantial amounts of honey at agreed-upon prices, while the honey market was experiencing significant price increases. However, these suppliers failed to deliver the product to the Debtor. As a result, the Debtor was forced to re-enter the honey market to buy replacement product at a time when, on a global basis, prices were increasing and the supply of honey was decreasing. The Debtor has initiated legal action against certain suppliers in order to receive the contracted honey. These issues have put further pressure on the Debtor's financial condition.

30. As a result of the foregoing and various other factors, the Debtor defaulted under its Credit Agreement with Wells. As a result, Wells began to exercise its rights and remedies, including without limitation: (a) imposing a $750,000 reserve in borrowing on July

23, 2013; and (b) reducing or limiting the Debtor's available credit. These actions significantly reduced the Debtor's available cash, rendering it unable to buy necessary raw honey needed in the operation of its business.

31. On or about July 24, 2013, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan") to assist with the assessment and implementation of strategic alternatives. Thereafter, Houlihan undertook an extensive marketing effort, including reaching out to 165 potentially interested parties, including strategic and financial buyers and capital providers. Houlihan secured Confidentiality Agreements from 75 parties and submitted a Confidential Information Memorandum to those parties. As part of the marketing process, Houlihan requested the submission of Indications of Interest ("IOIs") on or before September 18, 2013.

32. The Debtor received eight written IOIs, including a proposal from Honey Financing Company, LLC ("Honey Financing"), an affiliate of Peak Rock Capital, to restructure the obligations of the Debtor and acquire the equity of the reorganized Debtor pursuant to the chapter 11 Plan of Reorganization (the "Plan") filed contemporaneously herewith. After reviewing the IOIs, the Debtor determined that the proposal from Honey Financing was the best overall offer based on the following factors, among others: (1) the Debtor's financing needs and lending arrangements; (2) the speed and certainty of closing the transaction; and (3) the total overall value to be provided to all stakeholders as a result of the transaction. Therefore, the Debtor elected to pursue the transaction with Honey Financing. The Debtor entered into the Restructuring Support Agreement in connection with the offer (the "Honey Financing RSA"). The Honey Financing RSA is attached hereto as Exhibit A.

33. Also on September 18, 2013, HC, an affiliate of Honey Financing, purchased the Wells debt, and became the Debtor's senior secured lender.

34.     In order to further bolster its restructuring efforts, the Debtor executed a Restructuring Support Agreement with certain of its senior subordinated debt holders, Argosy Investment Partners II, L.P, and Marquette Capital Fund I, LP (the "Senior Subordinated Debt RSA"). The Senior Subordinated Debt RSA is attached hereto as Exhibit B.

35.     The Debtor has also engaged in negotiations with the court-appointed interim class counsel ("Interim CA Counsel") for the Class Action Claim Holders.  The Debtor and the Interim CA Counsel have reached a settlement of the Putative Class Action resulting in the execution of a Restructuring Support Agreement (the "Putative Class Action RSA", and collectively with the Honey Finance RSA, and the Senior Subordinated Debt RSA, the "RSAs").  Pursuant to the Putative Class Action RSA, the proposed settlement (the "Class Action Settlement") provides for the Class Action Claim Holders to receive $1.75 million (the "Class Action Settlement Amount") in proceeds from the Debtor's D&O Insurance Policy. According to the Putative Class Action RSA, the Class Action Settlement would have to be approved by the insurer within twenty-four (24) days after the Petition Date, and the Bankruptcy Court and a United States District Court have both approved the Class Action Settlement on a final basis.  The Putative Class Action RSA is attached hereto as Exhibit C.

36.     The Debtor filed this chapter 11 case in order to affect the restructuring transaction as defined in the RSAs.

37.     Under the Restructuring Agreement, HC will provide DIP financing to the Debtor, as more fully detailed in the Plan of Reorganization (the "Plan") and Disclosure Statement filed contemporaneously herewith.

38.     Upon the Effective Date of the Plan, if confirmed, HC will also provide an Exit Facility (as that term is defined in the Plan), which will be used to pay off a portion of the Loans, administrative expenses, and professional fees.

39.     Based on the information I have learned from the marketing process, I believe that the Restructuring Agreement is the optimal solution for all of the Debtor's stakeholders.  If the Plan is not confirmed, it is likely the Debtor will have to cease operations and liquidate its business.

