THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| GROEB FARMS, INC. | Case No. 13-58200 |
| Debtor. | Honorable Walter Shapero |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO
28 U.S.C. §156(c) AND BANKRUPTCY RULE 2002 AUTHORIZING
ENGAGEMENT OF KURTZMAN CARSON CONSULTANTS LLC
AS CLAIMS, NOTICING, AND BALLOTING AGENT
*NUNC PRO TUNC* TO THE PETITION DATE**

The debtor and debtor in possession in the above-captioned case (the "Debtor"), by and through its proposed counsel, Foley & Lardner, LLP, file this motion (the "Motion") for entry of order pursuant to 28 U.S.C. § 156(c) and Rule 2002(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing and approving the engagement of Kurtzman Carson Consultants LLC ("KCC") as claims, noticing, and balloting agent for the Debtor. In further support of this Motion, the Debtor respectfully represents as follows:

**Jurisdiction and Venue**

1. This Court has jurisdiction to hear the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding and the Application is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The relief sought herein is authorized by 28 U.S.C. § 156(c) and Rule 2002(f) of the Bankruptcy Rules.

**Background**

2. On the date hereof (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan. The Debtor intends to continue in possession of its property and to manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed and no committees have been appointed or designated in the Debtor's chapter 11 case.

3. The Debtor was formed in 1981 and is the country's leading processor and packager of honey for food manufacturers, food service companies, and retail customers.

4. The Debtor is headquartered in Onsted, Michigan. The Debtor also operates a honey processing facility in San Bernardino, California, and maintains a testing lab in Belleview, Florida.

5. The Debtor has approximately 76 full time employees, 8 contractors hired through staffing services, and 4 part time employees. Approximately 47 of the employees are in Michigan, 25 are in California, 2 are in Georgia, and 2 are in Florida. For the fiscal year ended December 31, 2012 the Debtor had net sales from continuing operations of approximately $137.8 million.

6. In 2001, the Government imposed anti-dumping duties on honey imported from China. After the institution of these duties, the honey industry increasingly imported honey whose country of origin was identified to the buyers as Asian nations such as Vietnam, Malaysia, and Indonesia. When imports identified with a Chinese country of origin fell, the Government began to investigate the honey industry and the possibility that honey was being transshipped (i.e. shipped through a second country to conceal its origins) and/or mislabeled to avoid the anti-dumping duties. Beginning in 2007, the U.S. Department of Justice ("DOJ") brought the first of several cases in different districts alleging that U.S. honey packers had imported transshipped

honey. In 2008, the Debtor received a grand jury subpoena seeking information relating to the investigation of its industry.

7. Following an extensive DOJ investigation, in February 2013, the Debtor entered into a deferred prosecution agreement (the "DPA") with the DOJ as a global resolution for the Debtor. The agreement required the Debtor to: (1) accept and acknowledge responsibility for historical purchases of transshipped honey; (2) continue cooperating with the government's ongoing investigation for two years; (3) pay a $2 million fine; (4) dispose of any and all Chinese-origin honey in its possession which entered the country in contradiction to the duty requirements and (5) cease selling any of its finished goods containing such Chinese honey. The agreement further required the Debtor to continue ongoing compliance programs and remediation measures. The DPA acknowledged that two former, unnamed executives had misled the Debtor's board, the Debtor's customers and the public.

8. Both before and after execution of the DPA, the Debtor took a number of steps to remediate issues regarding potentially transshipped honey. In January 2012, the Debtor retained Foley & Lardner LLP to conduct an internal investigation. In January 2012, the Debtor also began revising its policies and procedures relating to the procurement of honey overseas. In February 2012, the Debtor named a new interim president and relieved its then-current CEO from his operating responsibilities. In June 2012, the Debtor agreed to a separation agreement with such CEO and stripped the then-current vice president of operations of all purchasing responsibility and subsequently terminated him. The Debtor hired a new full time president and CEO, Rolf Richter, effective June 27, 2012. The Debtor also licensed software to facilitate verification of container numbers and countries of origin for the honey that the Debtor purchases. The Debtor continues to carry BRC certification at each of its plants, which is a globally

recognized food safety, quality and audit program subject to stringent audit testing by third parties. The Debtor also has strengthened its supplier audit program and reinvigorated lab testing procedures at its state-of the-art lab testing facility in Florida. In October 2012, the Debtor hired John Wolf as its Vice President of Supply Chain and Management, to further enhance supply management and compliance. Mr. Wolf has a long history of experience in the food industry, including 24 years with Kellogg's.

