**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GROEB FARMS, INC. | ) | Case No. 13-58200 |
|  | ) |  |
| Debtor. | ) | Honorable Walter Shapero |
|  | ) |  |

### DISCLOSURE STATEMENT FOR THE
### PLAN OF REORGANIZATION OF GROEB FARMS, INC.
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE
### DATED OCTOBER 1, 2013

FOLEY & LARDNER LLP
Judy A. O'Neill (P32142)
John A. Simon (P61866)
Tamar N. Dolcourt (P73425)
One Detroit Center
500 Woodward Ave., Suite 2700
Detroit, MI 48226-3489
(313) 234-7100 (Telephone)
(313) 234-2800 (Facsimile)

*Proposed Counsel for the Debtor and Debtor
in Possession*

# TABLE OF CONTENTS

**ARTICLE 1.** ................................................................................................................ 3

    **INTRODUCTION** ...................................................................................................... 3
    A.    Overview of Chapter 11 ................................................................................ 3

**ARTICLE 2.** ................................................................................................................ 3

    **SUMMARY OF THE PLAN** ..................................................................................... 3
    A.    Overview of the Plan ..................................................................................... 4
        1.    Unclassified Allowed Administrative Claims and Priority Tax
               Claims ................................................................................................ 4
        i.    Applications for and Payment of Fee Claims ............................................. 5
        ii.    Final Fee Applications and Payment of Fee Claims .................................. 5
        iii.    Post-Effective Date Fees and Expenses ..................................................... 6
        2.    Classification of Claims and Equity Interests ............................................ 6
    B.    Classified Claims ........................................................................................ 10
        1.    Class 1:  Other Priority Claims ................................................................. 10
        2.    Class 2:  Other Secured Claims ................................................................. 11
        3.    Class 3: Senior Loan Claims ...................................................................... 11
        4.    Class 4:  Senior Subordinated Note Claims ............................................... 12
        5.    Class 5A:  Trade Claims ............................................................................ 13
        6.    Class 5B:  Other General Unsecured Claims ............................................ 13
        7.    Class 5C: Unsecured Convenience Class Claims ...................................... 14
        8.    Class 6:  Section 510(b) Claims ................................................................ 14
        9.    Class 7:  Existing Equity Interests ............................................................ 14

**ARTICLE 3.** .............................................................................................................. 15

    **DESCRIPTION OF THE DEBTOR AND THE DEBTOR'S BUSINESS** ............... 15
    A.    Description of the Debtor .............................................................................. 15
    B.    Description of the Principals ......................................................................... 15
        1.    Rolf Richter ................................................................................................ 15
        2.    Jack Irvin, Jr. ............................................................................................. 16
        3.    John Wolf ................................................................................................... 16
        4.    Craig Moore ............................................................................................... 16
        5.    Michael Modjeski ...................................................................................... 16
        6.    Joyce Schlachter ........................................................................................ 17
    C.    Events Leading to Chapter 11 ...................................................................... 17
        1.    The Debtor's Debt Financing ..................................................................... 17
        2.    Government Investigations into the Debtor's Business ............................... 18
        3.    The Debtor Defaulted on the Loans ........................................................... 20
        4.    Marketing Efforts by the Debtor's Consultants and the Sale of the
               Loans ........................................................................................................... 20

     5.     The Restructuring Support Agreements .................................................... 21

**ARTICLE 4.** ................................................................................................................. 23

**SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES** ........................ 23
A.    Petition Date ................................................................................................. 23
B.    First Day Filings and Motions ..................................................................... 23
C.    The DIP Facility .......................................................................................... 24
D.    Retention of Professionals .......................................................................... 24
     1.     Debtor's Counsel ............................................................................. 24
     2.     Debtor's Financial Consultant ........................................................ 25
     3.     Debtor's Financial Advisor & Investment Banker ................................. 25
     4.     Debtor's Notice and Claims Agent .................................................. 25
E.    Litigation Pending During the Chapter 11 Case ...................................... 25

**ARTICLE 5.** ................................................................................................................. 25

**ASSETS AND LIABILITIES** .................................................................................. 25
A.    Assets ............................................................................................................ 25
     1.     Cash .................................................................................................. 25
     2.     Accounts Receivable ....................................................................... 25
     3.     Inventory ......................................................................................... 26
     4.     Leased Premises .............................................................................. 26
     5.     Property, Plant & Equipment .......................................................... 27
     6.     Promissory Note Receivables ......................................................... 27
     7.     Preferences/Fraudulent Transfer ..................................................... 27
     8.     Causes of Action ............................................................................. 28
B.    Liabilities ..................................................................................................... 28
     1.     Accounts Payable ............................................................................ 28
     2.     Accrued Expenses ........................................................................... 28
     3.     The Senior Loan Facility ................................................................ 28
     4.     Sr. Subordinated Notes .................................................................... 29
     5.     Jr. Subordinated Notes .................................................................... 29
     6.     The Seller Note ............................................................................... 29
C.    Letters of Credit .......................................................................................... 29
D.    Lease Rejections .......................................................................................... 29
E.    Other Obligations ........................................................................................ 29

**ARTICLE 6.** ................................................................................................................. 30

**DETAILS REGARDING IMPLEMENTATION OF PLAN** ................................... 30
A.    Restructuring Transactions .......................................................................... 30
B.    Sources of Consideration for Plan Distributions ....................................... 30
     1.     Cash Consideration ......................................................................... 30
     2.     Issuance and Distribution of New Equity ...................................... 30
     3.     Exit Facility ..................................................................................... 31
C.    New Subordinated Notes and New Warrants ............................................ 31

D.  General Unsecured Claims Litigation Trust .................................................................. 31
    1.  Creation and Governance of the General Unsecured Claims
        Litigation Trust ................................................................................................... 31
    2.  Purpose of the General Unsecured Claims Litigation Trust .................... 32
    3.  General Unsecured Claims Litigation Trustee and General
        Unsecured Claims Litigation Trust Agreement ........................................ 32
    4.  Compensation and Duties of the General Unsecured Claims
        Litigation Trustee ............................................................................................. 33
    5.  Cooperation of Reorganized Debtor ........................................................... 33
    6.  United States Federal Income Tax Treatment of the General
        Unsecured Claims Litigation Trust .............................................................. 34
    7.  Tax Reporting ..................................................................................................... 34
    8.  General Unsecured Claims Litigation Trust Assets.................................. 35
    9.  General Unsecured Claims Litigation Trust Fees and Expenses ............ 35
    10. Distribution of Unrestricted Cash ............................................................... 36
    11. General Unsecured Claims Litigation Trust Funding ............................... 36
    12. Distributions to General Unsecured Claims Litigation Trust
        Beneficiaries ...................................................................................................... 36
    13. Cash Investments .............................................................................................. 36
    14. Dissolution of the General Unsecured Claims Litigation Trust.............. 36
E.  Corporate Existence ........................................................................................................ 37
F.  Vesting of Assets in the Reorganized Debtor ........................................................... 37
G.  Cancellation of Existing Securities............................................................................. 37
H.  Corporate Action.............................................................................................................. 38
I.  New Management Incentive Plan ................................................................................. 38
J.  Directors and Officers of the Reorganized Debtor ................................................. 39
K.  Effectuating Documents; Further Transactions ...................................................... 39
L.  Exemption from Certain Taxes and Fees................................................................... 39
M.  Preservation of Causes of Action................................................................................ 39
N.  Release of Avoidance Actions ...................................................................................... 40
F.  Treatment of Executory Contracts and Unexpired Leases ................................... 40
    1.  Assumption and Rejection of Executory Contracts and Unexpired
        Leases.................................................................................................................... 40
    2.  Claims Based on Rejection of Executory Contracts or Unexpired
        Leases.................................................................................................................... 41
    3.  Cure of Defaults for Assumed Executory Contracts and Unexpired
        Leases.................................................................................................................... 41
    4.  Insurance Policies ............................................................................................. 42
    5.  Modifications, Amendments, Supplements, Restatements, or Other
        Agreements.......................................................................................................... 42
    6.  Reservation of Rights....................................................................................... 42
    7.  Contracts and Leases Entered Into After the Petition Date .................... 42
    8.  Nonoccurrence of Effective Date................................................................... 43
    9.  Deferred Prosecution Agreement.................................................................. 43

**ARTICLE 7.** ................................................................................................................ 43

**VOTING PROCEDURES** ........................................................................................ 43
A.    Voting Procedures ............................................................................................... 43
B.    Acceptance ........................................................................................................... 44
C.    Confirmation ....................................................................................................... 44
D.    Modification ........................................................................................................ 44
E.    Effect of Confirmation ....................................................................................... 44

**ARTICLE 8.** ................................................................................................................ 45

**CRAMDOWN AND THE ABSOLUTE PRIORITY RULE** ..................................... 45
A.    Discriminate Unfairly ......................................................................................... 45
B.    Fair and Equitable Standard ................................................................................ 45
    1.    Secured Claims ........................................................................................ 45
    2.    Unsecured Claims. ................................................................................... 46
    3.    Existing Equity Interests. ........................................................................ 46

**ARTICLE 9.** ................................................................................................................ 46

**BEST INTERESTS TEST** ........................................................................................ 46

**ARTICLE 10.** .............................................................................................................. 47

**FEASIBILITY** ........................................................................................................... 47

**ARTICLE 11.** .............................................................................................................. 47

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN** ................................................................................................................. 47
A.    Alternative Plan .................................................................................................. 47
B.    Liquidation under Chapter 7 ............................................................................... 48

**ARTICLE 12.** .............................................................................................................. 48

**CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN** ......................................................................... 48
A.    Introduction ......................................................................................................... 48
B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor ......... 49
    1.    Cancellation of Debt and Reduction of Tax Attributes ............................ 49
    2.    Limitation of Tax Attributes .................................................................... 49
    3.    Alternative Minimum Tax ........................................................................ 51
C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of
Allowed Claims ................................................................................................... 51
    1.    Consequences to Holders of Class 3 Senior Loan Claims ....................... 51
    2.    Consequences to Holders of Class 4 Senior Subordinated Notes
Claims ..................................................................................................... 53

        3.        Consequences to Holders of Class 5A Trade Claims, Class 5D Unsecured Convenience Class Claims and Certain Class 5B Class Action Litigation Claims ............................................................. 54

        4.        Consequences to Holders of Class 5C Other General Unsecured Claims and Certain Class 5B Class Action Litigation Claims .................. 54

        5.        Accrued Interest ................................................................................. 55

        6.        Market Discount ................................................................................. 55

D.     Receipt of Interests in the Litigation Trust ............................................. 56

E.     Withholding and Reporting .................................................................... 56

**ARTICLE 13.** ........................................................................................................ 57

**VOTING INSTRUCTIONS** ................................................................................ 57

A.     How to Vote ............................................................................................ 57

B.     Confirmation Hearing ............................................................................. 58

**ARTICLE 14.** ........................................................................................................ 58

**SUMMARY, RECOMMENDATION, AND CONCLUSION** ................................... 58

## DISCLOSURE STATEMENT WITH RESPECT
## TO THE PLAN OF REORGANIZATION OF GROEB FARMS, INC.

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Groeb Farms, Inc. (the "Debtor") proposes the following disclosure statement (the "Disclosure Statement") pursuant to Section 1125(b) of the Bankruptcy Code for use in the solicitation of votes on the Plan of Reorganization of Groeb Farms, Inc., Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan").  A copy of the Plan accompanies this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable nonbankruptcy laws. Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Interests in or securities of, the Debtor should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission or by any state securities commission or similar public, governmental or regulatory authority, and neither such commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

The Plan is a plan of reorganization.  The Plan distributes all of the equity in the Reorganized Debtor to both the Debtor's Senior Lender, HC Capital Holdings 0909A, LLC, as assignee of Wells Fargo Bank, National Association ("Wells"), and the Debtor's DIP Lender, satisfies senior subordinated debts with new notes and warrants, distributes proceeds of Causes of Action to unsecured creditors, cancels prior equity Interests and continues the business of the Debtor.

The Debtor will seek final approval of this Disclosure Statement under Section 1125 of the Bankruptcy Code at a hearing (the "Disclosure Hearing"), which the Debtor will seek to have held no later than thirty-six (36) days after the Petition Date.  The Disclosure Hearing will be held at the U.S. Bankruptcy Court for the Eastern District of Michigan located at 211 West Fort Street Bldg., Detroit, MI 48226, with the specific Courtroom to be determined.  The Debtor will also seek Confirmation of the Plan so that the Bankruptcy Court enters an order confirming the Plan no later than eighty-eight (88) days after the Petition Date.

At the Disclosure Hearing, the Bankruptcy Court will conduct a hearing to determine whether this Disclosure Statement contains adequate information to permit holders of Impaired Claims to make an informed judgment in exercising their rights to vote to accept or to reject the Plan.  If this Disclosure Statement is approved as having "adequate information," the Court will then schedule a hearing to consider Confirmation of the Plan.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference should be made to the Plan and to such documents for the full and complete statements of such terms and provisions.  All capitalized terms used herein, unless otherwise provided, have the meanings set forth in Article I of the Plan.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Existing Equity Interests in the Debtor under the Plan and will, upon the Effective Date of the

Plan, be binding upon all holders of Claims against, and Existing Equity Interests in, the Debtor and its Estate, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan, or any other operative document, the terms of the Plan and such other operative document are controlling.

The Plan contains various bar dates for asserting Claims. The Debtor has Filed a motion with the Bankruptcy Court seeking entry of an order establishing a Claims Bar Date as follows: (a) with respect to Governmental Units holding Claims that arose prior to the Petition Date, March 31, 2014, at 4:00 p.m., prevailing Pacific Time, or such other date established by the Court by which Proofs of Claims must have been Filed; and (b) with respect to all other Claims, except for Administrative Claims, arising prior to the Petition Date, November 4, 2013, at 4:00 p.m., prevailing Pacific Time, or such other date established by the Court by which Proofs of Claims must have been Filed, in each case as set forth in further detail in the Claims Bar Date Order. The right to assert a Claim or bring an objection will be waived unless a creditor complies with the deadlines set by the Bankruptcy Court.

The Debtor believes that Confirmation of the Plan and Consummation of the reorganization provided for therein is in the best interests of the Debtor and its creditors. Accordingly, the Debtor urges each creditor that is Impaired under and entitled to vote with respect to the Plan to vote to accept the Plan. Detailed voting instructions are set forth in Article 13 of this Disclosure Statement.

To be counted, a ballot containing your acceptance or rejection of the Plan must be received by the Debtor's Notice and Claims Agent at **Groeb Farms Claims Processing Center, c/o KCC, 2335 Alaska Ave., El Segundo, CA 90245**, no later than the balloting deadline provided herein by first class U.S. mail or delivered by messenger or overnight courier, ballots sent by facsimile, telecopy, or e-mail will not be accepted. **The balloting deadline is [    ], 2013.** To be considered, all ballots must be received by the Debtor's Notice and Claims Agent at **Groeb Farms Claims Processing Center, c/o KCC, 2335 Alaska Ave., El Segundo, CA 90245** by no later than 4:00 p.m., prevailing Pacific Time, on [    ], 2013. Ballots received after the balloting deadline will not be counted or otherwise considered.

THE DEBTOR STRONGLY URGES ACCEPTANCE OF THE PLAN.

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO. THE ACCURACY OF THE ACCOUNTING, FINANCIAL, ECONOMIC AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE EXCLUSIVE RESPONSIBILITY OF THE DEBTOR.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AT ANY TIME AFTER THE DATE HEREOF SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN ANY CHANGE IN THE INFORMATION STATED HEREIN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS AND OPERATIONS OF THE DEBTOR AND THE HISTORICAL AND PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTOR IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN.

**FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS.**

## ARTICLE 1.

### INTRODUCTION

**A.      Overview of Chapter 11**

On October 1, 2013, the Debtor Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Chapter 11 may be used to effectuate a reorganization of a debtor's business and assets. The commencement of a chapter 11 case creates an Estate that is comprised of all of the legal and equitable interests of the Debtor as of the Filing date. The Bankruptcy Code contemplates that the Debtor, through its pre-bankruptcy management, will continue to operate its business in the ordinary course and remain in possession of its property during the case while it seeks to negotiate and implement a plan. The Bankruptcy Court must approve any activities that are not within the ordinary course of the Debtor's business.