## PART II.  FIRST DAY MOTIONS[1]

40.     The Debtor expects to file a number of First Day Motions and respectfully requests that the Court grant such First Day Motions.  I am familiar with each of the First Day Motions and attest to the truth of the facts set forth therein.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value; and (b) constitutes a critical element in preserving the value of the Debtor's estate.

**A.     Emergency First Day Motion Of The Debtor Pursuant To Sections 105(A), 361, 362, 363, 364, 507 And 552 Of The Bankruptcy Code And Bankruptcy Rule 4001(B) For Entry Of Interim And Final Orders (A) Authorizing Post-Petition Financing; (B) Authorizing Use Of Cash Collateral; (C) Granting Adequate Protection; And (D) Scheduling A Final Hearing On The Motion (the "Cash Collateral/DIP Financing Motion")**

41.     The Debtor urgently requires the use of its cash collateral and debtor-in-possession financing to fund day-to-day operations to maintain production for its customers.  Continuing production of honey is necessary to preserve the Debtor's operations and is integral

---

[1] Capitalized terms used but not otherwise defined in the description of the various First Day Motions shall have the meanings ascribed to them in the respective First Day Motion described.

to preserving the value of the estate. Any inability to fund continuing production would result in a material, negative impact on the Debtor's business, to the detriment of its creditors, customers and employees.

42. Absent immediate use of cash collateral and DIP Financing in the amount of $27 million for the period between the Petition Date and the Effective Date of the Plan, as more fully detailed in the Budget attached to the Cash Collateral/DIP Financing Motion, the Debtor will be unable to pay operating expenses and, therefore, unable to continue to conduct its business pending the Final Hearing on the DIP Financing Motion. Consequently, if interim relief is not obtained, the Debtor's case will be immediately and irreparably jeopardized, to the detriment of the estate, creditors and other parties in interest.

43. By the Cash Collateral/DIP Financing Motion, the Debtor seeks entry of an interim and final order authorizing the Debtor to, among other things, (i) use Cash Collateral in accordance with the terms of the Cash Collateral/DIP Financing Motion; (ii) use proceeds of the DIP Financing Facility pursuant to sections 105, 361, 363, 364, and 552 of the Bankruptcy Code on an interim basis in the amounts set forth in the Budget attached to the DIP Financing Motion; (iii) grant adequate protection pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code to the pre-petition Lender; and (iv) schedule a final hearing on the Cash Collateral/DIP Financing Motion.

44. The Debtor requires the ability to immediately pay for, among other things, the purchase of raw materials, the funding of payroll obligations, the operation of the Debtor's honey processing facilities and other working capital needs. A portion of the DIP Financing will also be used to pay off the Loans in accordance with the RSAs. It is essential that the Debtor immediately stabilize its operations and resume paying for ordinary, post-petition

operating expenses, as well as the prepetition expenses requested in the First Day Motions, to maximize value for all stakeholders. Without such relief, it is unlikely the Debtor will be able to operate its business, which will significantly damage its reorganization prospects.

45. I expect that the Debtor will need the use of all of the amounts reflected in the budget attached to the DIP Financing Motion. All proceeds of the DIP Financing shall be used in accordance with this budget.

**B. Debtor's First Day Motion For An Order Pursuant to Bankruptcy Code Sections 105(a), 363, 364 and 503(b)(1) Authorizing (I) Continued Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Business Forms; (III) Continued Use of Existing Cash Management System; and (IV) Waiver of Certain Operating Guidelines Relating to Bank Accounts (the "Cash Management Motion")**

46. By the Cash Management Motion, the Debtor seeks entry of an order (a) authorizing the continued use of its existing bank accounts, (b) authorizing the continued use of its existing business forms, and (c) authorizing the continued use of its existing cash management system.

47. The Debtor utilizes a multi-layered cash management system to collect, transfer and disburses funds generated by its operations and to record accurately all such funds, transactions as they are made, as described herein (the "Cash Management System").

48. Through the Cash Management Motion, the Debtor seeks a waiver of the U.S. Trustee's requirement that its Bank Accounts be closed and that new postpetition bank accounts be opened. If the Debtor is forced to comply with the U.S. Trustee's requirements, I believe that those requirements would cause enormous disruption in its business and would impair the estate. I believe that maintenance of the Debtor's Bank Accounts and the existing Cash Management System would greatly facilitate the Debtor's transition to post-petition

operations, avoid delays in payments to administrative creditors and Employees, and insure as smooth a transition into chapter 11 as possible.