9. As a result of the foregoing measures, the Debtor has robust policies and procedures in place relating to the purchase of honey to avoid international duty issues in the future. The Debtor also provides compliance training to all of its employees.

10. The Debtor had hoped that the DPA would enable the Debtor to have a fresh start with new executives and a new compliance program. However, in April 2013, just two months after the DPA was finalized, two civil putative class action lawsuits were filed against the Debtor in the United States District Court for the Northern District of Illinois by producers, packers and/or distributors of honey. In *Adee Honey Farms, et al v. Groeb Farms, et al.*, Case No. 1:13-cv-02922 (the "Adee Lawsuit"), the putative class alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Lanham Act. In *Moore's Honey Farm, et al. v. Groeb Farms, Inc., et al.*, Case No. 1:13-cv-02905 (the "Moore Lawsuit", and collectively with the Adee Lawsuit, the "Putative Class Actions"), the putative class alleges violations of RICO and common law fraud, negligent misrepresentations, conspiracy, and clandestine wrongful importation without paying the anti-dumping duties. On June 24, 2013, the Putative Class Actions were consolidated (hereinafter, the "Putative Class Action") by Order of the Court handling the Moore Lawsuit (the "Consolidation Order"). An Amended Complaint must be filed pursuant to the Consolidation Order on or before October 21, 2013. The Putative Class Action is

based on the factual statements contained in the DPA and claims the class members were harmed by the Debtor and other defendants' purchases of transshipped honey. While none of the claims make a specific damage demand, RICO and Lanham Act cases carry a potential for treble damages and attorneys' fees.

11. As a result of the DPA, and the costs associated with it, including: (1) the $2,000,000 fine; (2) the legal fees; (3) the costs of the compliance programs; and (4) the costs incurred in recruiting and hiring new, experienced executives, the Debtor has incurred significant unanticipated expenses.

12. Although the Debtor has significant defenses to the allegations in the Putative Class Action, the fine, the attorneys' fees and litigation and other expenses have severely strained, and would continue to severely strain, the Debtor's liquidity. In addition, despite the fact that the putative classes have not been certified, the mere existence of these lawsuits negatively affects the value of the Debtor outside of a bankruptcy proceeding and impedes potential buyers from purchasing the company at a maximized value to resolve the Debtor's financial issues.

13. In addition, increased prices in the honey market and supply shortages have had a negative impact on the Debtor. In late 2010, the Debtor had contracts with certain suppliers to purchase substantial amounts of honey at agreed-upon prices, while the honey market was experiencing significant price increases. However, these suppliers failed to deliver the product to the Debtor. As a result, the Debtor was forced to re-enter the honey market to buy replacement product at a time when, on a global basis, prices were increasing and the supply of honey was decreasing. The Debtor has initiated legal action against certain suppliers in order to

4814-2484-7126.1

13-58200-wsd Doc 16 Filed 10/01/13 Entered 10/01/13 18:36:22 Page 5 of 16

receive the contracted honey. These issues have put further pressure on the Debtor's financial condition.

14. As a result of the foregoing and various other factors, the Debtor defaulted under its Credit Agreement with Wells Fargo Bank, N.A. ("Wells"). As a result, Wells began to exercise its rights and remedies, including without limitation: (a) imposing a $750,000 reserve in borrowing on July 23, 2013; and (b) reducing or limiting the Debtor's available credit. These actions significantly reduced the Debtor's available cash, rendering it unable to buy necessary raw honey needed in the operation of its business.