The Consummation of a plan is a principal objective of a chapter 11 case. A plan of reorganization provides for a reorganization of the Debtor's Estate. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder: (i) is impaired under or has accepted the plan; or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the Plan itself or the Confirmation Order, the Confirmation Order will terminate all rights and Interests of Existing Equity Interests as of the date specified in the Plan.

## ARTICLE 2.

### SUMMARY OF THE PLAN

This section summarizes the major terms of the Plan. The Plan is attached to this Disclosure Statement as **Exhibit A**. Parties are encouraged to review the Plan in its entirety for a full understanding of its provision and impact on Creditors and Existing Equity Interests.

**A. Overview of the Plan**

    1.    Unclassified Allowed Administrative Claims and Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article 3 hereof.

Below is a summary of the unclassified Claims:

| Claim Type | Description | Approximate Amount of Claims |
|---|---|---|
| DIP Facility Claims | Claims arising under the DIP Facility. | The DIP Facility Claims are approximately $27,000,000, plus accrued but unpaid interest and fees due and owing as of the Effective Date. |
| Allowed Administrative Claims | Fee Claims are Claims for Accrued Professional Compensation. | Approximately $5,000,000 in unpaid Fee Claims. |
| | U.S. Trustee Fees | Approximately $30,000 in unpaid U.S. Trustee Fees. |
| | Other fees and expenses | This includes, without limitation, any operating expenses incurred since the Petition Date allowed under Section 503 of the Bankruptcy Code, in the approximate amount of $2,200,000. |
| Priority Tax Claims | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Approximately $1,372 in Allowed Priority Tax Claims. |

    *a.*    *Administrative Claims*

Except with respect to Administrative Claims that are Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment with respect to such holder's Administrative Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim, to be paid on the latest of:  (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and payable, or as soon as reasonably practicable thereafter; *provided*, *however*, that Allowed Administrative Claims that arise in the ordinary course of the Debtor's businesses shall be paid in the ordinary course of business, in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other

4

documents relating to such transactions; or (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be.

Except as otherwise provided in Article II.A of the Plan or any prior applicable Court order, and except with respect to Administrative Claims that are Fee Claims or DIP Facility Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Allowed Administrative Claims by such date that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtor and the requesting party no later than thirty (30) days after the Administrative Claims Bar Date.

b.    *Professional Compensation.*

i. Applications for and Payment of Fee Claims

In accordance with Article II.B of the Plan, on the Effective Date, the Debtor shall establish the Professional Fee Account. The Debtor shall fund the Professional Fee Account with Cash in the amount of the aggregate Professional Fee Amount (which amount, for clarity, shall include only unpaid and outstanding Fee Claims) for all Professionals. The Professional Fee Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtor's Estate except as otherwise provided in Article II.B.2 of the Plan.

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall provide an estimate of their Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtor and Senior Lender Affiliate no later than five (5) Business Days prior to the intended Effective Date. If a Professional does not provide an estimate, the Debtor, with the consent of the Senior Lender Affiliate, may estimate the unbilled fees and expenses of such Professional and such estimate will be used to establish the Professional Fee Amount attributable to that Professional. The total amount so estimated shall be the Professional Fee Amount.

ii. Final Fee Applications and Payment of Fee Claims

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Court orders, the Allowed amounts of Fee Claims for Professionals shall be determined by the Court. The amount of Fee Claims owing to Professionals shall be paid in Cash to Professionals from funds held in the Professional Fee Account when such Fee Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Account are unable to satisfy the amount of Fee Claims owing to the Professionals, any Professional whose estimate was lower than the Allowed amount of its Fee Claims shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II of the Plan. After all Allowed Fee Claims have been paid in full to the extent required by Article II.B.2 of the Plan, any excess amounts in the Professional Fee Account shall be returned to or transferred to the Reorganized Debtor.

### iii. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, shall pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtor.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

### c.     DIP Facility Claims

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, each such holder shall receive (i) its Pro Rata share of the New Equity based on the New Equity Distribution Calculation in satisfaction of $7 million of DIP Facility Claims and (ii) payment in full, in Cash, on the Effective Date or as soon as reasonably practicable after the Effective Date; *provided*, *however*, that to the extent the Commitment Fee (as defined in the DIP Agreement) has previously been paid and included as part of the DIP Facility Claim, an amount equal to the Commitment Fee shall be waived by the DIP Lender and the Allowed DIP Facility Claim paid in Cash, as set forth in Article III.B of the Plan, shall be reduced by such amount to reflect the waiver.

### d.     Priority Tax Claims

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired under the Plan. Unless the holder of such Claim and the Debtor agree to a different treatment, holders of Priority Tax Claims shall be paid, to the extent such Claims are Allowed, in the ordinary course of the Debtor's business, consistent with past practice; *provided*, *however*, that in the event the balance of any such Claim becomes due during the pendency of this Chapter 11 Case and remains unpaid as of the Effective Date, the holder of such Claim shall be paid in full in Cash on the Effective Date. A Secured Tax Claim shall be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### e.     Administrative Expense Claim Bar Date.

No Administrative Expense Claim will be an Allowed Administrative Expense Claim and such Claim shall be forever barred and enjoined if it is not Filed by the first Business Day that is forty-five (45) days following the Administrative Claims Bar Date, except as specifically set forth in the Plan or a Final Order.

### 2.     Classification of Claims and Equity Interests

While the amount of distributions to certain Classes is currently unknown, the Debtor believes that the Plan provides the best and most prompt possible recovery for holders of Claims. Under the Plan, Claims against and Existing Equity Interests in the Debtor are divided into different Classes as follows:

| Class | Description | Status | Voting |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| Class 3 | Senior Loan Claims | Impaired | Entitled to Vote |
| Class 4 | Senior Subordinated Note Claims | Impaired | Entitled to Vote |
| Class 5A | Trade Claims | Impaired | Entitled to Vote |
| Class 5B | Other General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5C | Unsecured Convenience Class Claims | Unimpaired | Deemed to Accept |
| Class 6 | Section 510(b) Claims | Impaired | Deemed to Reject |
| Class 7 | Existing Equity Interests | Impaired | Deemed to Reject |

The following table is only a summary of the distribution to holders of Classified Claims. For a more detailed analysis, please refer to the discussion below:

| Class No. | Class Name | Approximate Amount of Claims | Treatment |
|---|---|---|---|
| Class 1 (Unimpaired – Not entitled to vote) | Other Priority Claims | Approximately $0 in total Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Case, in full in Cash in the ordinary course of business by the Debtor or the Reorganized Debtor, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, or as soon thereafter as reasonably practicable, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court. |
| Class 2 | Other Secured | Approximately $0 | On the Effective Date, except to the extent that |

| Class No. | Class Name | Approximate Amount of Claims | Treatment |
|---|---|---|---|
| (Unimpaired – Not entitled to vote) | Claims | in Other Secured Claims | a holder of an Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Senior Lender Affiliate: (i) payment in full in Cash, including the payment of interest allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any; (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code; (iii) the collateral securing any such Allowed Other Secured Claim, or (iv) such other consideration so as to render such Allowed Other Secured Claim Unimpaired.<br><br>In the event an Allowed Other Secured Claim may also be classified as a Secured Tax Claim, such Claim shall: (i) be paid in full in Cash, including the payment of interest under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any, or (ii) retain any lien until such Claim is paid in full (it being understood that such Other Secured Claim may be paid in the ordinary course as and when it comes due, rather than on the Effective Date). |
| Class 3 (Impaired – entitled to vote) | Senior Loan Claims | Approximately $16,570,949.08 in Senior Loan Claims (to the extent any such amounts have not been previously satisfied pursuant to the DIP Facility) | On the Effective Date, except to the extent that a holder of a Senior Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Senior Loan Claim, each holder of a Senior Loan Claim shall receive (i) Cash in satisfaction of any Allowed Senior Loan Claim in excess of $3 million and (ii) its Pro Rata share of the New Equity in the Reorganized Debtor based on the New Equity Distribution Calculation in satisfaction of all remaining Allowed Senior Loan Claims, after which, on the Effective Date the cash collateral pledged in favor of the Senior Lender pursuant to various pledge agreements executed by Argosy Investment Partners III, L.P., Marquette Capital Fund I, LP, Horizon Partners, Ltd., and Horizon Capital Partners III, L.P., to secure the Senior |

| Class No. | Class Name | Approximate Amount of Claims | Treatment |
|---|---|---|---|
| | | | Loan Claims shall be released to its respective pledgers in accordance with their respective interests therein. |
| Class 4 (Impaired – entitled to vote) | Senior Subordinated Note Claims | Approximately $7 million in Senior Subordinated Note Claims, plus accrued but unpaid interest as of the Petition Date | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a Senior Subordinated Note Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Subordinated Note Claim, each holder of a Senior Subordinated Note Claim shall receive its Pro Rata share of the (i) New Subordinated Notes and (ii) New Warrants. |
| Class 5A (Impaired – Entitled to vote) | Trade Claims | The Debtor estimates the Trade Claims to be $14,500,000 | On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Trade Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Trade Claim, each holder of a Allowed Trade Claim shall receive either: (i) if such holder and the Debtor enter into a New Trade Agreement, a cash recovery equal to such holder's Trade Claim Distribution, which the Reorganized Debtor shall satisfy by paying 110% on each invoice for products ordered post-Effective Date with each holder that executes a New Trade Agreement until the Trade Claim Distribution has been paid in full; *provided*, *however*, that the Reorganized Company shall satisfy the Trade Claim Distribution by no later than the date that is eighteen (18) months after the Effective Date; or (ii) its Pro Rata share of the proceeds from the General Unsecured Claims Litigation Trust. |
| Class 5B (Impaired – Entitled to vote) | Other General Unsecured Claims | The Debtor estimates the Other General Unsecured Claims to be $4,000,000 (unless the Class Action Claims are included in the | On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, or agrees to be an Unsecured Convenience Class Claim, in full and final satisfaction, in full and final satisfaction, settlement, release, and discharge |

| Class No. | Class Name | Approximate Amount of Claims | Treatment |
|---|---|---|---|
|  |  | event that the Class Action Settlement is not Approved, which could be multiple millions of dollars) | of and in exchange for each Allowed Other General Unsecured Claim, each holder of an Allowed Other General Unsecured Claim shall receive its Pro Rata share of the proceeds from the General Unsecured Claims Litigation Trust. |
| Class 5C (Unimpaired– Note Entitled to Vote) | Unsecured Convenience Class Claims | The Debtor estimates the Unsecured Convenience Claims to be $235,000 | On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Unsecured Convenience Class Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Convenience Class Claim, each holder of an Allowed Unsecured Convenience Class Claim shall receive payment in full in Cash on account of such Allowed Unsecured Convenience Class Claim pursuant to the Convenience Class Distribution, unless the cap of $250,000 is exceeded. |
| Class 6 (Deemed to Reject the Plan and Not Entitled to Vote) | Section 510(b) Claims | The Debtor estimates the Section 510(b) Claims to be $0 | On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. |
| Class 7 (Deemed to Reject the Plan and Not Entitled to Vote) | Existing Equity Interests | Not Applicable | On the Effective Date, Existing Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Existing Equity Interests on account of such Existing Equity Interests. |

**B. Classified Claims**

1. Class 1: Other Priority Claims

   a. *Classification*: Class 1 consists of Other Priority Claims.

   b. *Description*: Other Priority Claims include any Allowed Claim against the Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim (including a DIP Claim); or (b) Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Case.

c.　　*Treatment*:  Unimpaired. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Case, in full in Cash in the ordinary course of business by the Debtor or the Reorganized Debtor, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, or as soon thereafter as reasonably practicable, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court.

d.　　*Voting*:  Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.　　Class 2:  Other Secured Claims

a.　　*Classification*:  Class 2 consists of Other Secured Claims.

b.　　*Description*:  A holder of an Other Secured Claim is a holder of an Allowed prepetition Secured Claim other than a Senior Loan Claim.

c.　　*Treatment*:  Unimpaired.  On the Effective Date, except to the extent that a holder of an Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Senior Lender Affiliate:  (i) payment in full in Cash, including the payment of interest allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any; (ii) reinstatement pursuant to Section 1124 of the Bankruptcy Code; (iii) the collateral securing any such Allowed Other Secured Claim, or (iv) such other consideration so as to render such Allowed Other Secured Claim Unimpaired.

In the event an Allowed Other Secured Claim may also be classified as a Priority Tax Claim, such Claim shall:  (i) be paid in full in Cash, including the payment of interest under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any, or (ii) retain any Lien until such Claim is paid in full (it being understood that such Other Secured Claim may be paid in the ordinary course as and when it comes due, rather than on the Effective Date).

d.　　*Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.　　Class 3: Senior Loan Claims

a.　　*Classification*:  Class 3 consists of Senior Loan Claims.

11

b.     *Description*:  Senior Loan Claims are the Claims arising under the Senior Loan Agreement.  To the extent any such amounts have not been previously satisfied pursuant to the DIP Facility, the Senior Loan Claims shall be Allowed in an aggregate amount equal to approximately $16,570,949.08, plus interest and fees due and owing under the Senior Facility as of the Effective Date pursuant to the terms of the Senior Facility or related documents, including payment on account of any accrued but unpaid interest (including at the default contract rate pursuant to the terms of the Senior Facility), which amount shall be subject to adjustment to an amount acceptable to the Senior Lender to the extent previously satisfied by the DIP Facility.

c.     *Treatment*:  Impaired.  On the Effective Date, except to the extent that a holder of a Senior Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Senior Loan Claim each holder of a Senior Loan Claim shall receive (i) Cash in satisfaction of any Allowed Senior Loan Claim in excess of $3 million and (ii) its Pro Rata share of the New Equity in the Reorganized Debtor based on the New Equity Distribution Calculation in satisfaction of all remaining Allowed Senior Loan Claims, after which, on the Effective Date the cash collateral pledged in favor of the Senior Lender pursuant to various pledge agreements executed by Argosy Investment Partners III, L.P., Marquette Capital Fund I, LP, Horizon Partners, Ltd., and Horizon Capital Partners III, L.P., to secure the Senior Loan Claims, shall be released to its respective pledgers in accordance with their respective interests therein.

d.     *Voting*:  Class 3 is Impaired under the Plan.  Therefore, holders of Class 3 Senior Loan Claims are entitled to vote to accept or reject the Plan.

4.     Class 4:  Senior Subordinated Note Claims

a.     *Classification*:  Class 4 consists of the Senior Subordinated Note Claims.

b.     *Description*.  The Senior Subordinated Note Claims consist of any Claims arising under the Senior Subordinated Notes.  The Senior Subordinated Notes means approximately $7 million, plus accrued but unpaid interest as of the Petition Date, in issued and outstanding notes pursuant to those certain twelve-percent (12%) senior subordinated debentures by and among the Debtor and Miller's American Honey, Inc., on one hand, and Argosy Investment Partners III, L.P., Horizon Capital Partners III, L.P., and Marquette Capital Fund I, LP, on the other hand, due March 16, 2014 (as amended, restated, supplemented, or otherwise modified from time to time).  Senior Subordinated Note Claims shall be Allowed in an aggregate amount equal to $7.0 million, plus accrued but unpaid interest as of the Petition Date

c.     *Treatment*:  Impaired. On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a Senior Subordinated Note Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Subordinated Note Claim, each holder of a Senior Subordinated Note Claim shall receive its Pro Rata share of the (i) New Subordinated Notes and (ii) New Warrants.

12

d.      *Voting*: Class 4 is Impaired under the Plan.  Therefore, holders of Class 4 Senior Subordinated Note Claims are entitled to vote to accept or reject the Plan.