49.     The Debtor requests that it be authorized to maintain and use its Bank Accounts in the same manner and with the same account numbers, account names, styles, and document forms as those employed during the pre-petition period.

50.     To protect against inadvertent payment of prepetition claims, the Debtor will immediately advise all banks maintaining the Debtor's Bank Accounts not to honor checks issued prior to the Petition Date, except as otherwise ordered by the Court.

51.     The Debtor further requests, through the Cash Management Motion, that it not be required to open a bank account for the sole purpose of paying its tax obligations.  I believe that the Debtor can pay its tax obligations most efficiently out of its existing Bank Accounts that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of such accounts, and that the creation of a new debtor in possession account designated solely for tax obligations would be unnecessary and inefficient.

52.     The Debtor also requests, through the Cash Management Motion, that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices), and checks existing immediately before the Petition Date, without reference to the Debtor's status as debtor-in-possession.  Parties doing business with the Debtor undoubtedly will be aware of its status as a debtor-in-possession as a result of the fact that the industry is small and thus there is likely to be publicity surrounding this case in the industry.  Moreover, the Debtor's vendors will receive direct notice of the commencement of this case.  I believe that changing the various business forms already in use would create a sense of disruption and potential confusion within the Debtor's organization and for its

customers and vendors. I further believe that it would be extremely costly and disruptive to cease using all existing forms and to purchase and begin using new business forms and checks.

53.     In order to ensure an orderly transition into chapter 11, the Debtor also requests authority to continue to use its existing Cash Management System.

54.     The Cash Management System includes accounting controls needed to enable the Debtor, as well as creditors and the Court, if necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

55.     The Debtor's Cash Management System works as follows: first, the vast majority of the Debtor's incoming cash receipts are directed to a lockbox account controlled by Wells Fargo. A small amount of the funds are sent to the Debtor's Michigan and California operations to release material for sales. Those funds are then are sent to Wells. Wells then holds the funds for one day in a cash collateral account to ensure they clear. Once the funds clear, then they are applied to the Debtor's line of credit revolver balance.

56.     Each day, the Debtor submits a Daily Cash Report ("DCR") to its lender, HC. The DCR reflects all cash received by the Debtor as well as all newly generated receivables for the prior day. 85% of the receivable amount is added to the Debtor's availability under its revolving line of credit. When cash is received, the receivable is liquidated, and the Debtor receives an additional 15% increase in its available credit.

57.     Once a week the Debtor submits an updated inventory report to HC. The Debtor is permitted to borrow against 39% of its raw honey inventory and 59% of its finished goods inventory. Those amounts also potentially increase the Debtor's available credit.

58.     The Cash Management System incorporates ordinary, usual and essential business practices similar to those used by other corporate enterprises. The Cash Management

System provides significant benefits to the Debtor, including the ability to control corporate funds centrally, ensure availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Furthermore, the Cash Management System complies with the Lender's requirements.

59. The operation of the Debtor's business requires that the Cash Management System continue during the pendency of this chapter 11 case. I believe that requiring the Debtor to adopt a new cash management system at this critical stage of this case would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely affect the estate. Further, I believe that requiring changes to the Cash Management System could irreparably harm the Debtor, its estate, and creditors by creating cash flow interruptions while systems are changed. Maintenance of the existing Cash Management System therefore is in the best interest of all creditors and other parties-in-interest.

**C. Debtor's First Day Motion For Order Pursuant To Sections 105(a), 363(b) and 507(a) of The Bankruptcy Code Authorizing (I) Payment Of Wages, Compensation, and Employee Benefits; (II) Continuation of Employee Benefit Programs; and (III) Financial Institutions To Honor and Process Checks and Transfers Related Thereto (the "<u>Employee Wage Motion</u>")**

60. By the Employee Wage Motion, the Debtor seeks authority to (i) pay, in its sole discretion, all prepetition obligations incurred under or related to Wage Obligations, Payroll Taxes, Expense Reimbursements, and other Employee Benefits (each as defined below, and collectively, the "<u>Employee Amounts</u>") and all costs incident to such obligations; (ii) pay, in its sole discretion, all service fees related to the foregoing (collectively, the "<u>Administrative Fees</u>" and hereafter with the Employee Amounts, the "<u>Employee Obligations</u>"); (iii) pay, in its sole discretion, prepetition obligations owed to brokers and purchasing groups who place the

Debtor's goods with additional customers (the "Sales Broker Obligations") and (iv) maintain and continue to honor the Employee Benefits (as defined below), including practices, plans (including vacation and holiday plans), programs, and policies, available for employees as they were in effect as of the Petition Date or as they may be modified, amended, or supplemented from time to time in the ordinary course of the Debtor's business. The Debtor also requests that the Court authorize the Debtor's banks and other financial institutions (collectively, the "Banks") to receive, honor, process, and pay any and all checks drawn on the Debtor's payroll and general disbursement accounts (collectively, the "Disbursement Accounts") and automatic payroll transfers, to the extent that the checks or transfers relate to Employee Obligations or Sales Broker Obligations.