15. On or about July 24, 2013, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan") to assist with the assessment and implementation of strategic alternatives. Thereafter, Houlihan undertook an extensive marketing effort, including reaching out to 165 potentially interested parties, including strategic and financial buyers and capital providers. Houlihan secured Confidentiality Agreements from 75 parties and submitted a Confidential Information Memorandum to those parties. As part of the marketing process, Houlihan requested the submission of Indications of Interest ("IOIs") on or before September 18, 2013.

16. The Debtor received eight written IOIs, including a proposal from Honey Financing Company, LLC ("Honey Financing"), an affiliate of Peak Rock Capital, to restructure the obligations of the Debtor and acquire the equity of the reorganized Debtor pursuant to the chapter 11 Plan of Reorganization (the "Plan") filed contemporaneously herewith. After reviewing the IOIs, the Debtor determined that the proposal from Honey Financing was the best overall offer based on the following factors, among others: (1) the Debtor's financing needs and lending arrangements; (2) the speed and certainty of closing the transaction; and (3) the total overall value to be provided to all stakeholders as a result of the transaction. Therefore, the

Debtor elected to pursue the transaction with Honey Financing. The Debtor entered into the Restructuring Support Agreement in connection with the offer (the "Honey Financing RSA").

17. Also on September 18, 2013, HC Capital Holding 0909A ("HC"), an affiliate of Honey Financing, purchased the Wells debt, and became the Debtor's senior secured lender.

18. In order to further bolster its restructuring efforts, the Debtor executed a Restructuring Support Agreement with its senior subordinated debt holders, Argosy Investment Partners II, L.P, and Marquette Capital Fund I, LP (the "Senior Subordinated Debt RSA").

19. The Debtor has also entered into a Restructuring Support Agreement with the interim class action co-lead counsel in the Putative Class Action (the "Putative Class Action RSA" and collectively with the Honey Financing RSA and the Senior Subordinated Debt RSA, the "RSAs").

20. The Debtor filed this chapter 11 case in order to affect the restructuring transaction as defined in the RSAs.

21. Additional factual background relating to the Debtor, including its corporate structure, business operations, the circumstances leading to the filing of the chapter 11 case, the Restructuring Agreement and the Debtor's existing indebtedness, is set forth in detail in the Irvin Declaration, filed concurrently herewith and fully incorporated herein by reference.

**Relief Requested**

22. Pursuant to 28 U.S.C. 156(c) and Bankruptcy Rule 2002, the Debtor seeks to engage KCC in connection with this Chapter 11 Case pursuant to the terms set forth in the proposed engagement agreement (the "Engagement Agreement"), attached hereto as **Exhibit 6**

## Basis for Relief

23.   The relief requested herein is appropriate under 28 U.S.C. § 156(c) which governs staffing and expenses of the Court and states in pertinent part:

> Any court may utilize facilities or services, either on or off the court's premises, which pertain to the provision of notices, dockets, calendars, and other administrative information to parties in cases filed under the provisions of title 11, United States Code, where the costs of such facilities or services are paid out of the assets of the estate and are not charged to the United States.

28 U.S.C. § 156(c).

24.   The Debtor has identified approximately 1000 entities or persons to which notice must be given for various purposes, making utilization of an outside claims and noticing agent appropriate in this case. Noticing and receiving, docketing and maintaining proofs of claim would impose heavy administrative and other burdens upon the Court and the Office of the Clerk of the United States Bankruptcy Court for the Eastern District of Michigan (the "Clerk's Office"). Preparing and serving the notices on all such creditors and parties in interest and docketing and maintaining the large number of proofs of claim that may be filed in this case would strain the resources of the Clerk's Office.

25.   The Debtor respectfully submits that the Debtor's engagement of an independent third party to act as agent for the Court and to perform such services is the most effective and efficient manner by which to perform, among other things, the following tasks: (i) transmit certain notices to creditors and parties in interest in this case, (ii) receiving, docketing, maintaining, photocopying and transmitting proofs of claim in this case, (iii) overseeing the distribution of solicitation material, (iv) receiving, reviewing and tabulating ballots, and (v) performing other administrative tasks such as maintaining creditor lists and mailing addresses.