5.      <u>Class 5A:  Trade Claims</u>

a.      *Classification*: Class 5A consists of the Trade Claims.

b.      *Description*:  Trade Claims are Allowed General Unsecured Trade Claims.

c.      *Treatment*:  Impaired.  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Trade Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Trade Claim, each holder of a Allowed Trade Claim shall receive either: (i) if such holder and the Debtor enter into a New Trade Agreement, a cash recovery equal to such holder's Trade Claim Distribution, which the Reorganized Debtor shall satisfy by paying 110% on each invoice for products ordered post-Effective Date with each holder that executes a New Trade Agreement until the Trade Claim Distribution has been paid in full; *provided*, *however*, that the Reorganized Company shall satisfy the Trade Claim Distribution by no later than the date that is 18 months after the Effective Date; or (ii) its Pro Rata share of the proceeds from the General Unsecured Claims Litigation Trust.

d.      *Voting*: Class 5A is Impaired under the Plan.  Therefore, holders of Class 5A Trade Claims are entitled to vote to accept or reject the Plan.

6.      <u>Class 5B:  Other General Unsecured Claims</u>

a.      *Classification*: Class 5C consists of the Other General Unsecured Claims.

b.      *Description*:  Other General Unsecured Claims are Allowed General Unsecured Claims that are not Trade Claims, including, without limitation, General Unsecured Claims, Junior Subordinated Note Claims, Seller Note Claims, Opt-Out Claims[1], and all Class Action Claims, to the extent that the Class Action Settlement has not been Approved.

c.      *Treatment*:  Impaired.  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, or agrees to be an Unsecured Convenience Class Claim, in full and final satisfaction, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other General Unsecured Claim, each holder of an Allowed Other General Unsecured Claim shall receive its Pro Rata share of the proceeds from the General Unsecured Claims Litigation Trust.

d.      *Voting*:  Class 5B is Impaired under the Plan.  Therefore, holders of Class 5B Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

---

[1] As defined in Article 3(B) and in the Plan.

7.      Class 5C: Unsecured Convenience Class Claims

    a.      *Classification*:  Class 5C consists of the Unsecured Convenience Class Claims.

    b.      *Description*:    Unsecured Convenience Class Claims include any Allowed General Unsecured Claim, other than Trade Claims that receive treatment pursuant to Article III.C.5(b)(i) of the Plan, that is $7,500.00 or less.

    c.      *Treatment*: Unimpaired. On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Unsecured Convenience Class Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Convenience Class Claim, each holder of an Allowed Unsecured Convenience Class Claim shall receive payment in full in Cash on account of such Allowed Unsecured Convenience Class Claim pursuant to the Convenience Class Distribution, unless the cap of $250,000 is exceeded.

    d.      *Voting*: Class 5C is Unimpaired under the Plan.  Holders of Claims in Class 5C are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 5C Unsecured Convenience Class Claims are not entitled to vote to accept or reject the Plan.

8.      Class 6:  Section 510(b) Claims

    a.      *Classification:* Class 6 consists of all Section 510(b) Claims.

    b.      *Description*:    Section 510(b) Claims include any Claims arising from (a) rescission of a purchase or sale of a Security of the Debtor, (b) purchase or sale of such a Security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.  Section 510(b) Claims specifically exclude the Senior Subordinated Note Claims and the Junior Subordinated Claims.

    c.      *Treatment*: On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery.

    d.      *Voting*: Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

9.      Class 7:  Existing Equity Interests

    a.      *Classification*:  Class 7 consists of the Existing Equity Interests.

    b.      *Description*:  The Existing Equity Interests are Allowed Existing Equity Interests in the Debtor, which may include, but are not limited to the following: Series A Common Stock, Series B Common Stock, Series C Common Stock, Series D Common Stock, Series E Common Stock, Series F Common Stock, Series G Common Stock, Series A 6% Convertible Preferred Stock, Series B Convertible

Preferred Stock, Series C 6% Convertible Preferred Stock, Common Stock C Warrants and Common Stock G Warrants.

c.   *Treatment*:  Impaired.  On the Effective Date, Existing Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Allowed Existing Equity Interests on account of such Existing Equity Interests.

d.   *Voting*:  Class 7 is Impaired under the Plan.  Therefore, holders of Claims in Class 7 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

# ARTICLE 3.

## DESCRIPTION OF THE DEBTOR AND THE DEBTOR'S BUSINESS

**A.    Description of the Debtor**

The Debtor was formed in 1981 and is the country's leading processor and packager of honey for food manufacturers and food service companies.  The Debtor is headquartered in Onsted, Michigan, which also serves as the primary location of operation. The Debtor also operates a honey processing facility in San Bernardino, California, and maintains a testing lab in Belleview, Florida.

The Debtor has approximately 76 full time employees, 8 contractors hired through staffing services, and 4 part-time employees.  Approximately 47 of the employees are in Michigan, 25 are in California, 2 are in Georgia, and 2 are in Florida.  For the fiscal year ended December 31, 2012, the Debtor had net sales from continuing operations of approximately $137.8 million.  The Debtor's primary customers are the in the food service, industrial and retail segments.

**B.    Description of the Principals**

The following is a summary of the principals that will manage the Debtor during its Chapter 11 Case, some of whom will be retained by the Reorganized Debtors.  The identity and compensation of those who will be retained on the Effective Date will be disclosed no later than the Confirmation Hearing:

1.   Rolf Richter

Rolf Richter has been the Chief Executive Officer and President of the Debtor since June 2012.  Mr. Richter is also a member of the Board of Directors of the Debtor.  Mr. Richter is responsible for leading the strategic initiatives of the Debtor and leading the Debtor's corporate strategy.  Mr. Richter holds a bachelor degree in Business Administration and a Diploma of Business Retailing from Ryerson Polytechnical University, Canada.

Previously, Mr. Richter was the President and Chief Executive Officer of AFA Foods, Inc., from June 2008 through July 2011.  Mr. Richter was also the President and Chief Executive Officer at United Food Group LLC prior to the sale of the company to AFA Foods, Inc.  Mr. Richter was the President of Conagra Foods Canada, Inc., from February 2004 through June 2008.  Mr. Richter worked for Gruen Inc., in New York, NY as the Chief Operating Officer during the time period of 1999 through 2002, where he

brokered a deal between the founder and venture capitalists. Mr. Richter also held the position of Vice President, General Manager – Europe of the Vlasic Division of Campbell Soup Company, as well as Managing Director for Freshbake Frozen Foods LTD., General Manager of the Dry Foods (Soup) Business Unit and Vice President / General Manager of the Frozen Foods, Food Service, and Refrigerated department during his employment.

2.   Jack Irvin, Jr.

Jack Irvin, Jr., has been the Chief Financial Officer and Vice President of the Debtor since January 2008.  Mr. Irvin has over twenty (20) years of management experience in the food industry.  Mr. Irvin is a certified public accountant.  Mr. Irvin holds a Bachelor of Science degree in Accounting and minor in Finance from Pennsylvania State University, and he is a Certified Public Accountant in Pennsylvania and Maryland.

Most recently, Mr. Irvin was the President and Chief Financial Officer for Baltimore Spice, Inc., from 1991 through 1998, and 2002 through 2007. Mr. Irvin was the Vice President of Finance and Chief Financial Officer of Baltimore Spice, Inc., from 1989 through 2001.

3.   John Wolf

John Wolf has been a Vice President of Supply Chain & Management of the Debtor since October 2012.  Mr. Wolf is also the Debtor's Corporate Compliance Officer.  Mr. Wolf has a Bachelor of Arts in Business Administration from Grove City College.

Mr. Wolf has over twenty-four (24) years of experience in operations, purchasing and procurement with Kellogg's.  Mr. Wolf was responsible for approximately $2.5 Billion of spend across Kellogg America's internal manufacturing network, as well as the Kellogg North America contract manufacturing network.  Mr. Wolf has managed up to seven direct reports and has been responsible for 97 facilities simultaneously.  For four years, Mr. Wolf was the Vice President of Americas – Ingredients, Commodities, Risk Management at the Kellogg Company where he led the successful global procurement integration of the Pringles acquisition.

4.   Craig Moore

Mr. Moore is the Vice President of Industrial and Retail Sales.  Mr. Moore joined the Debtor in January 2009 and has over twenty (20) years of experience in the food industry.  Previously, he was a Director of Specialty Products at Imperial Sugar Company.  Mr. Moore graduated from Georgia Tech University, Atlanta, Georgia.  Mr. Moore is responsible for all industrial and retail sales for the Debtor, and working with the brokers that handle those customers.

5.   Michael Modjeski

Mr. Modjeski is a Vice President of Foodservice and Club Sales, and he joined the Debtor in February 2009.  Mr. Modjeski holds a Bachelor of Science, Food Systems Economics and Management degree from Michigan State University, East Lansing, Michigan.  Mr. Modjeski is responsible for all food service and club sales, and working with the brokers that handle those customers.

Mr. Modjeski has over twenty (20) years of food industry experience.  From August 2007 through December 2008, Mr. Modjeski was a National Sales Manager at Yucatan Foods in Los Angeles, California, where he was responsible for 17 million in sales for the US, Canada, International and Club

Stores. From May 2005 through August 2007, Mr. Modjeski was the National Sales Manager for the Deli Division of Nestle Foodservices in Glendale, California.

      6.     <u>Joyce Schlachter</u>

Ms. Schlachter is the Vice President of Technical Services. Ms. Schlachter joined the Debtor in 2005, and she is responsible for all aspects of quality control including quality assurance, quality specifications, and maintaining the Debtor's British Retail Consortium ("<u>BRC</u>") certification. Ms. Schlachter also handles honey supplier audits. Ms. Schlachter has a Bachelor of Science in Food Science from Michigan State University, East Lansing, Michigan. Ms. Schlachter worked at Little Caesar Enterprises/Blue Line Distributing from 1987 through 2004, and during the time period of 1994 through 2004, she served as the Senior Director of Quality Assurance and directed the Quality Assurance Program for the purchase of food and packaging for all domestic and international operations. During the time period of 1990 through 1994, Ms. Schlachter was the Director of Quality Assurance/Quality Assurance Manager. At Little Caesar Enterprises, she implemented, executed and directed all aspects of the Corporate Supplier Quality Assurance Program to include on-going supervision of the supplier audit program. Mr. Schlachter was an integral member of the procurement team that restructured Little Caesar's supplier base, upgraded product quality and supported new restaurant growth of 2000+ stores.

Ms. Schlachter maintains professional affiliations with the Institute of Food Technologists, International Association for Food Protection, National Council of Chain Restaurants – Food Safety Task Force and International Foodservice Distributors Association – Food Safety Task Force.

Information regarding the six above-described principals' compensation and fringe benefits for the one-year time period prior to the Petition Date is attached hereto as **Exhibit B**.

**C.**    **Events Leading to Chapter 11.**

      1.     <u>The Debtor's Debt Financing</u>

The Debtor is a party to that certain Credit and Security Agreement dated as of January 30, 2012 (as amended from time to time, the "<u>Senior Loan Agreement</u>"), by and between the Debtor as borrower, and Wells, as the lender. The Senor Loan Agreement sets forth the terms and obligations regarding an aggregate revolving commitment of a maximum of $25,000,000 and a five-year term loan of $1,120,000 (collectively the "<u>Loans</u>"). On September 18, 2013, Senior Lender purchased Wells' position in the Loans and became the senior secured lender with respect to the Loans. As Security for the indebtedness under the Loans, and pursuant to Section 3.1 of the Senior Loan Agreement, the Debtor granted to Senior Lender a security interest in various assets, including without limitation, all accounts, books, chattel paper, deposit accounts, goods, including equipment and fixtures, general intangibles, inventory, investment related property, negotiable collateral, supporting obligations, commercial tort claims, money, Cash equivalents, any other assets which come into Senior Lender's possession, and all proceeds relating to or arising from them (all categories of collateral described herein and in Schedule 1.1 of the Security Agreement collectively referred to as the "<u>Collateral</u>").

In addition to the Loans, the Debtor also has subordinated debt obligations. Three private equity funds, Argosy Investment Partners III, L.P., Horizon Capital Partners III, L.P., and Marquette Capital Fund I, LP, hold $7,000,000 of senior subordinated secured debt consisting of the Senior Subordinated Notes. Ernest L. Groeb, a former officer of the Debtor, is the shareholder representative with respect to $1,500,000 of junior subordinated debt consisting of the Junior Subordinated Notes. The Debtor also has an unsecured note obligation in the approximate amount of $423,762 to the Olesanik Family Living Trust, defined as the Seller Note, and unsecured trade debt of approximately $14,500,000.

2.      Government Investigations into the Debtor's Business

In 2001, the Government imposed anti-dumping duties on honey imported from China.  After the institution of these duties, the amount of Chinese imports fell, as the amount of honey exports rose from Vietnam, Malaysia, Indonesia, and other Asian countries that had not historically exported significant amounts of honey.  As a result, the Government began to investigate the honey industry and the possibility that honey was being transshipped (*i.e.* shipped through a second country to conceal its origins) and/or mislabeled to avoid the anti-dumping duties.  Beginning in 2007, the U.S. Department of Justice ("DOJ") brought the first of several cases in different districts alleging that U.S. honey packers had imported transshipped honey.  In 2008, the Debtor received a grand jury subpoena seeking information relating to the investigation of its industry.

Following an extensive DOJ investigation, in February 2013, the Debtor entered into a deferred prosecution agreement (the "Deferred Prosecution Agreement") with the DOJ as a global resolution for the Debtor.  The agreement required the Debtor to: (1) accept and acknowledge responsibility for historical purchases of transshipped honey; (2) continue cooperating with the government's ongoing investigation for two years; (3) pay a $2 million fine; (4) dispose of any and all Chinese-origin honey in its possession which entered the country in contradiction to the duty requirements; and (5) cease selling any of its finished goods containing such Chinese honey.  The agreement further required the Debtor to put in place a number of compliance and remediation measures.  The Deferred Prosecution Agreement acknowledged that two former, unnamed executives (Executive A and Executive B) had misled the Debtor's board, the Debtor's customers and the public.

Both before and after execution of the Deferred Prosecution Agreement, the Debtor took a number of steps to remediate issues regarding potentially transshipped honey.  In January 2012, the Debtor retained Foley & Lardner LLP ("Foley") to conduct an internal investigation.  In January 2012, the Debtor also began revising its policies and procedures relating to the procurement of honey overseas.  In February 2012, the Debtor named a new interim president and relieved its then-current CEO from his operating responsibilities.  In June 2012, the Debtor agreed to a separation agreement with such CEO and stripped the then-current vice-president of operations of all purchasing responsibility and subsequently terminated him.

The Debtor hired a new full time president and CEO, Rolf Richter, effective June 27, 2012.  The Debtor also purchased Datamyne software that would facilitate verification of container numbers and countries of origin for the honey that the Debtor purchases.  The Debtor continues to carry BRC certification, which subjects it to stringent audit testing by third parties.  The Debtor also has strengthened its supplier audit and reinvigorated lab testing procedures at its state-of the-art lab testing facility in Florida.

In October 2012, the Debtor hired John Wolf as its Vice President of Supply Chain and Management, to further enhance supply management and compliance.  Mr. Wolf has a long history of experience in the food industry, including 24 years with Kellogg's.

As a result of the foregoing measures, the Debtor has robust policies and procedures in place relating to the purchase of honey to avoid international duty issues in the future.  The Debtor also provides compliance training to all of its employees.