61. As of the Petition Date, the Debtor employed approximately 76 full-time employees (the "Full-Time Employees"), approximately 4 part-time employees (the "Part-Time Employees") and approximately 8 individuals who are employed by staffing agencies (the "Contractors", and together with the Full-Time Employees and the Part-Time Employees, the "Employees"). The work of the Employees is critical to the Debtor's business. Out of the Full-Time Employees and the Part Time Employees, approximately 55 are hourly employees (the "Hourly Employees") and approximately 25 are salaried employees (the "Salaried Employees").

62. The Employees possess the institutional knowledge, experience and skills necessary to support the estate. Because of the Debtor's need for the continued commitment of its Employees, the Debtor is requesting the relief set forth in the Employee Wage Motion to minimize any hardship to the Employees resulting from the commencement of the Debtor's chapter 11 case.

## Employee Obligations

### Wage Obligations

63.     Prior to the Petition Date and in the ordinary course of business, the Debtor typically paid obligations relating to wages, salary, and compensation for the Employees as follows: (a) employees receive compensation on a weekly basis, one week in arrears (the "Employee Wage Obligations"); and (b) Contractors are paid through staffing companies hired by the Debtor (the "Contractor Payment Obligations"); and together with the Employee Wage Obligations, the "Wage Obligations").  The Debtor pays the Wage Obligations through direct deposits into the account directed by the Employee or by check made out the Employee, or by check to the staffing companies who provide the Contractors on a net 45 day basis.  To facilitate payment of the Employee Wage Obligations, the Debtor engages a payroll service, Paycor, Inc. ("Paycor").  Paycor draws the money for the relevant payroll every Thursday, and then distributes the payroll to its Employees every Friday.

64.     The Debtor's current estimated weekly gross payroll for all employees is approximately $90,000, but may vary based on overtime, and the Contractor Payment Obligations are approximately $14,000 per month.  Prior to filing chapter 11, on September 26, 2013, in the ordinary course of its business, the Debtor paid payroll of approximately $88,000.

65.     As of the Petition Date, the Debtor has accrued approximately $94,000 in unpaid prepetition Wage Obligations.

66.     By the Employee Wage Motion, the Debtor seeks the authority to pay all its accrued and outstanding prepetition Wage Obligations in the amount of approximately $94,000.

Payroll Taxes

67.     The Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  The Payroll Taxes are approximately $5,200 on a weekly basis. As of the Petition Date, the Debtor has accrued approximately $4,500 in Payroll Taxes that relate to the Employees for the period prior to the Petition Date.  The Debtor requests authority through the Employee Wage Motion to pay such amounts to the extent they have not already been paid.

Expense Reimbursements

68.     The Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses, including amounts charged on personal or business-issued credit cards.  Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's businesses, the Debtor directly pays or reimburses the Employees in full for these expenses (the "Expense Reimbursements"), subject to the submission of proper documentation to the appropriate accounting department.    A majority of Expense Reimbursements are travel-related expenses related to sales or client development.  The Debtor reimburses expenses on a rolling basis, with a time lag of up to two weeks between submission

or the request for reimbursement and payment. It is difficult to determine what Expense Reimbursements that accrued prepetition are outstanding on the Petition Date because of the lag time in the submission of such requests. However, based upon historical figures, the Debtor estimates that it has approximately $10,000 in prepetition Expense Reimbursements outstanding as of the Petition Date. The Debtor requests authority to pay all Expense Reimbursements.