26. Accordingly, the Debtor proposes to engage KCC to perform these tasks in this case.

**Scope of KCC's Services**[1]

27. The Debtor seeks to engage KCC to, among other things, (i) transmit certain notices to creditors and parties in interest in this case, (ii) receiving, docketing, maintaining, photocopying and transmitting proofs of claim in this case, (iii) overseeing the distribution of solicitation material, (iv) receiving, reviewing and tabulating ballots, and (v) performing other administrative tasks such as maintaining creditor lists and mailing addresses. If KCC is not engaged, then the Debtor may have to divert substantial manpower to, or employ other professionals to, among other tasks, manage the claims process and implement the plan solicitation process.

28. Pursuant to the Engagement Agreement, KCC may provide the following services to the Debtor:

    a. Prepare and serve required notices in this Chapter 11 Case, such as:

        (1) notice of the commencement of this Chapter 11 Case and the initial meeting of creditors pursuant to § 341(a) of the Bankruptcy Code;

        (2) notice of the claims bar date;

        (3) notice of objections to claims;

        (4) notice of any hearings on the disclosure statement and confirmation of the plan of reorganization; and

        (5) other miscellaneous notices to any entities, as the Debtor may deem necessary or appropriate for an orderly administration of this Chapter 11 Case;

---

[1] This only serves as a summary of the services to be provided. If there are any discrepancies between the Application and the Engagement Agreement, the Engagement Agreement shall govern.

b. After the mailing of a particular notice, prepare for filing with the Bankruptcy Court a certificate or affidavit of service that includes a copy of the notice involved, an alphabetical list of persons to whom the notice was mailed, and the date and manner of mailing;

c. Receive and record proofs of claim and proofs of interest filed;

d. Create and maintain official claims registers, including, among other things, the following information for each proof of claim or proof of interest:

    (1) the name and address of the claimant and any agent thereof, if the proof of claim or proof of interest was filed by an agent, and the entity against which such claim was filed;

    (2) the date received;

    (3) the claim number assigned;

    (4) the asserted amount and classification of the claim;

    (5) implement necessary security measures to ensure the completeness and integrity of the claims registers; and

    (6) transmit to the Clerk's Office a copy of the claims registers upon request and at agreed upon intervals;

e. Act as balloting agent which will include the following services:

    (1) print ballots including the printing of color-coded, creditor- and shareholder-specific ballots, as required by the plan of reorganization;

    (2) prepare voting reports by plan class, creditor or shareholder and amount for review and approval by the Debtor and its counsel;

    (3) coordinate mailing of ballots, disclosure statement and plan of reorganization or other appropriate materials to all voting and nonvoting parties and provide affidavit of service;

    (4) establish a telephone contact number to receive questions regarding voting on the plan; and

    (5) receive and tabulate ballots, inspect ballots for conformity to voting procedures, date stamp and number ballots consecutively, provide computerized balloting database services and certify the tabulation results;

f. Maintain an up-to-date mailing list for all entities that have filed a proof of claim or proof of interest, which list shall be available upon request of a party in interest or the Clerk's Office;

g. Provide access to the public for examination of copies of the proofs of claim or interest without charge during regular business hours;

h. Record all transfers of claims pursuant to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 3001(e)") and provide notice of such transfers as required by Bankruptcy Rule 3001(e);

i. Comply with applicable federal, state, municipal, and local statutes, ordinances, rules, regulations, orders and other requirements;

j. Promptly comply with such further conditions and requirements as the Clerk's Office or the Court may at any time prescribe; and

k. Perform such other administrative and support services related to noticing, claims, docketing, solicitation and distribution as the Debtor may reasonably request and which Servicing Agent may agree to perform, including but not limited to, providing administrative support services with respect to the Debtor's information assembly and dissemination/distribution functions.

29. The Debtor believes that the engagement of KCC will: (a) relieve the Clerk's Office of a significant administrative burden, (b) avoid delay in processing proofs of claim and interests, (c) reduce legal fees that would be otherwise incurred in connection with the retrieval of proof of claim copies from the Clerk's Office and responding to numerous claim-related inquiries, and (d) reduce costs of notice to parties and provide an efficient medium to communicate case information. In addition, the Debtor's management and professionals will

coordinate responsibilities with KCC to ensure that no unnecessary duplication of services occurs.