The Debtor had hoped that the Deferred Prosecution Agreement would enable the Debtor to have a fresh start with new executives and a new compliance program.  However, in April 2013, just two months after the Deferred Prosecution Agreement was finalized, two civil putative class action lawsuits

were filed against the Debtor in the United States District Court for the Northern District of Illinois by producers, packers and/or distributors of honey. In *Adee Honey Farms, et al v. Groeb Farms*, *et al*., Case No. 1:13-cv-02922 (the "Adee Lawsuit"), the putative class alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Lanham Act. In *Moore's Honey Farm, et al. v. Groeb Farms, Inc.*, *et al*., Case No. 1:13-cv-02905 (the "Moore Lawsuit" and collectively with the Adee Lawsuit, the "Putative Class Actions"), the putative class alleges violations of RICO and common law fraud, negligent misrepresentations, conspiracy, and clandestine wrongful importation without paying the anti-dumping duties. On June 24, 2013, the Putative Class Actions were consolidated (hereinafter, the "Putative Class Action") by Order of the Court handling the Moore Lawsuit (the "Consolidation Order"). An Amended Complaint must be filed pursuant to the Consolidation Order on or before October 21, 2013. The Putative Class Action is based on the factual statements contained in the Deferred Prosecution Agreement. While none of the claims make a specific damage demand, RICO and Lanham Act cases carry a potential for treble damages. The claims include requests for attorneys' fees. These claims could amount to multiple millions of dollars. A Claim arising on account of the Putative Class Action against the Debtor is a "Class Action Claim," and a holder of a Class Action Claim who does not opt-out from being a member of the certified class (in the event the class is certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure) is a "Class Action Claim Holder".

The Debtor has engaged in negotiations with the court-appointed interim class counsel ("Interim CA Counsel") for the Class Action Claim Holders. The Debtor and the Interim CA Counsel have reached a settlement of the Putative Class Action resulting in the execution of a Restructuring Support Agreement (the "Putative Class Action RSA"). Pursuant to the Putative Class Action RSA, the proposed settlement (the "Class Action Settlement") provides for the Class Action Claim Holders, upon the approval of the Insurer (as defined below) and the appropriate Courts, to receive $1.75 million (the "Class Action Settlement Amount") in proceeds from the Debtor's insurance policy with Chubb Group of Insurance Companies (the "Insurer"). The policy covers the period of May 1, 2011 through May 1, 2012, and covers certain Claims against the Debtor and directors and officers of the Debtor, along with their respective defense costs. The policy has a combined maximum aggregate limit of liability in the amount of $5,000,000 (the "Insurance Policy"). According to the Putative Class Action RSA, the Class Action Settlement would have to be "Approved," which means that approval of the Insurer has been obtained on or before October 10, 2013, and the Bankruptcy Court and a United States District Court have both approved the Class Action Settlement on a final basis. The holder of a Class Action Claim who chooses to opt-out from being a member of the certified class, in the event the class is certified pursuant to Federal Rules of Civil Procedure Rule 23(b)(3), will have an "Opt-Out Claim," which will be treated as General Unsecured Claims under Class 5B of the Plan. If the Class Action Settlement is Approved, then the Class Action Claims, excluding any applicable Opt-Out Claims, will not be administered under the Plan. If the Class Action Settlement is not Approved as required by the Putative Class RSA, then the Class Action Claims will be administered as Class 5B Claims in accordance with Article III of the Plan and will be deemed General Unsecured Claims.

As a result of the Deferred Prosecution Agreement, and the costs associated with it, including: (1) the $2,000,000 fine; (2) the legal fees; (3) the costs of the compliance programs; and (4) the costs incurred in recruiting and hiring new, experienced executives, the Debtor has incurred significant unanticipated expenses.

Although the Debtor has significant defenses to the allegations in the Putative Class Action and ultimately could prevail, the attorneys' fees and litigation expenses have severely strained, and would continue to severely strain, the Debtor's liquidity. In addition, despite the fact that the putative classes have not been certified, the mere existence of these lawsuits negatively affects the value of the company outside of a bankruptcy proceeding and impedes potential buyers from purchasing the company at a maximized value to resolve the Debtor's financial issues.

In addition, increased prices in the honey market and supply shortages have had a negative impact on the Debtor. In late 2010, the Debtor had contracts with certain suppliers to purchase substantial amounts of honey at agreed-upon prices, while the honey market was experiencing significant price increases. However, these suppliers failed to deliver the product to the Debtor. As a result, the Debtor was forced to re-enter the honey market to buy replacement product at a time when, on a global basis, prices were increasing and the supply of honey was decreasing. The Debtor initiated legal action against certain suppliers in order to receive the contracted honey. These issues have put further pressure on the Debtor's financial condition.

### 3. The Debtor Defaulted on the Loans

On June 18, 2013, Wells issued a Notice of Default because the Debtor fell below the average excess availability amount required by the Senior Loan Agreement (the "Excess Availability Default"). As a result of the Excess Availability Default, Wells assessed default interest on the Loans at a rate of 3.0% per annum above the rate in the Senior Loan Agreement.

On June 26, 2013, Wells issued a Notice of Default because the Debtor failed to maintain the Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") required by the Senior Loan Agreement (the "EBITDA Default"). As a result of the EBITDA Default, Wells restated that the Loans would accrue interest at a rate of 3.0% per annum above the rate in the Senior Agreement.

On July 23, 2013, Wells unilaterally implemented a $750,000 reserve against the Debtor's available funds under the Loans (the "Reserve"). The Reserve severely impacted the Debtor's ability to make payments to vendors, and fund its operations. Discussions regarding a Forbearance Agreement continued and the parties entered into a revised Forbearance Agreement and Fourth Amendment to the Senior Loan Agreement on August 15, 2013 (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, among other things: (a) Wells agreed to consider making discretionary advances during the period of August 15, 2013 through September 6, 2013 (the "Initial Forbearance Period"); (b) reduced the maximum revolver amount to $17,250,000 as of September 6, 2013, and reduced the inventory sublimit from $15,000,000 to $12,500,000; and (c) required the Debtor to release Wells from any claims against it. The Debtor also hired Conway Mackenzie, Inc., to provide Wells various reports, a Chapter 11 budget and a Chapter 11 restructuring strategy.

On September 9, 2013, the Debtor and Wells entered into the revised Forbearance Agreement and Fifth Amendment to Credit Security Agreement ("Amended Forbearance Agreement"), which among other things (a) continued the Forbearance Period through September 27, 2013 (the "Second Forbearance Period"); (b) further reduced the Debtor's borrowing base from $12,500,000 to $7,500,000; (c) required the Debtor to continue to engage a consultant to assist the Debtor in assessing, restructuring and marketing a sale of the Debtor's business or assets and determining the Debtor's financial strategy; and (d) included various marketing milestones for a potential sale of the Debtor's business or assets.

### 4. Marketing Efforts by the Debtor's Consultants and the Sale of the Loans

On or about July 24, 2013, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan") to assist with the assessment and implementation of strategic alternatives. Thereafter, Houlihan undertook an extensive marketing effort, including reaching out to 165 potentially interested parties, including strategic and financial buyers and capital providers. Houlihan secured Confidentiality Agreements from 75 parties and submitted a Confidential Information Memorandum to those parties. As part of the marketing process, Houlihan requested the submission of Indications of Interest ("IOIs") on or before September 18, 2013.

During the marketing process, the Debtor's liquidity was limited to the point that the Debtor's vendors were concerned about the ability to receive payment for previously delivered goods and services. As a result, the Debtor experienced considerable difficulty procuring additional product deliveries. This condition was exasperated as the Debtor suffered further limitations on its ability to borrow funds.

Houlihan continued to market the Debtor's business notwithstanding the difficult liquidity situation and encouraged all interested parties to proceed quickly. In addition to considering alternative sources of financing and methods to procure additional raw honey in support of the operations, the Debtor and Houlihan also encouraged interested parties to consider funding the business on an interim basis.

The Debtor received eight written IOIs, including a proposal from Honey Financing Company, LLC ("Honey Financing" or "Senior Lender Affiliate"), an affiliate of Peak Rock Capital, to restructure the obligations of the Debtor and acquire the equity of the Reorganized Debtor pursuant to the Plan filed contemporaneously herewith. After reviewing the IOIs, the Debtor determined that the proposal from Senior Lender Affiliate was the best overall offer based on the following factors, among others: (1) the Debtor's financing needs and lending arrangements; (2) the speed and certainty of closing the transaction; and (3) the total overall value to be provided to all stakeholders as a result of the transaction. Therefore, the Debtor elected to pursue the transaction with Senior Lender Affiliate. The Debtor entered into the Restructuring Support Agreement in connection with the offer (the "Honey Financing RSA").

On September 18, 2013, Senior Lender, an affiliate of Honey Financing, purchased the Wells debt, and became the Debtor's senior secured lender.

     5.     <u>The Restructuring Support Agreements</u>

     *a.  The Honey Financing RSA*

On or about October 1, 2013, the Debtor, Senior Lender Affiliate, and Senior Lender entered into a Restructuring Support Agreement (the "Honey Financing RSA"). Through various Restructuring Support Agreements, Debtor agreed to restructuring and recapitalization transactions between the Debtor, Senior Lender Affiliate, the Senior Lender, the Interim CA Counsel, and certain holders of the Senior Subordinated Notes (the "Restructuring Transactions"). Pursuant to the Honey Financing RSA, the Debtor agreed to commence the Chapter 11 Case in order to implement the Restructuring Transactions. Pursuant to the Honey Financing RSA, the Debtor agreed to, among other things: (i) commence the Chapter 11 Case on or before October 1, 2013; (ii) provide the Senior Lender Affiliate and Senior Lender, and their counsel, the final forms of the "first day pleadings" at least two days before the anticipated petition date, and the documents must be in a form acceptable to Senior Lender Affiliate prior to the bankruptcy filing; (iii) file the Plan and this Disclosure Statement on the Petition Date; (iv) move to have the hearing to approve the Disclosure Statement and the solicitation materials no later than thirty-six (36) days after the Petition Date; (v) obtain interim approval of the DIP Financing no later than two business days following the Petition Date, and a final order approving the DIP Financing no later than thirty-six days after the Petition Date.

Pursuant to the Honey Financing RSA, the Senior Lender Affiliate agreed, among other things, to provide the DIP Facility to the Debtor, to provide the Exit Facility upon the Effective Date of the Plan, and as applicable, vote to accept the Plan by balloting in favor of the Plan.

   b.  *The Senior Subordinated Debt RSA*

   On or about October 1, 2013, the Debtor, the Senior Lender Affiliate, the Senior Lender and certain holders of the Senior Subordinated Notes entered into a Restructuring Support Agreement (the "Senior Subordinated Debt RSA"), pursuant to which certain holders of the Senior Subordinate Notes agreed to, among other things: (i) support the Restructuring Transactions; (ii) consent to the Debtor's continued use of cash collateral during the Chapter 11 case and to the proposed DIP Facility, and provided that the Debtor provides the acknowledgements, adequate replacement liens and the reporting described therein, the holders of the Senior Subordinated Notes agreed that they are not entitled to any additional adequate protection on account of any diminution in value of their security interest based on the Debtor's use of cash collateral or entry into the DIP Facility during the pendency of the Chapter 11 Case; (iii) provided that the Senior Subordinated Debt RSA was not terminated, they would vote to accept the Plan by balloting in favor of the Plan; (iv) not object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan; (v) not propose, file, support, or vote for any restructuring, workout, plan of arrangement or plan of reorganization for the Debtor other than the Plan; (vi) not directly or indirectly cause any other Entity to take any action contemplated in clauses (iv) or (v); and (vii) would execute at the request of Senior Lender Affiliate agreed upon deposit account control agreements in respect of funds pledged as collateral pursuant to the Senior Loan Agreement.

   Pursuant to the Senior Subordinated Debt RSA, the Debtor agreed to, among other things: (a) support and implement the Restructuring Transactions and all transactions set forth in the Plan and the Senior Subordinated Debt RSA, including, without limitation, the proposed treatment of Senior Subordinated Note Claims as set forth in the "Term Sheet" attached thereto; (b) take any and all necessary and appropriate actions in furtherance of the Plan and the Senior Subordinated Debt RSA; (c) complete the Restructuring Transactions and all transactions set forth in the Plan; and (d) obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions; and (e) not object to the Claims or Liens, or seek or take any action to avoid the Claims or Liens of the holders of certain Senior Subordinated Notes, and seek appropriate orders of the Bankruptcy Court regarding the same.

   c.  *The Putative Class Action RSA*

   On or about October 1, 2013, the Debtor, Senior Lender Affiliate, Senior Lender and the Interim CA Counsel entered into the Putative Class Action RSA, according to which, the Interim CA Counsel agreed to (i) settle the Putative Class Action against the Debtor for $1.75 million subject to Insurer approval and Court approval; (ii) support, and encourage each of the Class Action Claimants (as defined therein) to support the Restructuring Transactions; (iii) support the Plan; (iv) vote on behalf of all of the Class Action Claimants to accept the Plan by voting in favor of the Plan, however, the Interim CA Counsel's ballot shall not count as an acceptance of the Plan with respect to any Class Action Claimant that appropriately opts-out of the class; (v) not object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan; (vi) not propose, file, support, or vote for any restructuring, workout, plan of arrangement or plan of reorganization for the Debtor other than the Plan; (vii) not directly or indirectly cause any other Entity take any action contemplated in clauses (v) or (vi); and (viii) support the Debtor's efforts to obtain entry of one or more orders in the Chapter 11 Case approving the Class Action Settlement, pursuant to which the Debtor would make $1.75 million of proceeds of the Insurance Policy available to the Class Action Claimants upon the emergence from chapter 11, which would be distributed on a Pro Rata basis in accordance with Article III of the Plan.

   The Honey Financing RSA, the Senior Subordinated Debt RSA, and Putative Class Action RSA are attached as exhibits to the *Declaration of Jack M. Irvin, Jr., in Support of Chapter 11 Petition and First Day Motions*, docket number 15 (the "First Day Declaration"). Factual background relating to the Debtor's commencement of the Bankruptcy Cases is also set forth in the First Day Declaration.

22

# ARTICLE 4.

## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES

### A.    Petition Date

The Debtor Filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 1, 2013, thereby commencing the Bankruptcy Case.  Since that date, the Debtor has been operating as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  As a consequence of the Debtor's commencement of the Bankruptcy Case, all actions and proceedings against the Debtor and all acts to obtain property from the Debtor have been stayed under section 362 of the Bankruptcy Code.

### B.    First Day Filings and Motions

In order for the Debtor to continue to operate its business and to implement the terms of the Restructuring Support Agreement, on the Petition Date the Debtor Filed the following with the Bankruptcy Court:

1.    Declaration of Jack Irvin, Jr., in Support of Chapter 11 Petition and First Day Motion.

2.    Emergency First Day Motion of the Debtor Pursuant to Sections 105(a), 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing Post-Petition Financing; (B) Authorizing Use of Cash Collateral; (C) Granting Adequate Protection; and (D) Scheduling a Final Hearing on the Motion (the "DIP Motion").

3.    Plan of Reorganization of Groeb Farms, Inc., Pursuant to Chapter 11 of the Bankruptcy Code.

4.    Debtor's First Day Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, 364 and 503(b)(1) Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, and (III) Continued Use of Existing Cash Management.

5.    Debtor's First Day Motion for Order Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code Authorizing (I) Payment of Wages, Compensation, and Employee Benefits (II) Continuation of Employee Benefit Programs and (III) Financial Institutions to Honor and Process Checks and Transfers Related Thereto.

6.    Debtor's First Day Motion for Order Pursuant to Sections 366 and 105 of the Bankruptcy Code (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Service to the Debtor and (II) Establishing Certain Procedures to Determine Requests for Adequate Assurance of Payment.

7.    Debtor's First Day Motion for an Order Establishing Bar Date for Filing Proofs of Claim, Including Section 503(b)(9) Claims and Approving Form and Manner of Notice Thereof.

8.    Debtor's Motion for an Order (I) Approving the Disclosure Statement; (II) Approving the Form and Manner of notice of Confirmation Hearing (III) Establishing Procedures For Filing Objections to Confirmation of Debtor's Plan; (IV) Approving the Balloting Agents

and Subscription Agents; (V) Approving Solicitation Package and Related Procedures; (VI) Setting the Voting and Subscription Record Dates; (VII) Approving Forms of Ballots; (VIII) Establishing the Voting Deadline; (IX) Approving procedures for Vote Tabulation; (X) Establishing a Deadline and Procedures for Temporary Allowance of Claims for; (XI) Approving Certain Other Related Matters.

9.     Debtor's First Day Motion Pursuant to Sections 105(a), 363(b) and 364(b) of the Bankruptcy Code, for an Order Authorizing it to Pay the Prepetition Claims of Certain Potential Lienholders.