Employee Benefits

69.     In the ordinary course of business, the Debtor has established various benefit plans and policies for its Employees that fall into the following categories: (i) paid time off plans, including vacation days, paid holidays, bereavement leave, and jury duty (collectively, the "PTO Plans"); (ii) medical insurance, dental insurance, prescription coverage, life insurance, and disability insurance plans and programs (collectively, the "Health and Welfare Plans"); (iii) workers' compensation plans and programs (the "Workers' Compensation Plans"); (iv) a 401(k) plan (the "401(k) Plan") and (v) severance benefit packages offered to severed employees in the Debtor's discretion prior to the Petition Date (the "Severance Benefits"), and together with the PTO Plans, Health and Welfare Plans, and the Workers' Compensation Plans, the "Employee Benefits"). In connection with certain of the Employee Benefits, such as medical insurance and 401(k) Plan contributions, the Debtor directly deducts specified amounts from eligible Employees' wages. The Employee Benefits are described below. The Debtor requests authority to continue and honor all of their obligations in respect of the Employee Benefits as they come due.

70.     Additional information regarding the Wage Obligations and the Employee Benefits may be found in the Employee Wage Motion.  I hereby verify the facts contained in the Employee Wage Motion.

71.     The uninterrupted continuation of the Debtor's business is critically dependent upon a stable work force.  I believe that any significant number of Employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtor's business, resulting in immediate and irreparable harm to the estate and its creditors.  There is a real, immediate risk that if the Debtor is not authorized to continue to honor its pre-petition Employee Obligations in the ordinary course, the Employees would no longer support and maintain the operations of the Debtor, thereby crippling its business operations and damaging the value of the Debtor materially.  Consequently, the Debtor strongly believes that it is critical that it be permitted to pay its Employees their pre-petition wages and continue with their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.  Similarly, the Sales Broker Obligations are essential to maintaining the Debtor's customer base.  Without the services of the brokers, the Debtor will lose access to customer relationships and suffer decreased revenue.   This would cause substantial harm to the Debtor's reorganization efforts and value.

72.     For the foregoing reasons, the Debtor submits, and I believe, that the relief requested in the Employee Wage Motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

**D.** **Debtor's First Day Motion For Order Pursuant to Sections 105 and 366 of the Bankruptcy Code (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Service to the Debtor and (II) Establishing Certain Procedures to Determine Requests for Adequate Assurance of Payment (the "Utility Motion")**

73.     By the Utility Motion, and to ensure continued provision of utility services (the "Utility Services") to the Debtor's various locations, the Debtor seeks entry of an order prohibiting utility companies from terminating services on account of pre-petition invoices, deeming the Utility Companies to be adequately assured of future payment, and establishing procedures to determine additional adequate assurance.

74.     In connection with the operation of its business, the Debtor obtains electricity, natural gas, water, telephone, internet, and/or similar services through various utility companies (collectively, the "Utility Companies"). A detailed list of the Utility Companies and the services provided by each is attached to the Utility Motion as Exhibit 6.

75.     Uninterrupted utility services are critical to the Debtor's ability to sustain its operations during the pendency of this chapter 11 case. The Debtor's facilities are dependent on electricity and gas service for lighting, manufacturing plant use and general office use. In addition, telephone and internet service is necessary to permit the Debtor to conduct sales and marketing functions and to communicate with customers, vendors, between the Debtor sites, and among other Debtor personnel. Continued water service is necessary to maintain sanitary lavatory facilities for Employees and for plant operations. Any interruption of these services would severely disrupt the Debtor's day-to-day operations.

76.     In accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtor proposes to, as necessary in accordance with the procedures detailed herein, deposit, for the benefit of the Utilities, a sum equal to approximately 50% of the Debtor's estimated cost of monthly utility consumption calculated as a historical average over the past twelve months –

$16,536.50 – into a newly-created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within 30 days after the Petition Date. The Adequate Assurance Deposit Account will be increased in the event that there are any Added Utilities (as defined below), in an amount equal to the value of two weeks of services utilized by the Debtor (based on a historical average over the past twelve months) from such Added Utilities.

77.     The Assurance Procedures proposed in the Utilities Motion are designed to ensure that the Utilities receive the "adequate assurance" contemplated by section 366(c) of the Bankruptcy Code by providing for a fair and orderly method for processing requests by the Utilities for additional or different Adequate Assurance or for the Utilities to object to the procedures themselves. Because the proposed Assurance Procedures will ensure that the Debtor will continue to receive Utility Services without prejudice to the Utilities, the Debtor submits, and I believe, that the relief requested in the Utilities Motion is necessary, appropriate, and in the best interests of the Debtor and its estate and creditors.