### KCC's Qualifications

30. KCC is well-qualified to perform claims processing and the various services set forth in the Engagement Agreement. KCC specializes in providing data processing services to chapter 11 debtors in connection with administration and reconciliation of claims, as well as administration of plan balloting.

31. KCC has provided identical or substantially similar services, as contractor or subcontractor, in many other chapter 11 cases in this and a variety of other jurisdictions. *See, e.g., Energy Conversion Devices, Inc., et al.,* Case No. 12-43166 (Bankr. E.D. Mich. 2012); *In re Checker Motors Corp.*, Case No. 09-00358 (Bankr. W.D. Mich. 2009); *In re Contech U.S., LLC, et al.*, Case No. 09-42392 (Bankr. E.D. Mich. 2009); *In re North Oakland Medical Center (Pontiac General Hospital)*, Case No. 08-60731 (Bankr. E.D. Mich. 2008); *In re Sturgis Iron & Metal Co., Inc.*, Case No. 08-02966 (Bankr. W.D. Mich. 2008); *In re BHM Technologies Holdings, Inc., et al.*, Case No. 08-04413 (Bankr. W.D. Mich. 2008); *In re Greektown Holdings, LLC, et al.*, Case No. 08-53104 (Bankr. E.D. Mich. 2008); *In re Pine River Plastics, Inc.*, Case No. 07-42051 (Bankr. E.D. Mich. 2007); *In re Collins & Aikman Corp., et al.,* Case No. 05-55927 (Bankr. E.D. Mich. 2005); *In re Giordano's Enter., Inc., et al.,* Case No. 11-06098 (Bankr. N.D. Ill. 2011); *In re Gas City, Ltd., et al.,* Case No. 10-47879 (Bankr. N.D. Ill. 2010); *In re AMCORE Financial, Inc.,* Case No. 10-37144 (Bankr. N.D. Ill. 2010); *In re XMH Corp.1 (f/k/a Hartmarx Corp.), et al.,* Case No. 09-02046 (Bankr. N.D. Ill. 2009); *In re Trident Microsystems, Inc., et al.,* Case No. 12-10069 (Bankr. D. Del. 2012); *In re AES Eastern Energy, L.P., et al.,* Case No. 11-14138 (Bankr. D. Del. 2011); *In re William Lyon Homes, et al.,* Case No. 11-14019 (Bankr. D. Del. 2011); *In re PMI Group., Inc.*, Case No. 11-13730 (Bankr. D. Del.

2011); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (Bankr. D. Del. 2011); *In re Filene's Basement, LLC,* Case No. 11-13511 (Bankr. D. Del. 2011); *In re NewPage Corp., et al.,* Case No. 11-12804 (Bankr. D. Del. 2011); *In re DSI Holdings, Inc., et al.,* Case No. 11-11941 (Bankr. D. Del. 2011); *In re Nebraska Book Co., Inc., et al.,* Case No. 11-12005 (Bankr. D. Del. 2011); *In re Alexander Gallo Holdings, LLC, et al.,* Case No. 11-14220(Bankr. S.D.N.Y. 2011); *In re Marco Polo Seatrade B.V., et al.,* Case No. 11-13634 (Bankr. S.D.N.Y. 2011); *In re MSR Resort Golf Course LLC, et al*., Case No. 11-10372 (Bankr. S.D.N.Y. 2011); *In re Great Atl. & Pac. Tea Co.,* Case No. 10-24549 (Bankr. S.D.N.Y. 2010); *In re Vertis Holdings, Inc.,* Case No. 10-16170 (Bankr. S.D.N.Y. 2010).