10.     Debtor's First Day Motion Pursuant to Sections 105(a), 363(b), 503(b)(1) and 503(b)(9) of the Bankruptcy Code, for an Order (I) Authorizing But Not Obligating the Debtor to Pay Section 503(b)(9) Claims on an Immediate Basis, and (II) Confirming Administrative Expense Priority for Goods Delivered Post-Petition.

11.     Debtor's First Day Motion for an Order Authorizing the Debtor to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business.

## C.     The DIP Facility

On the Petition Date, the Debtor Filed its *Emergency First Day Motion of the Debtor Pursuant to Sections 105(a), 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing Post-Petition Financing; (B) Authorizing Use of Cash Collateral; (C) Granting Adequate Protection; and (D) Scheduling a Final Hearing on the Motion*, pursuant to which it sought, among other things, interim approval of the DIP Facility, which consists of senior secured $25 million debtor-in-possession financing provided by the DIP Lender.  The terms of the DIP Facility are set forth in the DIP Motion.  Some of the salient terms of the DIP Facility include, but are not limited to, the following: (i) the DIP Lender has agreed to provide the DIP Facility with a maximum credit amount of up to $27,000,000, by way of a debtor-in-possession revolving line of credit facility; (ii) the Debtor may use the DIP Facility to: (a) refinance the obligations of the Senior Loan Agreement; (b) pay fees and expenses associated with the DIP Facility; and (c) the working capital needs of the Debtor, subject the budget approved by the DIP Lender; and (iii) the DIP Facility shall terminate at the earliest of: (x) the date that is one hundred ten (110) days after the Petition Date; (y) three (3) days following the Petition Date, unless the Interim Order has been entered by that date and is in full force and effect, and not stayed; (z) thirty-six (36) days following the Petition Date unless the Final Order has been entered and is in full force and effect, and not stayed; (aa) the date the Borrower terminates the DIP Facility; or (bb) the date the DIP Facility terminates pursuant to any event of default.

## D.     Retention of Professionals

### 1.     Debtor's Counsel

The Debtor has retained Foley as their bankruptcy counsel.  On the Petition Date, the Debtor Filed its First Day Application to Employ Foley & Lardner LLP as General Bankruptcy Counsel Pursuant to 11 U.S.C. 327(a), 328(a), 329 & 1107, Rules 2014(a) & 2016(b) of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2014-1, or in the Alternative Special Counsel Pursuant to 11 U.S.C. 327(e), 328(a), 329 & 1107, Bankruptcy Rules 2014(a) & 2016(b) of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2014-1, pursuant to which the Debtor seeks to employ Foley as its general bankruptcy counsel, and in the alternative, special counsel during the term of the Chapter 11 Case.  Because of issues concerning: (a) the existence of a large pre-petition unsecured Claim

("Foley Claims"); and (b) payments (other than retainers) made in the pre-petition preference period, the Debtor hired Clark Hill PLC ("Clark Hill") to advise the Debtor on settlement of the potential preferences. A settlement was reached pursuant to the advice of Clark Hill and all settled amounts repaid to the Debtor by Foley and prior to the Filing of the Bankruptcy Case. In addition, Foley waived all Foley Claims.

### 2. Debtor's Financial Consultant

Early in the Chapter 11 Case, the Debtor Filed an application seeking the entry of an order authorizing the retention and employment of Conway MacKenzie, Inc., as its financial consultant.

### 3. Debtor's Financial Advisor & Investment Banker

Early in the Chapter 11 Case, the Debtor Filed its Application to Employ Houlihan Lokey Capital, Inc., as Financial Advisor and Investment Banker Pursuant to 11 U.S.C §§ 327(a) and 328(a), Rules 2014 and 5002 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2014-1, pursuant to which, the Debtor seeks the entry of an order authorizing the retention and employment of Houlihan as its financial advisor and investment banker.

### 4. Debtor's Notice and Claims Agent

On the Petition Date, the Debtor Filed its First Day Motion for Entry of an Order Pursuant to 28 U.S.C. § 156(c) and Bankruptcy Rule 2002 Authorizing the Engagement of Kurtzman Carson Consultants LLC as Claims, Noticing, and Balloting Agent *Nunc Pro Tunc* to the Petition Date, pursuant to which, the Debtor seeks the entry of an order authorizing the retention and employment Kurtzman Carson Consultants, LLC as it claims, noticing and balloting agent.

## E. Litigation Pending During the Chapter 11 Case

As further discussed above in Article 3(C)(2), the Putative Class Action is pending as of the Petition Date, and remains pending post-petition.

# ARTICLE 5.

## ASSETS AND LIABILITIES

## A. Assets

### 1. Cash

The Debtor's cash balance includes balances in each of its two petty cash accounts as well as its Wells operating and collateral accounts.

### 2. Accounts Receivable

The Debtor has valued accounts receivable based on management's expected realization net of costs to collect based on management experience with the customer base and age of the receivable. As of August 30, 2013, over eighty-five percent (85%) of the Debtor's account receivables are current or within terms. This is due to the credit pressures imposed by vendors on the Debtor. Accounts receivable may be collected at amounts less than the projected value for a variety of reasons, including, without limitation,

because account debtors may assert setoffs, account debtors may be uncollectible, or the costs to collect the receivables may be higher than projected.

3.   Inventory

The Debtor's inventory consists of raw honey, other raw material food commodities, packaging materials, and finished goods such as honey packaged for retail and food service customers. The majority of the Debtor's raw inventory is received in 55-gallon drums or large totes and is stored on site at either the Debtor's California or Michigan facilities. There is no useable or merchantable inventory at the Debtor's Florida facility. Due to the nature of the Debtor's production process, there is no work in process inventory. The Debtor has valued inventory based management's expected realizable value. Inventory may be realized at amounts less than projected because the selling price may be lower than expected and the cost of obtaining possession of inventory may be higher than expected.

4.   Leased Premises

The Debtor has three leased facilities located in (i) Onsted, Michigan (the "Michigan Facility"), (ii) Belleview, Florida (the "Florida Facility"), and (iii) San Bernardino, California (the "California Facility").

The Michigan Facility is located at 10464 Bryan Highway, Onsted, Michigan. The Michigan Facility is leased from Ernest L. Groeb, Jr. Trust B, United Bank & Trust, Successor Trustee. The Debtor initially entered into an original Lease on February 1, 2006, then a First Amendment to Lease dated March 19, 2007, and Lease Extension Agreement dated March 15, 2012 (collectively, the "Michigan Lease"). The Michigan Lease term is April 1, 2012 through March 31, 2017, with an option to extend the lease for an additional five years. The annual rent for the Michigan Facility is $97,200. The Michigan Facility is 31,698 square feet, and it has the annual capacity of blending approximately 36 million pounds of honey, and the daily capacity to blend approximately 120,000 pounds of honey per day. The Michigan Facility is currently operating at approximately ninety percent (90%) capacity. The Michigan Facility includes a main production building with administrative offices, a finished warehouse and a maintenance / storage facility.

The California Facility is located at 1455 E. Riverview Drive, San Bernardino, CA. The California Facility is leased from GT 94 LP, by GTI Management Co., LP, pursuant to a Standard Industrial / Commercial Single-Tenant Lease dated May 2, 2012 (the "California Lease"). The California Lease term is from July 1, 2012 through November 30, 2017, with an option to extend for an additional two years. The annual base rent for the California Facility is $363,936 ($30,328 per month). The warehouse area of the California Facility conducts all operations of storage, processing, production and shipping. The California Facility is 116,645 square feet, and has a 16,000 square foot office space with a reception area, conference room, employee offices and a lab. The California Facility has an annual capacity of blending approximately 40 million pounds of honey per day, but it is currently operating approximately 20 million pounds, or fifty-percent (50%) capacity. The Debtor's management believes that the daily output could be double with limited investment that would increase the daily oven cycles.

The Florida Facility is located at 3220 SW Highway 484, Belleview, Florida. The Florida Facility is leased from Ernest Leland Groeb, Troy L. Groeb, and E. Jeanne Groeb, as tenants in common and doing business as Groeb Farms. The Debtor initially entered into an original Lease on or about January 1, 2003, then a First Amendment to Lease dated March 16, 2007, and finally a Lease Extension on March 15, 2012 (collectively, the "Florida Lease"). The lease term is from April 2012 through March 2017. The annual rent for the Florida Facility is $59,400 ($4,950 per month). The Florida Facility is 116,000 square feet. The Florida Facility has the capacity to blend 85,000 pounds of honey per day;

however, the Debtor idled the Florida Facility in May 2013 except for lab operations, which are continued for the Debtor's Michigan and California operations. The Debtor does not currently use a majority of the Florida Facility and is no longer blending honey at this facility. The Debtor will likely File a motion with the Bankruptcy Court seeking permission to reject the Florida Lease.

### 5. Property, Plant & Equipment

The Debtor's Property, Plant and Equipment consists of mostly physical plant equipment such as processing equipment, warming ovens, bottling lines, laboratory and testing equipment, and various leasehold improvements to the Debtor's processing facilities. In addition, the Debtor has both owned and leased vehicles and trucks. The Debtor has a nominal amount of furniture and fixtures.

### 6. Promissory Note Receivables

In about December 2009, three executives of the Debtor executed promissory notes in favor of the Debtor as follows: (i) Jack Irvin, Jr. executed an Unconditional Promissory Note dated December 2009 in the principal amount of $50,000 (the "Irvin Note"); (ii) Joyce D. Schlachter executed an Unconditional Promissory Note dated December 2009 in the principal amount of $30,000 (the "Schlachter Note"); and (iii) Michael R. Modjeski executed an Unconditional Promissory Note dated December 2009 in the principal amount of $37,420 (the "Modjeski Note"). These three promissory notes were for the deferred purchase price of the Debtor's stock in the amounts indicated in the respective Executive Investment/Shareholder Agreements between each shareholder and the Debtor. The notes are payable over fifteen (15) years, with a balloon payment due in 2014. However, in about April 2013, acting on the authority of the Debtor's board of directors, the Debtor's Chief Executive Officer cancelled the obligations under these promissory notes. No payments have been made on the notes since that time.

On or about February 1, 2012, Ernest L Groeb and Troy Groeb executed a Promissory Note in favor of the Debtor in the original principal amount of $185,000, which currently has principal and interest outstanding in the approximate amount of $204,000.

### 7. Preferences/Fraudulent Transfer

The Debtor has potential preference Avoidance Actions against various vendors of the Debtor for payments on past due invoices within the ninety (90) day pre-petition period. The list of such payments during the ninety-day (90) day pre-petition period is included in the Debtor's Statement of Financial Affairs. The Debtor estimates that the value for such Causes of Action is approximately $23 million, and the estimated recovery is 25% ($5.8 million).

Pursuant to a settlement with a litigation claimant (the "Litigation Settlement"), within the ninety day (90) pre-petition period the Debtor paid one creditor approximately $700,000 (in three payments). The Debtor estimates that the estimated recovery is $100,000.

Pursuant to the settlement of potential preference claims made to Foley, Foley is paying $320,000 to the Debtor to resolve such potential preferential transfers based on payments to Foley in the amount of $476,550 during the preference period (and totaling $421,000 after subtracting transfers for which the Debtor received "new value" under Section 547 of the Bankruptcy Code, as determined by independent counsel for the Debtor). Therefore, the Debtor is receiving a 76% recovery (after subtracting the "new value" transfers) on these potential preference claims against Foley.

The Debtor has potential preference Avoidance Actions against former insiders for severance and other compensation payments made during the one-year pre-petition time period. The Debtor estimates

that the value for such Causes of Action is approximately $62,500, and that the estimated recovery is $20,000.

8.    Causes of Action

Potential claims for breaches of fiduciary duty against certain officers and directors in connection with the facts set forth in the Deferred Prosecution Agreement concerning the transshipping of honey (the "Fiduciary Duty Causes of Action").  The Debtor believes the Insurance Policy will cover the claims consisting of the Fiduciary Duty Causes of Action, if sufficient proceeds remain after payment of defense costs.  The defense costs of the Debtor and its officers and directors are covered by the Insurance Policy.  As discussed above, according to the Putative Class Action RSA, the Class Action Claim Holders may receive the Class Action Settlement Amount, which consists of certain proceeds of the Insurance Policy, if the Class Action Settlement is Approved.  Therefore, any remaining Insurance Policy coverage after subtracting the Class Action Settlement Amount and the estimated legal costs of $1,500,000 for the Fiduciary Duty Causes of Action, would be the estimated recovery on the Fiduciary Duty Causes of Action.

**B.  Liabilities**

The projected amount of priority, administrative and unsecured Claims is reflected in Article II above.

1.    Accounts Payable

The Debtor's accounts payable primarily relate to trade credit for raw honey and other food commodity products.  Additional accounts payable include trade credit for packaging, prior professional services, and certain marketing expenses, among other items.

2.    Accrued Expenses

Accrued expenses as of the Petition Date include accrued interest, accrued customer rebates, accrued brokerage payments, accrued trade payables not vouchered, and an accrual allowance for prior honey purchases that were deemed to be non-useable and non-merchantable.  Accrued expenses also include accrued payroll and related employee obligations, including the accrued liability under the Litigation Settlement.

3.    The Senior Loan Facility

The Senior Loan Facility includes indebtedness under (i) the Senior Loan Agreement, including payment on account of any accrued but unpaid interest (including at the default contract rate, as applicable) (as amended, restated, supplemented, or otherwise modified from time to time), together with related loan, security, collateral, and other documents; (ii) the full amount drawn by the Debtor on the working capital facility to facilitate the Debtor's operations; (iii) a letter of credit for approximately $50,000.  The Senior Lender and the Debtor entered into a Waiver Agreement and Sixth Amendment to Credit and Security Agreement dated September 26, 2013, which provided the Debtor, among other things, an overadvance of $3 million and a waiver of existing defaults.  The Debtor paid a 4% amendment fee in connection with such amendment.

4.     Sr. Subordinated Notes

The Senior Subordinated Notes include approximately $7,000,000 in issued and outstanding secured notes Claims pursuant to those certain 12% senior subordinated debentures by and among the Debtor and Miller's American Honey, Inc., on one hand, and Argosy Investment Partners III, L.P., Horizon Capital Partners III, L.P., and Marquette Capital Fund I, LP, on the other hand, due March 16, 2014 (as amended, restated, supplemented, or otherwise modified from time to time).

5.     Jr. Subordinated Notes

The Jr. Subordinated Notes includes approximately $1,500,000 in issued and outstanding notes pursuant to that certain 8% Junior Subordinated Note by and between GF Acquisition, Inc., and Ernest L. Groeb, due March 16, 2014 (as amended, restated, supplemented, or otherwise modified from time to time).  The Junior Subordinated Notes were initially secured, but because the Debtor lacks value below the Senior Subordinated Note Claims, the Junior Subordinated Note Claims are being treated as unsecured.

6.     The Seller Note

The Seller Note is the unsecured note in favor of the Olesanik Family Living Trust with a current outstanding balance in the approximate amount of $423,762, which was assumed by the Debtor prior to the Petition Date.

**C.  Letters of Credit**

As noted above, the Debtor's Senior Loan Facility includes a letter of credit for approximately $50,000 relating to the Debtor's P-Card account.

**D.  Lease Rejections**

The Debtor will likely reject the Florida Lease.  The Debtor expects rejection damage claims of $48,000.

**E.  Other Obligations**

The Debtor has various indemnification obligations to defend its officers and directors, including Executive A and Executive B for breach of fiduciary duty claims pursuant to numerous documents, including but not limited to its bylaws.

In connection with the Seller Note discussed above, the Debtor has certain obligations related to the Debtor's purchase of Miller's American Honey, Inc. ("MAH"), pursuant to which the Debtor assumed the obligations under the Seller Note.  Previously, MAH entered into an Asset Purchase Agreement with Resurgence Corporation, d/b/a E.F. Lane and Son ("E.F. Lane"), in which MAH agreed to pay E.F. Lane certain royalty payments and covenant not to compete payments.  After the Debtor purchased MAH, MAH assigned to George T. Murdock ("Murdock") the Asset Purchase Agreement and Murdock assumed the obligations to pay the royalty payments.  The Debtor has been paying the obligation under the Seller Note and has been paying the covenant not to compete payments to E.F. Lane.