**E.     Debtor's First Day Motion Pursuant to Sections 105(a), 363(b) and 364(b) of the Bankruptcy Code, for an Order Authorizing it to Pay the Prepetition Claims of Certain Potential Lienholders (the "Lienholders Motion")**

78.     Through the Lienholders Motion, the Debtor seeks the authority to pay its common carriers and other shippers and warehousemen (collectively the "Lienholders") for pre-petition amounts owed. Under state law, each of these entities may be able to assert liens, including possessory liens, on the Debtor's property in their control, thus disrupting the Debtor's business.

79.     The Debtor and its customers rely on a smooth flow of raw materials into the Debtor's facilities and the shipment of finished goods from those facilities. If any of the Lienholders took possession of the Debtor's raw materials or finished goods while in transport or storage, the Debtor's ability to conduct its business would be severely harmed.

80.     Furthermore, because the amount of most of the Lienholder Claims are for less than the value of any property securing those claims, it appears that most of the Lienholders are (or will allege that they are) fully secured creditors. In general, I am advised that pursuant to section 506 of the Bankruptcy Code, fully secured creditors are entitled to receive (i) payment in full of their prepetition claims, and (ii) the post-petition interest accruing on such claims up to the value of the collateral. Consequently, payment of the Lienholder Claims now will: (a) in most cases give the Lienholders no more than they otherwise would be entitled to receive on account of their claims in the chapter 11 process; and (b) save the Debtor the cost of interest that otherwise may accrue on the Lienholder Claims.

81.     The Debtor estimates that, as of the Petition Date, the aggregate amount **of** Lienholder Claims was approximately $225,236.62.

82.     The Debtor requests that this Court allow the Debtor to pay the pre-petition amounts owed to its Lienholders so that the free flow of the Debtor's raw materials and finished goods can continue during the Chapter 11 case.  I believe that if there is a disruption in the Debtor's supply chain, its ability to fulfill its customer contracts would be imperiled, to the detriment of all of the stakeholders in this case.  Therefore, I believe the relief sought in the Lienholders' Motion is in the best interests of the Debtor.

**F.      Debtor's First Day Motion For an Order Establishing Bar Date For Filing Proofs Of Claim, Including 503(b)(9) Claims and Approving Form and Manner of Notice Thereof ("<u>Bar Date Motion</u>")**

83.     The Restructuring Agreement contemplates a very expedited bankruptcy process. I believe that this is in the interest of the Debtor because it will minimize the disruption to the Debtor's business, its employees, its vendors and customers, and will reduce the costs associated with a bankruptcy case.  In order to comply with the terms of the Restructuring Agreement, the Debtor seeks the entry of an order setting the Bar Date for non-

governmental claims, including claims pursuant to Section 503(b)(9) of the Bankruptcy Code, as November 4, 2013.

84.     The Bar Date Motion also seeks to set the governmental bar date as March 31, 2014, 180 days after the Petition Date. I am advised by counsel that this comports with Section 502(b)(9) of the Bankruptcy Code.

85.     I have been advised that these expedited bar dates comply with all applicable rules and requirements of the Bankruptcy Code.   They will also allow the Debtor to move quickly to fulfill the terms of the Restructuring Agreement and will hasten its exit from bankruptcy, to the benefit of all stakeholders.   Thus, I believe the relief sought in the Bar Date Motion is in the best interest of the Debtor.

**G.     Debtor's Motion For An Order (I) Approving Disclosure Statement; (II) Approving Form And Manner of Notice of Confirmation Hearing; (III) Establishing Procedures For Filing Objections To Confirmation of Debtor's Plan; (IV) Approving Balloting Agents; (V) Approving Solicitation Package And Related Procedures; (VI) Setting Voting Record Date; (VII) Approving Forms of Ballots; (VIII) Establishing Voting Deadline; (IX) Approving Procedures For Vote Tabulation; (X) Establishing Deadline And Procedures For Temporary Allowance Of Claims; And (XI) Approving Certain Other Related Matters ("<u>The Disclosure Statement and Solicitation Motion</u>")**

86.     The Debtor has filed the Plan and Disclosure Statement contemporaneously with the petition and the First Day Motions pursuant to the requirements of the Restructuring Agreement.

87.     The Restructuring Agreement requires the Court enter an order approving the Disclosure Statement no later than November 6, 2013.   It further requires that the Plan be confirmed by December 26, 2013.   As such, the Debtor seeks a hearing regarding the Disclosure Statement and the Solicitation Procedures on or before November 6, 2013.