**Compensation**

32. The Debtor proposes to engage KCC at the rates set forth in the Engagement Agreement. The Debtor and KCC (subject to the Court's authorization hereof) agree that KCC will bill the Debtor monthly for services rendered to the Debtor during the preceding month. The Debtor believes that the proposed rates to be charged by KCC are reasonable and appropriate for services of this nature. Pursuant to section 503(b)(1)(A) of title 11 of the Bankruptcy Code, the Debtor hereby requests that the fees to be charged by KCC, together with its necessary and actual expenses, be allowed as administrative expenses of the Debtor's estate.

33. As part of the overall compensation payable to KCC under the terms of the Engagement Agreement, the Debtor has agreed to certain limitations of liability and indemnification obligations as described in the Engagement Agreement. These indemnification obligations exclude any losses arising from KCC's gross negligence or willful misconduct, and also any indemnification for any matter which does not comport with applicable law.

34. If KCC's services are terminated, KCC shall perform its duties until a complete transition with the Clerk's Office or any successor claims/noticing/balloting agent occurs in accordance with the amounts and procedures set forth in the Engagement Agreement.

35. The Debtor respectfully submits that the fees and expenses to be incurred by KCC are administrative in nature and, therefore, should not be subject to the standard fee application procedures for professionals. Specifically, the Debtor requests authorization to compensate KCC on a monthly basis, in accordance with the terms of the Engagement Agreement, upon KCC's submission to the Debtor, United States Trustee and counsel for any official committees to be formed in this case of monthly invoices summarizing in reasonable detail the services rendered and expenses incurred in connection with services provided by KCC. The Debtor further proposes that any official committee and the United States Trustee have fifteen (15) days from service of a monthly invoice to object to payment of the invoice by the Debtor, and that in the event any such objection cannot be resolved by the parties, that the Debtor shall schedule the objection for hearing.

36. KCC will comply with all requests of the Clerk's Office and follow the guidelines promulgated by the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c).

**KCC's Disinterestedness**

37. Although the Debtor does not propose to retain KCC under Section 327 of the Bankruptcy Code, to the best of the Debtor's knowledge, and as disclosed in the attached Gershbein Affidavit, the officers and employees of KCC: (a) do not have any material adverse connection with the Debtor, the Debtor's creditors or any other party in interest or its respective attorneys and accountants, the United States Trustee or any person employed in the office of the United States Trustee; and (b) do not hold or represent an interest materially adverse to the

Debtor's estate. Because of the ministerial nature of the duties performed by KCC and the confidentiality clause in the Engagement Agreement, KCC may, however, provide professional services to entities or persons that may be creditors or parties in interest in this Chapter 11 Case, which services do not relate to, or have any direct connection with this Chapter 11 Case or the Debtor.

38. To the best of the Debtor's knowledge, KCC is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that its officers and employees:

    a. are not creditors, equity security holders or insiders of the Debtor;

    b. are not and were not, within two years before the date of the filing of the Debtor's Chapter 11 petition, directors, officers or employees of the Debtor; and

    c. do not have an interest materially adverse to the interests of the Debtor's estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor.

39. Prior to the Petition Date, KCC performed certain professional services for the Debtor. The Debtor does not owe KCC any amount for services performed or expenses incurred prior to the Petition Date.

## Notice

40. Notice of this Motion will be given to (i) the United States Trustee for the Eastern District of Michigan, (ii) all known secured creditors and the their counsel; (iii) the twenty (20) largest unsecured creditors of the Debtor, and (iv) any party requesting notice. In light of the nature of the relief requested herein, the Debtor submits that no further notice is required.

41. No previous motion for the requested relief has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form attached as **Exhibit 1**, and granting such further relief as the Court deems appropriate.

| | |
|---|---|
| Dated: Detroit, Michigan<br>October 1, 2013 | FOLEY & LARDNER LLP<br><br>/s/ Judy A. O'Neill<br>Judy A. O'Neill (P32142)<br>John A. Simon (P61866)<br>Tamar N. Dolcourt (P73425)<br>One Detroit Center<br>500 Woodward Ave., Suite 2700<br>Detroit, MI 48226-3489<br>(313) 234-7100 (Telephone)<br>(313) 234-2800 (Facsimile)<br>*Proposed Counsel for the Debtor and Debtor in Possession* |