# ARTICLE 6.

## DETAILS REGARDING IMPLEMENTATION OF PLAN

**A.      Restructuring Transactions**

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (i) the execution and delivery of the Exit Facility Documents and other appropriate agreements or other documents of restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to the Bankruptcy Code or applicable state law; and (iv)  all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**B.      Sources of Consideration for Plan Distributions**

The Reorganized Debtor shall fund distributions under the Plan as follows:

1.      <u>Cash Consideration</u>

Except to the extent otherwise set forth herein, all Cash consideration necessary for the Reorganized Debtor to make payments or distributions pursuant hereto shall be obtained from proceeds of the Exit Facility or the Debtor's other Cash on hand, including Cash derived from business operations. Further, the Debtor and the Reorganized Debtor will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtor to satisfy their obligations under the Plan.

2.      <u>Issuance and Distribution of New Equity</u>

On the Effective Date, the Reorganized Debtor shall issue the New Equity for distribution to holders of DIP Facility Claims and Senior Loan Claims in accordance with Article III.C of the Plan.  The issuance of the New Equity shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New Organizational Documents and the other instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Notwithstanding anything to the contrary in the Plan, in no event shall more than $10 million of DIP Facility Claims and Senior Loan Claims in the aggregate be satisfied with the New Equity.

3. Exit Facility

On the Effective Date the Reorganized Debtor shall enter into the Exit Facility. Confirmation shall be deemed approval of the Exit Facility to the extent not approved by the Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtor or the Reorganized Debtor in connection therewith), and the Reorganized Debtor is authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtor and the Senior Lender Affiliate may deem to be necessary to consummate the Exit Facility. Proceeds of the Exit Facility shall be used to satisfy obligations outstanding under the DIP Facility and to provide necessary working capital for the Reorganized Debtor.

## C. New Subordinated Notes and New Warrants

On the Effective Date, the Reorganized Debtor shall issue the New Subordinated Notes and the New Warrants, the terms of which shall be set forth in the Plan Supplement, for distribution to holders of Senior Subordinated Note Claims in accordance with Article III of the Plan; *provided, however*, that the aggregate amount of the New Subordinated Notes shall not exceed $3 million and the aggregate amount of the New Warrants shall not exceed 13% of the New Equity, subject to the terms set forth in the Plan Supplement. The issuance of the New Subordinated Notes and the New Warrants shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests.

Each distribution and issuance of the New Subordinated Notes and the New Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

As set forth in the New Subordinated Notes and the New Intercreditor Agreement, the New Subordinated Notes shall have a security interest in the same assets of the Reorganized Debtor as granted under the Exit Facility Documents, provided that such security interest shall be junior to the security interest granted pursuant to the Exit Facility Documents.

## D. General Unsecured Claims Litigation Trust

1. Creation and Governance of the General Unsecured Claims Litigation Trust

On the Effective Date, the Debtor shall transfer to the General Unsecured Claims Litigation Trust the General Unsecured Claims Litigation Trust Assets, which includes the $50,000 one-time non-refundable payment by the Debtor or the Reorganized Debtor, and Avoidance Actions. The Debtor and the General Unsecured Claims Litigation Trustee shall execute the General Unsecured Claims Litigation Trust Agreement and shall take all steps necessary to establish the General Unsecured Claims Litigation Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the General Unsecured Claims Litigation Trust Beneficiaries. In the event of any conflict between the terms of the Plan and the terms of the General Unsecured Claims Litigation Trust Agreement, the terms of the Plan shall govern. Additionally, on the Effective Date the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the General Unsecured Claims Litigation Trust all of its rights, title, and interest in and to all of the General Unsecured Claims Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the General Unsecured Claims Litigation Trust Assets shall

automatically vest in the General Unsecured Claims Litigation Trust free and clear of all Claims, liens, encumbrances, or interests subject only to: (a) General Unsecured Claims Litigation Trust Interests, and (b) the expenses of the General Unsecured Claims Litigation Trust, as provided for in the General Unsecured Claims Litigation Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. The General Unsecured Claims Litigation Trustee shall be the exclusive trustee of the assets of the General Unsecured Claims Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The General Unsecured Claims Litigation Trust shall be governed by the General Unsecured Claims Litigation Trust Agreement and administered by the General Unsecured Claims Litigation Trustee. The powers, rights, and responsibilities of the General Unsecured Claims Litigation Trustee shall be specified in the General Unsecured Claims Litigation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article V.D of the Plan. The General Unsecured Claims Litigation Trustee shall hold and distribute the General Unsecured Claims Litigation Trust Assets in accordance with the provisions of the Plan and the General Unsecured Claims Litigation Trust Agreement. Other rights and duties of the General Unsecured Claims Litigation Trustee and the General Unsecured Claims Litigation Trust Beneficiaries shall be as set forth in the General Unsecured Claims Litigation Trust Agreement. After the Effective Date, the Debtor and the Reorganized Debtor shall have no interest in the General Unsecured Claims Litigation Trust Assets except as set forth in the General Unsecured Claims Litigation Trust Agreement. In connection with the vesting and transfer of the General Unsecured Claims Litigation Trust Assets (including any General Unsecured Claims Litigation Trust Causes of Action) to the General Unsecured Claims Litigation Trust, any attorney-client, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral) expressly transferred to the General Unsecured Claims Litigation Trust shall vest in the General Unsecured Claims Litigation Trust. The Debtor and the General Unsecured Claims Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections, and immunities, to the extent the Debtor so desires.

2.    Purpose of the General Unsecured Claims Litigation Trust

The General Unsecured Claims Litigation Trust shall be established for the purpose of pursuing or liquidating the General Unsecured Claims Litigation Trust Assets, distributing the General Unsecured Claims Litigation Trust Distributable Proceeds, if any, reconciling (and, if agreed to by the Debtor or the Reorganized Debtor, objecting to) General Unsecured Claims as provided for in the Plan and, if, as, and to the extent determined by the General Unsecured Claims Litigation Trustee pursuant to the General Unsecured Claims Litigation Trust Agreement, distributing the General Unsecured Claims Litigation Trust Payment to the General Unsecured Claims Litigation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

3.    General Unsecured Claims Litigation Trustee and General Unsecured Claims Litigation Trust Agreement

The General Unsecured Claims Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the General Unsecured Claims Litigation Trust Expenses, (b) the payment of other reasonable expenses of the General Unsecured Claims Litigation Trust, including the cost of pursuing the General Unsecured Claims Litigation Trust Causes of Action, (c) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation, (d) the investment of Cash by the General Unsecured Claims Litigation Trustee within certain limitations, including those specified in the Plan, (e) the orderly liquidation of the General Unsecured Claims Litigation Trust Assets, and (f) litigation of any General Unsecured Claims Litigation

Trust Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such General Unsecured Claims Litigation Trust Causes of Action.

Except as otherwise ordered by the Bankruptcy Court, the General Unsecured Claims Litigation Trust Expenses shall be paid from the General Unsecured Claims Litigation Trust Assets in accordance with the Plan and General Unsecured Claims Litigation Trust Agreement.

The General Unsecured Claims Litigation Trustee, on behalf of the General Unsecured Claims Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including Professionals previously retained by the Creditors' Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the General Unsecured Claims Litigation Trust Assets in accordance with the Plan and the General Unsecured Claims Litigation Trust Agreement; *provided*, *however*, that the General Unsecured Claims Litigation Trustee shall provide ten Business Days' notice to the Reorganized Debtor before the payment of any such professional fees and expenses.

The General Unsecured Claims Litigation Trust Agreement may include reasonable and customary provisions that allow for indemnification by the General Unsecured Claims Litigation Trust. Any such indemnification shall be the sole responsibility of the General Unsecured Claims Litigation Trust and payable solely from the General Unsecured Claims Litigation Trust Assets.

In furtherance of and consistent with the purpose of the General Unsecured Claims Litigation Trust and the Plan, the General Unsecured Claims Litigation Trustee, for the benefit of the General Unsecured Claims Litigation Trust, shall: (a) hold the General Unsecured Claims Litigation Trust Assets for the benefit of the General Unsecured Claims Litigation Trust Beneficiaries, (b) make distributions of General Unsecured Claims Litigation Trust Distributable Proceeds as provided herein and in the General Unsecured Claims Litigation Trust Agreement, and (c) have the power and authority to prosecute and resolve any General Unsecured Claims Litigation Trust Causes of Action, without approval of the Bankruptcy Court. The General Unsecured Claims Litigation Trustee shall be responsible for all decisions and duties with respect to the General Unsecured Claims Litigation Trust and the General Unsecured Claims Litigation Trust Assets, except as otherwise provided in the General Unsecured Claims Litigation Trust Agreement. In all circumstances, the General Unsecured Claims Litigation Trustee shall act in the best interests of the General Unsecured Claims Litigation Trust Beneficiaries and with the same fiduciary duties as a Chapter 7 trustee.

4.     Compensation and Duties of the General Unsecured Claims Litigation Trustee

The salient terms of the General Unsecured Claims Litigation Trustee's employment, including the General Unsecured Claims Litigation Trustee's duties and compensation shall be set forth in the General Unsecured Claims Litigation Trust Agreement. The General Unsecured Claims Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

5.     Cooperation of Reorganized Debtor

The Reorganized Debtor, upon reasonable notice, shall be required to provide information and access to pertinent documents, to the extent the Reorganized Debtor has such information and/or documents, to the General Unsecured Claims Litigation Trustee sufficient to enable the General Unsecured Claims Litigation Trustee to perform its duties hereunder. The Reorganized Debtor shall reasonably cooperate with the General Unsecured Claims Litigation Trustee in the administration of the General Unsecured Claims Litigation Trust, including, in providing documentation, witness testimony,

and other evidence in support of the prosecution of the General Unsecured Claims Litigation Trust Causes of Action, at no cost or expense of the General Unsecured Claims Litigation Trust other than out of pocket expenses for copying or similar expenses; provided however, that such cooperation shall not involve violation of an attorney client privilege, unless agreed to by the Reorganized Debtor.

6.  United States Federal Income Tax Treatment of the General Unsecured Claims Litigation Trust

For all United States federal income tax purposes, the parties shall treat the transfer of the General Unsecured Claims Litigation Trust Assets to the General Unsecured Claims Litigation Trust as: (a) a transfer of the General Unsecured Claims Litigation Trust Assets directly to the applicable holders of Allowed General Unsecured Claims, followed by (b) the transfer by the holders of such Allowed General Unsecured Claims to the General Unsecured Claims Litigation Trust of such General Unsecured Claims Litigation Trust Assets in exchange for the General Unsecured Claims Litigation Trust Interests; *provided*, *however*, that the General Unsecured Claims Litigation Trust Assets will be subject to any post-Effective Date obligations incurred by the General Unsecured Claims Litigation Trust relating to the pursuit of General Unsecured Claims Litigation Trust Assets.  Accordingly, the General Unsecured Claims Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the General Unsecured Claims Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

7.  Tax Reporting

(a)  The General Unsecured Claims Litigation Trustee shall file tax returns for the General Unsecured Claims Litigation Trust treating the General Unsecured Claims Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b)  Except to the extent definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations, the receipt by the General Unsecured Claims Litigation Trustee of a private letter ruling if the General Unsecured Claims Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the General Unsecured Claims Litigation Trustee) indicates that such valuation is not necessary to maintain the treatment of the General Unsecured Claims Litigation Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as reasonably practicable after the General Unsecured Claims Litigation Trust Assets are transferred to the General Unsecured Claims Litigation Trust, the General Unsecured Claims Litigation Trustee shall make a good faith valuation of the General Unsecured Claims Litigation Trust Assets.  Such valuation shall be made available from time to time to all parties to the General Unsecured Claims Litigation Trust Agreement, to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(c)  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the General Unsecured Claims Litigation Trustee of a private letter ruling if the General Unsecured Claims Litigation

Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the General Unsecured Claims Litigation Trustee), allocations of General Unsecured Claims Litigation Trust taxable income or loss shall be allocated by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining General Unsecured Claims Litigation Trust Assets. The tax book value of the General Unsecured Claims Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the General Unsecured Claims Litigation Trust Assets are transferred to the General Unsecured Claims Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(d) The General Unsecured Claims Litigation Trustee shall be responsible for payment, out of the General Unsecured Claims Litigation Trust Assets, of any taxes imposed on the General Unsecured Claims Litigation Trust or its assets.

(e) The General Unsecured Claims Litigation Trustee shall distribute such notices to the General Unsecured Claims Litigation Trust Beneficiaries as the General Unsecured Claims Litigation Trustee determines are necessary or desirable.

8.    General Unsecured Claims Litigation Trust Assets

The General Unsecured Claims Litigation Trustee shall, in consultation with the Reorganized Debtor, have the exclusive right on behalf of the General Unsecured Claims Litigation Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all General Unsecured Claims Litigation Trust Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided herein or in the General Unsecured Claims Litigation Trust Agreement; *provided*, *however*, that such consultation shall be subject to the execution and delivery of one or more joint interest, common interest, or other similar agreements in form and substance reasonably acceptable to the General Unsecured Claims Litigation Trustee and the Reorganized Debtor. From and after the Effective Date, the General Unsecured Claims Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the General Unsecured Claims Litigation Trust, shall serve as a representative of the Estates and shall, in consultation with the Reorganized Debtor, retain and possess the right to commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action constituting General Unsecured Claims Litigation Trust Causes of Action in any court or other tribunal. The General Unsecured Claims Litigation Trustee shall provide the Reorganized Debtor with periodic reporting relating to the status of the General Unsecured Claims Litigation Trust Causes of Action.

For the avoidance of doubt, the General Unsecured Litigation Trust Assets shall not include any Claim or Cause of Action against a Released Party. Also for the avoidance of doubt, any proceeds of the General Unsecured Claims Litigation Trust shall be distributed Pro Rata to holders of Allowed Class 5B Claims and holders of Allowed Class 5A Claims that do not enter into a New Trade Agreement with the Debtor.

9.    General Unsecured Claims Litigation Trust Fees and Expenses

From and after the Effective Date, the General Unsecured Claims Litigation Trustee, on behalf of the General Unsecured Claims Litigation Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses

incurred by the General Unsecured Claims Litigation Trust and any professionals retained by the General Unsecured Claims Litigation Trust from the General Unsecured Claims Litigation Trust Assets, except as otherwise provided in the General Unsecured Claims Litigation Trust Agreement.

10.     Distribution of Unrestricted Cash

The General Unsecured Claims Litigation Trustee shall distribute to the General Unsecured Claims Litigation Trust Beneficiaries on account of their interests in the General Unsecured Claims Litigation Trust, at least annually, its net income plus all net proceeds from the sale of assets, except that the General Unsecured Claims Litigation Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the General Unsecured Claims Litigation Trust Assets or to satisfy Claims and contingent liabilities or pay anticipated fees and expenses.

11.     General Unsecured Claims Litigation Trust Funding

The funding by the Debtor of the General Unsecured Claims Litigation Trust Payment shall be authorized and approved, as of the Effective Date, in all respects, without need for the consent of or notice to any Person, notwithstanding any contrary provision in any financing and/or other agreement between the Debtor or the Reorganized Debtor and any other Person, and any such contrary provision shall be deemed null and void to the extent necessary to permit such funding.

12.     Distributions to General Unsecured Claims Litigation Trust Beneficiaries

The General Unsecured Claims Litigation Trustee may, in its discretion, distribute any portion of the General Unsecured Claims Litigation Trust Payment to the General Unsecured Claims Litigation Trust Beneficiaries at any time and/or use such funds, provided that such distribution or use is for any purpose permitted under the Plan, the General Unsecured Claims Litigation Trust Agreement, and applicable law.