88.     While the Debtor is pursuing an expedited timeline to complete this case, I have been advised that all of the dates and procedures set forth in the Disclosure Statement and Solicitation Motion comply with all applicable rules and requirements of the Bankruptcy Code.

89.     As with the Bar Date Motion, the Debtor is seeking these approvals to fulfill the terms of the Restructuring Agreement and limit the time spent in bankruptcy and the costs associated therewith.   As such, I believe the relief sought in the Disclosure Statement and Solicitation Motion is in the best interest of the Debtor.

**H.     Debtor's First Day Motion For Entry of an Order Pursuant To 11 U.S.C. 105(a) and 363(c) Authorizing The Debtor To Honor Prepetition Obligations To Customers and Otherwise Continue Customer Programs In The Ordinary Course of Business ("Customer Programs Motion")**

90.     In the Ordinary course of the Debtor's business, the Debtor offers incentive programs to certain of its customers (the "Customer Programs").  The Customer Programs are designed to encourage the Debtor's customers to purchase more supply from the Debtor, rather than its competitors, and to reward the loyalty of customers who do so.

91.     A large portion of the Debtor's business involves the sale of a commodity, honey, which is available from multiple sources.  In fact, many of the Debtor's customers purchase their supply from more than vendor in order to ensure they always have a ready stock of honey for use in their own businesses.  The Customer Programs are designed to encourage the Debtor's customers to purchase a larger percentage of their supply from the Debtor.

92.     The Customer Programs consist of various marketing initiatives with the Debtor's customers, including but not limited to rebates, allowances and volume discounts based on pre-negotiated terms.   These terms are ordinary course commercial terms for customers in the food service, industrial food and retail industries.   The rebate offered to certain of the Debtor's customers is based on pounds of product sold by the Debtor relative to

final selling prices paid by the customer. Allowances and discounts are based on net sales prices to the customer and are commonly included in the industry for a customer to recover marketing expenses or recognize purchasing power discounts. Historically, the Debtor estimates that the Customer Programs in total account for roughly 15% of its gross sales.

93.     As of the Petition Date, the Debtor has allocated and accrued approximately $170,000 to satisfy its obligations under the Customer Programs. However, these amounts are satisfied through credits to the customer rather than through direct cash payments. All of the Debtor's financial projections have accounted for the Customer Programs.

94.     If the Debtor is not authorized to continue the Customer Programs, it risks the goodwill of its customers, most of whom can easily replace the goods supplied by Debtor. As such, I believe the relatively low cost of the Customer Programs is justified by the additional sales they allow, and the relief sought in the Customer Programs Motion is in the best interest of the Debtor.

I.      **Debtor's First Day Motion Pursuant To Sections 105(a), 363(b), 503(b)(1) and 503(b)(9) Of The Bankruptcy Code, For An Order (I) Authorizing But Not Obligating The Debtor To Pay 503(b)(9) Claims On An Immediate Basis and (II) Confirming Administrative Expense Priority For Goods Delivered Post-Petition (the "503(b)(9) and Administrative Expense Confirmation Motion")**

95.     As explained herein, The Debtor has experienced significant liquidity issues in the months leading up to this bankruptcy case. As a result, it has not been able to pay its vendors in a timely manner. The Debtor is concerned that this bankruptcy filing will further erode the vendors' confidence in the Debtor's ability to pay them, and they will choose to ship to other customers. This is particularly true of the raw honey the Debtor needs to support the majority of tis operations. Honey is a fungible commodity and the Debtor competes with many other purchasers on the open market. The Debtor is particularly concerned that vendors may,

upon learning of this bankruptcy filing, direct their common carriers to halt delivery to the Debtor. If the Debtor is unable to secure the necessary honey and other raw materials to continue its operations, it will be unable to meet its customer obligations and its ability to reorganize will be threatened.

96. By the 503(b)(9) and Administrative Expense Confirmation Motion, the Debtor seeks to alleviate the concerns its vendors are likely to have once they are notified of this case. The Debtor seeks authority, but not the obligation, to pay the 503(b)(9) claims before confirmation. In exchange for the payment of the 503(b)(9) claims, the Debtor may impose trade terms on certain vendors in order to ensure a stable flow of raw materials during this case.

97. I am advised that the 503(b)(9) claims must be paid in full on the Effective Date of the Plan, which is likely to be about 105 days after the Petition Date. As such, the Debtor is only seeking to change the timing of these required payments. Doing so will provide the Debtor with a continued supply of raw materials during the case and will not be detrimental to any other parties in the case.