13.     Cash Investments

The General Unsecured Claims Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, *however*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.     Dissolution of the General Unsecured Claims Litigation Trust

The General Unsecured Claims Litigation Trustee and the General Unsecured Claims Litigation Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the General Unsecured Claims Litigation Trustee determines that the pursuit of additional General Unsecured Claims Litigation Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims, and (b) all distributions of General Unsecured Claims Litigation Trust Distributable Proceeds required to be made by the General Unsecured Claims Litigation Trustee to the General Unsecured Claims Litigation Trust Beneficiaries under the Plan have been made, but in no event shall the General Unsecured Claims Litigation Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension by agreement of the Reorganized Debtor and the General Unsecured Claims Litigation Trustee, at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension

would not adversely affect the status of the General Unsecured Claims Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the General Unsecured Claims Litigation Trust Assets. Upon dissolution of the General Unsecured Claims Litigation Trust, any remaining General Unsecured Claims Litigation Trust Assets shall be distributed first to all General Unsecured Claims Litigation Trust Beneficiaries in accordance with the Plan and the General Unsecured Claims Litigation Trust Agreement as appropriate; *provided*, *however*, that if the General Unsecured Claims Litigation Trustee reasonably determines that such remaining General Unsecured Claims Litigation Trust Assets are insufficient to render a further distribution practicable, or exceed the amounts required to be paid under the Plan, the General Unsecured Claims Litigation Trustee may transfer such remaining funds to a charitable institution qualified as a not-for-profit corporation under applicable federal and state laws selected by the General Unsecured Claims Litigation Trustee.

## E. Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtor, as the Reorganized Debtor, shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan, replaced by the New Organizational Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

## F. Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date all property in the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances, except for Liens securing the Exit Facility, if applicable. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## G. Cancellation of Existing Securities

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtor under the DIP Agreement, the Senior Loan Agreement, the Senior Subordinated Notes, the Seller Notes, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest shall be cancelled solely as to the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any

indebtedness or obligation of the Debtor shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under the Plan. On and after the Effective Date, all duties and responsibilities of the DIP Lender under the DIP Facility and the Senior Lender under the Senior Loan Facility, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

## H.  Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, as applicable:  (1) the issuance of the New Equity; (2) selection of the directors and officers for the Reorganized Debtor; (3) execution and delivery of the Exit Facility Documents; (4) adoption of the Management Incentive Plan; (5) implementation of the restructuring transactions contemplated by this Plan; and (6)  all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or the Reorganized Debtor.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor.  The authorizations and approvals contemplated by this Article 6.H and Article V.H of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

## I.  New Management Incentive Plan

Subject to the terms of the New Management Incentive Plan, a form of which shall be included in the Plan Supplement, as soon as reasonably practicable after the Effective Date, the new board of directors of Reorganized Debtor shall be authorized to adopt the New Management Incentive Plan pursuant to which options, warrants, or another form of consideration to acquire up to 10% of the New Equity of the Reorganized Debtor shall be allocable at the discretion of the New Board of the Reorganized Debtor.

To the extent required under the Plan or applicable nonbankruptcy law, the Reorganized Debtor will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with applicable corporate laws.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtor will prohibit the issuance of non-voting equity securities and provide for the other restrictions required therein.  After the Effective Date, the Reorganized Debtor may amend and restate its New Organizational Documents and other constituent documents as permitted by applicable corporate laws and the New Organizational Documents.

### J. Directors and Officers of the Reorganized Debtor

As of the Effective Date, the term of the current members of the board of directors of the Debtor shall expire, and the initial boards of directors, including the New Board, as well as the officers of the Reorganized Debtor, shall be appointed in accordance with the New Organizational Documents and other constituent documents of the Reorganized Debtor.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial Reorganized Debtor Board, as well as those Persons that will serve as an officer of the Reorganized Debtor. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtor.

### K. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers and members of the New Board, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Equity, in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

In furtherance of the foregoing, any New Organizational Documents which is contractual in nature (such as a stockholders agreement or limited liability company agreement) shall, upon the Effective Date, be deemed to become valid, binding and enforceable in accordance with its terms as to all Persons intended to be bound thereby.

### L. Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### M. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX and Article V.E of the Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. **To the fullest extent permitted by applicable law, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action**

**against it.  The Debtor or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise set forth herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, except to the extent transferred to the General Unsecured Claims Litigation Trust hereunder.  Subject to Article V.D of the Plan, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

## N.     Release of Avoidance Actions

On the Effective Date, except as otherwise set forth in the Plan, in the Plan Supplement, or in the Confirmation Order, the Debtor shall release any and all Avoidance Actions against the Released Parties, the Debtor and the Reorganized Debtor, and any of their successors or assigns and any Entity acting on behalf of the Debtor or the Reorganized Debtor shall be deemed to have waived the right to pursue any and all Avoidance Actions.

## F.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed rejected, other than those that are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases or are the subject of pending motions to assume on the Effective Date.

Entry of the Confirmation Order shall constitute a Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated or set forth in a motion or order relating to the same, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within thirty (30) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection; *provided*, *however*, that any such Rejection Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or property of the foregoing parties, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Court. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as Other General Unsecured Claims and shall be treated in accordance with Article III.C.5 of the Plan, as applicable.

3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Claims under an Executory Contract and Unexpired Lease, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the such Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any Cure Claims, (2) the ability of the Reorganized Debtor or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, payments on Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtor shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtor at least three (3) Business Days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or amount of the Cure Claim in the Cure Notice will be deemed to have assented to such assumption or amount of the Cure Claim. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or the Reorganized Debtor, at the direction of the Senior Lender Affiliate, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or

nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and for which the Cure Claim has been paid shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

4.    Insurance Policies

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, unless otherwise identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtor shall be deemed to have rejected all insurance policies and any agreements, documents, and instruments related thereto.

5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan, or subject to a motion to reject such agreement.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or, after the Effective Date, the Reorganized Debtor shall have twenty-eight (28) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

7.    Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

8.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9.      Deferred Prosecution Agreement

Nothing herein, in the Confirmation Order, or in any other document or order in this Chapter 11 Case shall affect the respective rights and obligations of the United States and the Debtor under the Deferred Prosecution Agreement.  In accordance with the requirement set forth in section 17 of the Deferred Prosecution Agreement, the Debtor obligations under the Deferred Prosecution Agreement shall be binding upon the Reorganized Debtor and the rights and benefits of the Debtor under the Deferred Prosecution Agreement shall bestow to the benefit of the Reorganized Debtor.

# ARTICLE 7.

## VOTING PROCEDURES

**A.      Voting Procedures**

Under the Bankruptcy Code, the only Classes that are entitled to vote to accept or reject a plan are Classes of Claims, or equity Interests, that are Impaired under the plan. Accordingly, Classes of Claims or Interests that are not Impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold Claims in more than one Impaired Class are entitled to vote separately in each Class. Such a creditor will receive a separate ballot for all of its Claims in each Class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a Claim in more than one Class and who has not been provided with sufficient ballots may photocopy the ballot received and File multiple ballots.

Votes on the Plan will be counted only with respect to Claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as Disputed, contingent or unliquidated; or (b) for which a Proof of Claim was Filed on or before the bar date set by the Court for the filing of proofs of Claim (except for certain Claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a Claim will not be counted if such Claim has been Disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such Claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a Claim or Interest in an Impaired Class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a Claim or Interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

## B. Acceptance

The Bankruptcy Code defines acceptance of a plan by an Impaired Class of Claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the Claims of that Class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an Impaired Class of equity Interests as acceptance by holders of at least two-thirds in number of the equity Interests of that Class that actually cast ballots. If no creditor or Interest holder in an Impaired Class votes, then that Class has not accepted the plan.

## C. Confirmation

11 U.S.C. § 1129(a) establishes conditions for the Confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for Confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1. Each Class of Impaired creditors and interests must accept the plan, as described in paragraph B, above.

2. <u>Either</u> each holder of a Claim or Interest in a Class must accept the Plan, <u>or</u> the Plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

## D. Modification

The Debtor reserves the right to modify or withdraw the Plan at any time before Confirmation, subject to 11 U.S.C. § 1127.

## E. Effect of Confirmation

If the Plan is confirmed by the Court:

1. Its terms are binding on the Debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2. Except as provided in the Plan and in 11 U.S.C. § 1141(d):

   a. In the case of a <u>corporation</u> that is reorganizing and continuing business:

      i. All Claims and Interests will be discharged.

      ii. Creditors and shareholders will be prohibited from asserting their Claims against or interests in the Debtor or its assets.

   b. In the case of a <u>corporation</u> that is liquidating and not continuing its business:

      i. Claims and Interests will not be discharged.

44

  ii. Creditors and shareholders will not be prohibited from asserting their Claims against or Interests in the Debtor or its assets.

  c. In the case of an individual or husband and wife:

    i. Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 1141(d). Unless the Court orders otherwise, the discharge will be entered only after completion of plan payments as provided in § 1141(d)(5)(a). It is the usual practice of the Court to close Chapter 11 cases after Confirmation, then the individual Debtor Files a motion to reopen the case for entry of discharge upon completion of plan payments.

    ii. Creditors will be prohibited from asserting their Claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 1141(d).

  See Article 3(A) of this Disclosure Statement to determine which of the above paragraphs applies in this case.

# ARTICLE 8.

## CRAMDOWN AND THE ABSOLUTE PRIORITY RULE

  If one or more of the Impaired Classes of Claims does not accept the Plan, it may nevertheless be confirmed and be binding upon the non-accepting Impaired Class through the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting Impaired Classes.

**A.** **Discriminate Unfairly**

  The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting Class must be treated equally with respect to other Classes of equal rank. The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Existing Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank, and the treatment under the Plan follows the distribution scheme dictated by the Bankruptcy Code.

**B.** **Fair and Equitable Standard**

  This test applies to Classes of different priority and status and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in that Class. As to the treatment that must be afforded to each rejecting Class, the test sets different standards, depending on the type of Claims or Existing Equity Interests in that Class:

  1. <u>Secured Claims</u>

  Each holder of an Impaired Other Secured Claim must either (i) retain its Liens on the property, to the extent of the Allowed amount of its Other Secured Claim, and receive deferred Cash payments having a value, as of the Effective Date, of at least the Allowed amount of the Claim, or (ii) have the right to credit bid the amount of its Claim if its collateral security is sold and retain its Liens against the net proceeds of the sale, or (iii) receive the "indubitable equivalent" of its Allowed Other Secured Claim.

2.    Unsecured Claims.

Either (i) each holder of an Impaired Other General Unsecured Claim must receive or retain under the Plan property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Existing Equity Interests that are junior to the Claims of the dissenting Class must not receive any property under the Plan.

3.    Existing Equity Interests.

Either (i) each Existing Equity Interest holder must receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of the stock and (b) the value of the stock, or (ii) the holders of Interests that are junior to the Existing Equity Interests of the dissenting Class must not receive or retain any property under the Plan.

The Debtor reserves the right to seek Confirmation of the Plan, notwithstanding the rejection of the Plan by any Class entitled to vote. If one or more Classes votes to reject the Plan, the Debtor may request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to the rejecting Class or Classes. The Debtor will seek such a ruling with respect to each Class that is deemed to reject the Plan.

# ARTICLE 9.

## BEST INTERESTS TEST

As described above, the Bankruptcy Code requires that each holder of an Impaired Claim or Existing Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, not less than the value the holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on that date.

The Debtor's liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtor (the "Liquidation Analysis"). The analysis is based on a number of significant assumptions that are described in the Liquidation Analysis attached hereto as **Exhibit C**. The Liquidation Analysis does not purport to be a valuation of the Debtor's assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

In determining whether this test has been satisfied, the Debtor determined the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The Liquidation Analysis estimates the realizable value of the Debtor's assets, in the event the Debtor is liquidated. The gross amount of Cash that would be available for satisfaction of Claims would be the sum of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, including any unencumbered Cash to the extent it exits.

The Debtor then reduced that gross amount by the costs and expenses of the chapter 7 liquidation itself and by such additional administrative and priority Claims that are projected to result from the liquidation of the Debtor under a hypothetical chapter 7 case. Any remaining net Cash would be allocated to creditors and stockholders in strict payment priority in accordance with section 726 of the Bankruptcy Code. Finally, the Debtor compared the present value of those allocations (taking into account the time necessary to accomplish the liquidation) to the value of the property proposed to be distributed under the Plan on the Effective Date.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other Professionals that the trustee might engage for purposes of liquidating the Debtor. Other liquidation costs include the expenses incurred during the Chapter 11 Cases and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other Professionals for the Debtor, as well as other compensation Claims.

The foregoing types of Claims, costs, expenses, fees, and other similar charges that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 Claims.

The Debtor believes that holders of Impaired Claims in each Impaired Class under the Plan are receiving more than what each holder of a Claim in such Class would receive under a chapter 7 liquidation. Indeed, the Debtor believes such Claims would receive less because the Debtor would be less likely to recover the full amount of its account receivables and other receivables, its inventory, and net PP&E under a chapter 7 liquidation scenario. Therefore, under a chapter 7 liquidation, the Senior Lender would be Impaired by approximately 18% and no other Classes of Claims would recognize any recovery, other than the proceeds of Avoidance Actions and Causes of Action. Accordingly, the Interests of the creditors are best served by confirming the Plan and allowing the Debtor to continue in possession to reorganize pursuant to the terms of the Plan, which the Debtor believes would result in the maximize the return to creditors.

## ARTICLE 10.

### FEASIBILITY

The Bankruptcy Code requires that the Bankruptcy Court determine that Confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor. The Debtor believes the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code, as evidenced by the Financial Projections of future performance of the Reorganized Debtor, as set forth in **Exhibit D** to this Disclosure Statement. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan is feasible.

## ARTICLE 11.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) an alternative plan of under chapter 11, (b) dismissal of the case, or (c) conversion of this case to a case under chapter 7 of the Bankruptcy Code.

**A.     Alternative Plan**

The Debtor does not believe that there are any alternative plans. Houlihan's marketing efforts revealed that the Plan, as described herein, enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### B. Liquidation under Chapter 7

If the Plan is not confirmed, the Bankruptcy Case may be converted to a chapter 7 liquidation case. In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor. The proceeds of the liquidation would be distributed to the holders of Claims and Existing Equity Interests in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in a diminution in the value of the Debtor's assets and increased administrative costs to the Estate which would result in significantly less distributions to creditors and an increased delay in distribution.

## ARTICLE 12.

## CERTAIN UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the Bankruptcy Courts. No assurance can be given that the IRS would not assert, or that a Bankruptcy Court would not sustain, a different position than any position discussed herein. This discussion does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtor within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the Exit Facility, or New Equity, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON**

THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

<u>INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE</u>: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor**

1.    <u>Cancellation of Debt and Reduction of Tax Attributes</u>

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Equity) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims will receive New Equity, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Equity. This value cannot be known with certainty until after the Effective Date. The Debtor expects that, subject to the limitations discussed herein, it will be required to make material reductions in its tax attributes.

2.    <u>Limitation of Tax Attributes</u>

The amount of tax attributes that will be available to the Reorganized Debtor at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2012 and 2013; (b) the fair market value of the New Equity; and (c) the amount of COD Income

49

incurred by the Debtor in connection with consummation of the Plan. Following consummation of the Plan, the Debtor anticipates that any remaining NOLs may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtor anticipates that the issuance of the New Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtor for these purposes, and that the Debtor's use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

### a. General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (1) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (2) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently approximately 3.5%. The Section 382 Limitation may be increased to the extent that the Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### b. Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the

change. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtor does not expect to qualify for, or utilize, the 382(l)(5) Exception. However, as mentioned above, if the Debtor does utilize the 382(l)(5) Exception and if another ownership change were to occur within the two-year period after consummation, then the Debtor's Pre-Change Losses would effectively be eliminated.

Because the Debtor does not expect to qualify for or utilize the 382(l)(5) exception, the Debtor expects that its use of the Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtor takes advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtor's use of its Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date. In order to prevent such a subsequent ownership change, the New Certificate of Incorporation of Reorganized Debtors may contain restrictions on trading of New Equity that are intended to prevent such a change. The specific terms of any such restrictions have not yet been determined.