98. The 503(b)(9) and Administrative Expense Confirmation Motion also seeks confirmation from the Court that any goods delivered to it after the Petition Date will be considered administrative expenses. The Debtor believes that an order including such confirmation will help ensure that vendors who have goods in transit to the Debtor will not halt those shipments when they learn that the Debtor filed this bankruptcy case. This will also keep the Debtor's operation running and allow it to continue to fulfill its customer obligations. Therefore, I believe that the relief sought in the 503(b)(9) and Administrative Expense Confirmation Motion is in the best interests of the Debtor.

**J.** **Debtor's First Day Application To Employ Foley & Lardner LLP As General Bankruptcy Counsel Pursuant To 11 U.S.C. §§ 327(A), 328(A), 329 & 1107, Rules 2014(A) & 2016(B) Of The Federal Rules Of Bankruptcy Procedure And Local Bankruptcy Rule 2014-1, Or In The Alternative, Special Counsel Pursuant To 11 U.S.C. §§ 327(E), 328(A), 329 & 1107, Rules 2014(A) & 2016(B) Of The Federal Rules Of Bankruptcy Procedure And Local Bankruptcy Rule 2014-1 ("<u>The Foley Retention Application</u>")**

99. The Debtor has filed the Foley Retention Application with its First Day Pleadings. Foley & Lardner LLP ("<u>Foley</u>") has represented the Debtor for six years in all aspects of the Debtor's business. Foley conducted an extensive investigation of the issues raised by the DOJ related to the transshipping of honey. Foley also negotiated the DPA on behalf of the Debtor. Foley represents the Debtor with respect to the Putative Class Action and has been attempting to settle that matter efficiently and expeditiously. Most recently, Foley has been deeply involved in the Debtor's restructuring efforts, including most significantly, the negotiation of the Restructuring Agreement.

100. The Debtor believes that Foley is the best-suited law firm to represent it as general bankruptcy counsel, due to its significant involvement with the Debtor and its institutional knowledge of the Debtor's business. Furthermore, given the extremely tight deadlines in the Restructuring Agreement, the Debtor does not believe it could bring another law firm up to speed quickly enough to complete the bankruptcy process in the time allotted.

101. However, the Debtor understands that as a result of Foley's prior involvement with it, there may be certain requirements of the Bankruptcy Code that could prevent it from being approved as the Debtor's general bankruptcy counsel. Therefore, the Debtor requires certainty as to whether Foley will be able to represent it in the case as quickly as possible, and accordingly is seeking expedited consideration of the Foley Retention Application.

102. In the event Foley cannot be retained as general bankruptcy counsel, the Debtor seeks to retain it as special counsel in order to leverage its knowledge of the Debtor's business

operations and history. The Debtor hopes to retain some of the efficiencies that Foley can provide, though it does not believe such retention will be as beneficial to the estate as if it can retain Foley as general bankruptcy counsel.

103. Based on the Debtor's need to confirm its ability to retain Foley, or if necessary, secure another law firm to represent it in the case, I believe that the Foley Retention Application and the Court's expedited consideration of it would be in the best interests of the Debtor.

**K.** **Debtor's First Day Motion for Entry of an Order Pursuant to 28 U.S.C. § 156(c) and Bankruptcy Rule 2002 Authorizing Engagement of Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent *Nunc Pro Tunc* to the Petition Date (the "KCC Motion").**

104. The Debtor has also filed the KCC Motion to be heard on an expedited basis. KCC's services are critical to the Debtor in the initial days of the case because of the volume of notices which must be sent in accordance with the timeline in the RSAs.

105. The Debtor has over 1000 creditors and would not be able to efficiently process and serve all of the required notices in this case. Furthermore, the Court's resources would likely be strained by the volume of claims processing and the balloting process required for the Debtor's case. Therefore, engaging KCC is the most reasonable and cost-effective solution to address the needs of the Debtor in this case.

106. Based on the Debtor's need to meet the timeline in the RSAs, and the impact on the Court with respect to the volume of notices, claims, and ballots which will be required in this case, I believe that the engagement of KCC is in the best interest of the Debtor.

[SIGNATURE PAGE FOLLOWS]

I SWEAR UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_____

Jack Irvin, Jr.
Chief Financial Officer
Groeb Farms, Inc.

Dated: October 1, 2013

4848-7492-8917.7

32