    3.    <u>Alternative Minimum Tax</u>

In general, an alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income ("<u>AMTI</u>") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

**C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims**

    1.    <u>Consequences to Holders of Class 3 Senior Loan Claims</u>

Pursuant to the Plan, each holder of an Allowed Senior Loan Claim will receive such holder's Pro Rata share of the New Equity.

Whether a holder of an Allowed Senior Loan Claim recognizes gain or loss as a result of the exchange of its claim for the New Equity depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Allowed Senior Loan Claim surrendered is treated as a "security" for purposes of the reorganization provisions of the IRC.

    *a.    Treatment of a Debt Instrument as a "Security"*

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The Senior Loan had an initial term of approximately five years. While not free from doubt, the Debtor expects to take the position that the debt underlying the Senior Loan Claims are "securities."

> b.      *Treatment of a Holder of an Allowed Senior Loan Claim if the      Exchange of its Claim is Treated as a Reorganization*

If a debt instrument constituting a surrendered Allowed Senior Loan Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed Senior Loan Claim for the New Equity would be treated as a recapitalization, and therefore a reorganization, under the IRC. In such case, a holder would recognize no gain or loss; *provided*, *however*, that to the extent that a portion of the New Equity received is allocable to accrued but untaxed interest, the holder may recognize ordinary income (see discussion below, "<u>Accrued Interest</u>"). Such holder's tax basis in its New Equity would be equal to the tax basis of the obligation constituting the Allowed Senior Loan Claim surrendered therefor, and a holder's holding period for its New Equity would include the holding period for the obligation constituting the surrendered allowed Senior Loan Claim; *provided* that the tax basis of the New Equity treated as received in satisfaction of accrued but untaxed interest would equal the amount of such accrued but untaxed interest, and the holding period for any such New Equity would not include the holding period of the debt instrument constituting the surrendered allowed Senior Loan Claim.

> c.      *Treatment of a Holder of an Allowed Senior Loan Claim if the Exchange of its Claim is not Treated as a Reorganization*

If a debt instrument constituting a surrendered allowed Senior Loan Claim is not treated as a "security" for U.S. federal income tax purposes, a holder of such a Claim would be treated as exchanging its allowed Senior Loan Claim for the New Equity in a fully taxable exchange. A holder of an Allowed Senior Loan Claim who is subject to this treatment would recognize gain or loss equal to the difference between (1) the fair market value of the New Equity that is not allocable to accrued but untaxed interest, and (2) the holder's adjusted tax basis in the obligation constituting the surrendered allowed Senior Loan Claim. Any such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Senior Loan Claims were held for more than one year by the holder. To the extent that a portion of the New Equity received in the exchange is allocable to accrued interest, the holder may recognize ordinary income. See the discussions of accrued interest and market discount below. A holder's tax basis in the New Equity received in exchange for such holder's Allowed Senior Loan Claims would equal its fair market value. A holder's holding period for the New Equity would begin on the day following the Effective Date.

**The tax consequences of the Plan and to the holders of Allowed Senior Loan Claims are uncertain. Holders of Allowed Senior Loan Claims should consult their tax advisors regarding whether such Claims be treated as "securities" for U.S. federal income tax purposes.**

2.      Consequences to Holders of Class 4 Senior Subordinated Notes Claims

Pursuant to the Plan, each holder of an Allowed Senior Subordinated Notes Claim will receive such holder's Pro Rata share of the New Subordinated Notes and New Warrants.

Whether a holder of an Allowed Senior Subordinated Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Subordinated Notes and New Warrants depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the Senior Subordinated Notes or the New Subordinated Notes are treated as "securities" for purposes of the reorganization provisions of the IRC (see discussion above). The Senior Subordinated Notes had an initial term of five years and the New Subordinated Notes are expected to have a term of five years. While not free from doubt, the Debtor expects to take the position that both the Senior Subordinated Notes and the New Subordinated Notes are "securities."

*a.    Treatment of a Holder of an Allowed Senior Subordinated Notes Claim if the Exchange of its Claim is Treated as a Reorganization*

If both the Senior Subordinated Notes and the New Subordinated Notes are treated as "securities" for U.S. federal income tax purposes, the exchange of a holder's Allowed Senior Subordinated Notes Claim for the New Subordinated Notes and New Warrants would be treated as a recapitalization, and therefore a reorganization, under the IRC. In such case, a holder would recognize no gain or loss, provided that to the extent that a portion of the New Subordinated Notes and New Warrants received is allocable to accrued but untaxed interest such holder may recognize ordinary income (see discussion of "Accrued Interest" below). Such holder's tax basis in its New Warrants and New Subordinated Notes would be equal to the tax basis of the Senior Subordinated Notes surrendered therefor, and such holder's holding period for its New Warrants and New Subordinated Notes would include the holding period for the surrendered Senior Subordinated Notes; *provided* that the tax basis of any New Warrants and New Subordinated Notes treated as received in satisfaction of accrued but untaxed interest would equal the amount of such accrued but untaxed interest, and the holding period for any such New Warrants and New Subordinated Notes would not include the holding period of the surrendered Senior Subordinated Notes.

If the Senior Subordinated Notes are treated as securities but the New Subordinated Notes are not, the exchange of a holder's Allowed Senior Subordinated Notes Claims for the New Subordinated Notes and New Warrants would still be treated as a recapitalization. In such case a holder would still recognize no loss, but would recognize gain to the extent of the issue price of the New Subordinated Notes. As mentioned above, to the extent that a portion of the New Warrants and New Subordinated Notes received is allocable to accrued but untaxed interest such holder may also recognize ordinary income (see discussion of "Accrued Interest" below). Such holder's tax basis in its New Warrants would be equal to the tax basis of the Senior Subordinated Notes surrendered therefor increased by any gain recognized on the exchange and decreased by the issue price of the New Subordinated Notes) and such holder's holding period for its New Warrants would include the holding period for the surrendered Senior Subordinated Notes; *provided* that the tax basis of any New Warrants treated as received in satisfaction of accrued but untaxed interest would equal the amount of such accrued but untaxed interest, and the holding period for any such New Warrants would not include the holding period of the surrendered Senior Subordinated Notes. Such holder's tax basis in the New Subordinated Notes would equal their issue price and such holder's holding period for such New Subordinated Notes would begin on the day following the Effective Date.

*b.    Treatment of a Holder of an Allowed Senior Subordinated Notes Claim if the Exchange of its Claim is not Treated as a Reorganization*

If the Senior Subordinated Notes are not treated as "securities" for U.S. federal income tax purposes, a holder of an Allowed Senior Subordinated Notes Claim would be treated as exchanging its Allowed Senior Subordinated Notes Claim for New Subordinated Notes and New Warrants in a fully taxable exchange. Similarly, even if the Senior Subordinated Notes are treated as securities but the New Subordinated Notes are not and the holder only receives New Subordinated Notes (and no New Warrants), such exchange would be fully taxable. A holder of an allowed Senior Subordinated Notes Claim who is subject to this treatment would recognize gain or loss equal to the difference between (1) the sum of (A) the fair market value of the New Warrants (if any) that are not allocable to accrued but untaxed interest, and (B) the issue price of the New Subordinated Notes that are not allocable to accrued but untaxed interest, and (2) the holder's adjusted tax basis in the Senior Subordinated Notes. Any such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Senior Subordinated Notes were held for more than one year by the holder. To the extent that a portion of the New Subordinated Notes or New Warrants received in the exchange is allocable to accrued interest, the holder may recognize ordinary income. See the discussions of accrued interest and market discount below. A holder's tax basis in any New Warrants received in the exchange would equal their fair market value, and such holder's tax basis in any New Warrants received in the exchange would equal their issue price. A holder's holding period for both the New Subordinated Notes and the New Warrants would begin on the day following the Effective Date.

**The tax consequences of the Plan and to the holders of Allowed Senior Subordinated Note Claims are uncertain. Holders of allowed Senior Subordinated Note Claims should consult their tax advisors regarding whether such Claims be treated as "securities" for U.S. federal income tax purposes.**

3. <u>Consequences to Holders of Class 5A Trade Claims, Class 5D Unsecured Convenience Class Claims and Certain Class 5B Class Action Litigation Claims</u>

Pursuant to the Plan, each holder of an Allowed Class 5B Class Action Litigation Claim that executes the Restructuring Support Agreement and reaches an appropriate settlement with the Debtor, and each holder of an Allowed Class 5A Trade Claim or an Allowed Class 5D Unsecured Convenience Class Claim will receive Cash in exchange for such holder's Claim. Holders of such Claims would recognize gain or loss equal to the difference between (1) the amount of such Cash, and (2) the holder's adjusted tax basis in such Claim. The character of such gain or loss as capital or ordinary will depend on whether or not the Holder of such Claims holds the Claim as a capital asset.

A portion of the Cash received by holders of Class 5A Trade Claims may be received over a period of up to eighteen months and as a consequence may be treated in part as a payment of interest. Holders of Class 5A Trade Claims should consult their tax advisors as to whether and to what extent a portion of the Cash received over time may be treated as the payment of interest.

4. <u>Consequences to Holders of Class 5C Other General Unsecured Claims and Certain Class 5B Class Action Litigation Claims</u>

Pursuant to the Plan, each holder of an Allowed Class 5C Other General Unsecured Claim and each holder of an Allowed Class 5B Class Action Litigation Claim that does not execute the Restructuring Support Agreement or reach an appropriate settlement with the Debtor, and each holder of an Allowed Class 5C Other General Unsecured Claim will receive interest in the Litigation Trust in exchange for such Holder's Claim. A Holder of such a Claim would be treated as exchanging its Claim for Litigation Trust interests in a fully taxable exchange. A holder of a Claim who is subject to this treatment would recognize gain or loss equal to the difference between (1) the fair market value of the Litigation Trust interests received in exchange for such holder's Claim, and (2) the holder's adjusted tax

basis in the obligation constituting the surrendered Claim. Any such gain should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the holder. To the extent that a portion of the Litigation Trust interests received in the exchange is allocable to accrued interest, the holder may recognize ordinary income. See the discussions of accrued interest and market discount below. A holder's tax basis in the Litigation Trust interests received in exchange for such holder's Claims would equal their fair market value. A holder's holding period for such Litigation Trust interests would begin on the day following the Effective Date. See discussion of Receipt of Interests in Litigation Trust, below.

It is plausible that a holder receiving the Litigation Trust interests could treat the transaction as an "open" transaction for United States federal tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the proceeds ultimately received from the Litigation Trust. The United States federal income tax consequences of an open transaction are uncertain and highly complex, and a holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

5. <u>Accrued Interest</u>

To the extent that any amount received by a holder of a surrendered allowed claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the holder's gross income, such amount will be taxable to the holder as ordinary interest income. Conversely, a holder of a surrendered allowed claim will generally recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the holder's gross income but was not paid in full by the Debtor.

The extent to which the consideration received by a holder of a surrendered allowed claim will be attributable to accrued interest on the debts constituting the surrendered allowed claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed claims will be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a Bankruptcy Court with respect to the appropriate tax treatment for creditors.

6. <u>Market Discount</u>

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition (determined as described above) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### D.  Receipt of Interests in the Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation section 301.7701-4(d) and related regulations, the Debtor believes that the Trustee of the Litigation Trust intends to take a position on the Litigation Trust's tax return that the Litigation Trust should be treated as a grantor trust set up for the benefit of the Litigation Trust Beneficiaries. Holders of Allowed General Unsecured Claims that receive a beneficial interest in the Litigation Trust in exchange for such Claims will be treated for United States federal income tax purposes as receiving their Pro Rata shares of the Litigation Trust Assets from the Debtor in a taxable exchange and then depositing them in the Litigation Trust in exchange for beneficial interests in the Litigation Trust.  Any Litigation Trust Assets originally held by such holder and contributed directly to the Litigation Trust by such Holders would not be part of taxable exchange. Holders of Allowed General Unsecured Claims that receive a beneficial interest in the Litigation Trust will be required to report on their United States federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust.  Holders of Allowed General Unsecured Claims that receive a beneficial interest in the Litigation Trust are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Litigation Trust.

### E.  Withholding and Reporting

The Debtor will withhold all amounts required by law to be withheld from payments of interest. The Debtor will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE 13.

### VOTING INSTRUCTIONS

**A.    How to Vote**

Each holder of a Claim in a voting Class should read this Disclosure Statement, together with the Plan and other exhibits hereto, in their entirety.  After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the ballot, including indicating your vote thereon with respect to the Plan, and return it as provided below.

If you are a member of a voting Class and did not receive a ballot, if your ballot is damaged or lost, or if you have any questions concerning voting procedures, please call Judy O'Neill or Tamar Dolcourt, counsel for the Debtor, at (313) 234-7113 or (313) 234-7161, respectively, or the Debtor's Notice and Claims Agent, at (877) 725-7539 for calls from within the United States or Canada, or (424) 236-7247, for international calls.

YOU SHOULD COMPLETE AND SIGN THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW.  IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN 4:00 P.M., PREVAILING PACIFIC TIME, ON THE BALLOT DATE DEADLINE OF [              ], 2013, UNLESS SUCH DEADLINE IS EXTENDED BY COURT ORDER.

All ballots should be returned and delivered by first class U.S. mail or delivered by messenger or overnight courier, ballots sent by facsimile, telecopy, or e-mail will not be accepted.  Ballots must be received on or before the ballot deadline by the Debtor's Notice and Claims Agent follows:

> **Groeb Farms Claims Processing Center**
> **c/o KCC**
> **2335 Alaska Ave.**
> **El Segundo, CA 90245**

As the holder of an Allowed Claim in the voting Classes, your vote on the Plan is extremely important.  In order for the Plan to be accepted and thereafter confirmed by the Court without resorting to the "cram-down" provisions of Section 1129(b) of the Bankruptcy Code as to other Classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each Impaired Class of Claims that are voting must be cast for the acceptance of the Plan.  The Debtor is soliciting acceptances only from members of the voting Classes.  You may be contacted with regard to your vote on the Plan.

57

## B. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on Confirmation of a Plan. The Bankruptcy Court has ordered the hearing on Confirmation of the Plan will begin at [     ] (prevailing Eastern Time) before the Honorable [ ], United States Bankruptcy Judge, at the U.S. Bankruptcy Court for the Eastern District of Michigan located at Courtroom [_  _], 211 West Fort Street Bldg., Detroit, MI 48226. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

The Plan will not constitute a valid and binding contract between the Debtor and its Creditors unless and until the Bankruptcy Court has issued a Final Order confirming the Plan. The Bankruptcy Court must hold a Confirmation Hearing before deciding whether to confirm the Plan.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of a Plan. Any objection to Confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of Claims or Existing Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefore, and must be Filed with the Bankruptcy Court, together with proof of service thereof, and served upon and received no later than [     ] (prevailing Eastern Time) on [            ], by counsel for the Debtor, Judy O'Neill, Foley & Lardner, LLP, One Detroit Center, 500 Woodward Ave., Suite 2700, Detroit, MI 48226-3489. Notice of any objection must also be served on the Office of the United States Trustee, counsel for the Senior Lender Affiliate, Ray Schrock, P.C., Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022.

Unless an objection to Confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

# ARTICLE 14.

## SUMMARY, RECOMMENDATION, AND CONCLUSION

The Debtor believes that the Plan is in the best interests of all holders of Claims, even though holders of Claims in Class 3, Class 4, Class 5A, and Class 5B may not be paid in full. In the event of a liquidation of the Debtor's Assets under chapter 7 of the Bankruptcy Code, the Debtor believes that holders of Claims in these Classes and other Classes would receive less than they would under the Plan. For these reasons, the Debtor urges that the Plan is in the best interests of all holders of Claims and that the Plan be accepted.

58

Respectfully submitted, as of the first date set forth above,

**GROEB FARMS, INC.**

By: /s/ Draft
Name:  Rolf Richter
Title:    President and CEO of Groeb Farms, Inc.